UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

*UNDER SEAL*

18-4

In re: Grand Jury Subpoena,      )
                                 )      OMNIBUS
CHELSEA MANNING,                 )      MOTION TO QUASH
                                 )      GRAND JURY SUBPOENA
            Subpoenaed Party.    )
                                 )      1: 19DM3
_____  )      10GJ3793

### STATEMENT OF MOTION

Comes now Chelsea Manning, by and through counsel, and pursuant to the First, Fourth,

and Fifth Amendments to the United States Constitution, hereby moves this court to quash the

subpoena *ad testificandum* summoning her to testify before a federal grand jury in this district.

For reasons set forth herein, if enforced the subpoena 1) will violate Ms. Manning's Fifth

Amendment right against compelled self incrimination and Double Jeopardy, 2) will violate her

First Amendment right to Freedom of Association and Freedom of Speech 3) is an abuse of the

grand jury process and 4) is a product of illegal electronic surveillance.

Ms. Manning further requests disclosure of any ministerial documents relevant to the

instant grand jury and any prior statements of Ms. Manning in the possession of the government.

Ms. Manning states the following in support of these requests:

### STATEMENT OF FACTS

The movant Chelsea Manning has been and is recognized world-wide as a champion of

the Free Press and open government. In 2013, Ms. Manning, then an all-source intelligence

analyst for the U.S. military, was convicted at a United States Army court martial for disclosing

classified information to the public. She was sentenced to thirty-five years imprisonment and a

dishonorable discharge.  She was confined under onerous conditions, including but not limited to prolonged solitary confinement.  In 2017 her sentence was commuted by then-President Barack Obama.  However, her appeal from that conviction remains pending and Ms. Manning may be subject to military re-call.

Following her release Ms. Manning has continued to be outspoken in her defense of First Amendment freedoms, for the rights of transgender persons, and against some United States government policies.  The current administration has made clear its views of Ms. Manning and her release. The President of the United States himself tweeted that Ms. Manning "should never have been released." The Central Intelligence Agency tweeted a letter written on CIA letterhead, in which then-CIA director, and now Secretary of State Mike Pompeo effectively convinced Harvard University to withdraw a fellowship that she had been awarded by their students. See @RealDonaldTrump tweet of January 26, 2017, and the September 14, 2017 tweet from @CIA Twitter account. Based on the explicit statements of this administration, Ms. Manning reasonably believes that the current administration is unhappy with her release, and seeks to punish her further by using any means at their disposal to incarcerate her. She reasonably fears that despite living a law-abiding life, the government is subjecting her to physical and electronic surveillance (see Declaration of Chelsea Manning) and other intrusions.  The instant subpoena is part of that process.

On February 5, 2019, Chelsea Manning was served through counsel with a subpoena *ad testificandum* ordering her to appear before a grand jury empaneled in this district. The appearance is now scheduled for March 5, 2019.

Secrecy is the defining feature of grand jury proceedings, and Federal Rule of Criminal Procedure 6(e) mandates that information presented to this grand jury is protected against public disclosure[1], absent a compelling need. While the subject of this grand jury's investigation is not publicly known, it almost certainly involves a complex of people, events, and disclosures with which Ms. Manning was briefly associated, and for her involvement with which she has been held accountable.

While it is our understanding that an immunity order has been secured, the subpoena will nonetheless violate Ms. Manning's Fifth Amendment rights. The appeal of her court martial remains pending. It is unclear that the immunity order would be effective as to that proceeding, which, as a function of the military, falls outside the jurisdiction of the Department of Justice. It is likewise unclear whether the military might attempt to assert jurisdiction over her, and while she would reserve the right to resist such an assertion, the jeopardy in which she might be placed were she to cooperate with this proceeding is very real. Additionally, the threat of foreign prosecution, unaffected by an immunity order, incentivizes disobedience with even perfectly immunized testimony.

Ms. Manning possesses no material information not already disclosed to the government. Ms. Manning herself gave robust testimony about her own relationship to the 2010 public disclosures during her court martial proceeding. At that time, the military, in consultation with the Department of Justice, cross-examined her and elicited testimony from her. Following that testimony she was confined and monitored, and since her release she has gained no further personal knowledge of any relevant people or events. Moreover, this constellation of digital

---

[1] Unlike attorneys and grand jurors, witnesses before grand juries are less constrained by this secrecy, as it is intended largely for their own protection.

media leaks and those associated with them have been obsessively studied, reported upon, and investigated by scholars, journalists, and governments around the world since at least 2010. Indeed, it is known that the federal investigation into these disclosures has involved information-gathering, testimony both voluntary and compelled, and both overt and covert surveillance for many years. There is little doubt that the prosecutor and this grand jury have access to a great deal of both public and non-public information on these matters, including, but far exceeding Ms. Manning's prior sworn testimony.

Ms. Manning has no knowledge of or information to offer about any other federal offense, and therefore no relevant testimony to offer to any investigative grand jury. The government is seeking Ms. Manning's testimony nearly a decade later despite the fact that it has unfettered access to hundreds of thousands of pages of documentary evidence and the sworn testimony of ninety witnesses (including Ms. Manning herself) presented in 2013 and found by a military judge to constitute proof beyond a reasonable doubt of Ms. Manning's central role in the 2010 disclosures. Ms. Manning cannot give the government or this grand jury information anywhere near the quality and quantity of that presented at her court martial in 2013. The government's interest in relying on anything other than the evidence acquired closest in time to the events purportedly under investigation gives rise to a legitimate concern that the instant subpoena was not motivated by the government's desire to discover information concerning possible violations of federal law.

There is a long and well-documented history of grand jury abuse. The grand jury system is enshrouded in secrecy and is, by its very nature, susceptible to abuse and impermissible government overreach. See, e.g., Mark Kadish, *Behind the Locked Door of An American Grand*

*Jury: Its History, Its Secrecy, and Its Process,* 24 Fla. St. U. L. Rev. 1 (1996); Michael Deutsch,

*The Improper Use of the Federal Grand July: An Instrument for the Internment of Political*

*Activists,* 75 J. Crim. L. & Criminology 1159 (1984). As a consequence of grand jury secrecy,

neither the courts, nor Congress, nor - most importantly - the public, can gauge how the

institution is being used - or abused, as the case may be. Marvin E. Frankel & Gary P. Naftalis,

*The Grand Jury: An Institution on Trial* 125 (1977).

Given this history, Ms. Manning has reason to believe that she will be subject to

questions intended to elicit information not properly within the scope of the grand jury, and that

questioning rather will focus on activities protected by the First Amendment such as news

gathering and other forms of protected speech and associations. Indeed, the mere issuance  of

this subpoena is already serving to chill her exercise of constitutional rights.

Notwithstanding the purported legitimacy of this grand jury investigation generally, Ms.

Manning fears the subpoena directed toward her may have issued in other than good faith. The

exhaustive and complex testimony in the court martial proceedings to which the government has

always had unrestricted access raises the inference that this subpoena has issued for the primary

purpose of coercing perjury or contempt, although she vigorously disputes that she has ever been

anything but truthful in her prior statements.  Whether issued in violation of the first amendment

or in bad faith, whether as a means of undermining her credibility, creating a perjury trap, or

coercing contempt, the subpoena must be quashed.

The subpoena should also be quashed because Ms. Manning has reason to believe that

she and those around her have been subject to unlawful electronic surveillance in violation of her

Fourth Amendment rights and other statutory prohibitions on such surveillance. See declaration

of Chelsea Manning, attached. During her time in prison, Ms. Manning was of course subject to routine observation. Since her release, Ms. Manning has experienced all manner of intrusive surveillance, including surveillance vans parked outside her apartment, federal agents following her, and strangers attempting to goad her into an absurdly contrived conversation about selling dual-use technologies to foreign actors.

Given Ms. Manning's notoriety it is likely that the grand jurors themselves harbor a bias against her. Her name and face are widely recognizable, and are likely well-known to all in the pool of potential grand jurors for the Eastern District of Virginia, which includes people who are more than usually likely to be connected with the intelligence community of which she was once a part. Due to her political notoriety, as well as her recent gender transition, she fears she will be subject to harms stemming from the grand jurors' preconceived notions and prejudices.

Ms. Manning believes this entire subpoena has been propounded unnecessarily, possibly in retaliation for her recent release from prison, and in violation of her First, Fourth, Fifth, and Sixth Amendment rights, and other statutory rights, such as would excuse her grand jury testimony. These concerns are magnified given not only the history of grand jury abuses, but the degree to which she personally has been subject to political harassment, oppression and demonization by certain forces within the government.

Ms. Manning therefore moves this court to quash the subpoena; to direct the government to canvass federal agencies to determine whether any electronic surveillance has been conducted and either affirm or deny that such surveillance has taken place; for disclosure of ministerial documents; for the right to instruct the grand jury; for disclosure of any prior statements relevant

to the questions propounded by the prosecution, and for all other and further relief as this court deems just and proper.

## ARGUMENT

### A.   NOTWITHSTANDING ANY IMMUNITY ORDER, THE SUBPOENA EXPOSES MS. MANNING TO JEOPARDY WITH RESPECT TO HER ONGOING MILITARY CASE AND POSSIBLE FOREIGN PROSECUTION

The grand jury subpoena should be quashed because Ms. Manning is still subject to military criminal jurisdiction. Thus any statements or testimony given in the grand jury proceeding could subject her to a court-martial, other military discipline, or prejudice her ongoing military appeal.[2] Accordingly the subpoena must be quashed as enforcement will violate her Fifth Amendment right against self incrimination.

The Fifth Amendment right against self-incrimination applies to the ongoing court-martial appeal, and obviously to any future military criminal investigations or actions. "The privilege against self-incrimination may be invoked when a 'witness has reasonable cause to apprehend danger' that he will implicate himself in a criminal offense by answering a question. *United States v. Villines*, 13 M.J. 46, 52 (C.M.A. 1982) (quoting *Hoffman v. United States*, 341 U.S. 479, 486). The *Villines* case is poignant because the military defendant in that case had been compelled to testify as a co-conspirator witness after he had already been convicted but while his appeal was pending. The court refused to compel him to testify because of the possibility that any statements he made as a witness could be used at a re-trial.

This logic holds true in Ms. Manning's case. Ms. Manning's case is presently on appeal. Depending on the outcome of the appeal the case could be sent back to the lower court for

---

[2] Ms. Manning reserves the right to contest an assertion of military jurisdiction.

further proceedings. In those proceedings, the military prosecutor would have access to, and likely seek to use, any testimony given by Ms. Manning before the grand jury. Alternatively, the military could drum up an entirely new prosecution since Ms. Manning may yet be subject to military jurisdiction.

The facts and circumstances of this case are unusual because of Ms. Manning's status in the military. It is well-known that Ms. Manning was convicted at an Army court-martial in 2013 for disclosing classified information the public through a number of different news sources. She was sentenced to thirty-five years imprisonment and a dishonorable discharge. In 2017 President Barack Obama commuted the sentence to time served.

Because the commutation did not affect the conviction, Ms. Manning's case is presently on appeal in the United States Court of Appeals for the Armed Forces, an Article I appellate court that hears military appeals. Under Article 76a of the Uniform Code of Military Justice (UCMJ), the military may retain jurisdiction over a servicemember while his or her appeal is pending. See 10 U.S.C. § 876a. To effectuate Article 76a, UCMJ, the military typically places servicemembers who have been punitively discharged at a court-martial (i.e., a dishonorable or bad conduct discharge) on *involuntary appellate leave* pending the conclusion of the appeal. Ms. Manning, who was dishonorably discharged, was placed on involuntary appellate leave after she was released from military prison pursuant to President Obama's commutation order.

"Although a person on involuntary appellate leave remains subject to military jurisdiction and possible recall, the individual returns to civilian life throughout the period of leave." *United States v. Pena*, 64 M.J. 259, 267 (C.A.A.F. 2007). If a servicemember violates the UCMJ while on involuntary appellate leave he or she may be court-martialed for offenses that are service-connected. See, *e.g.*, *United States v. Ray*, 24 M.J. 657 (A.F.C.M.R. 1987) (holding that a

servicemember who was on involuntary appellate leave could be prosecuted for distributing cocaine to a servicemember).

The threat of a military prosecution is real. President Obama's decision to commute Ms. Manning's sentence was not well-received by some military leaders and influencers. President Trump, in fact, tweeted on January 26, 2017 that Ms. Manning "should never have been released from prison." See https://twitter.com/realDonaldTrump/status/824573698774601729, *last visited* February 28, 2019. The prosecution has revealed very little about the nature of the grand jury or the questions Ms. Manning may be asked. At most we know that the grand jury probably relates to the 2010 disclosures, and related people and organizations. And despite repeated requests by Ms. Manning's legal team for information about the nature of the expected grand jury questions, the prosecutor has only generally revealed that he believes some of Ms. Manning's statements at the court-martial were either false or mistaken, and that the grand jury would benefit from hearing more details about Ms. Manning's contacts and communications with respect to the 2010 disclosures. Given the prosecutor's unwillingness to disclose information to Ms. Manning that would help her evaluate the risks of testifying, she must assume that the grand jury is a "perjury trap" or even worse, a subterfuge for another military prosecution.

Granting Ms. Manning immunity in the federal grand jury context will not shield her from prosecution by the military. In the military only a general court-martial convening authority (i.e., a military commander who is sufficiently high-ranking and who has command over the subject servicemember) can grant immunity from prosecution at a court-martial. See Rules for Court-Martial (RCM) 704. It would be wholly unfair to compel Ms. Manning to testify before the grand jury based on the limited protection of the grand jury immunity order.

Nor can it be argued that Ms. Manning's grand jury testimony will be kept secret from

the military. Rule 6(3)(A) of the Federal Rules of Criminal Procedure permits the disclosure of grand-jury information when a government attorney believes it is "necessary to assist in performing that attorney's duty to enforce federal criminal law." If Ms. Manning is compelled to testify in the grand jury proceeding it is foreseeable the prosecution could pass along her testimony to the military to assess whether criminal charges that are otherwise precluded from federal prosecution could be brought at a court-martial.

As a last note, Ms. Manning has reason to fear foreign prosecution, from which she is not shielded by any U.S. issued immunity agreement. United States v Balsys, 524 US 666, (1998). This exposes her to the dilemma of choosing between domestic contempt, or foreign prosecution. The failure of the law to accommodate this conundrum creates a regrettable and perverse incentive for refusal to give even immunized testimony.

For these reasons the grand jury subpoena should be quashed.

B.    THE SUBPOENA WILL IMPERMISSIBLY INTRUDE UPON CONSTITUTIONALLY PROTECTED EXPRESSIVE AND ASSOCIATIONAL RIGHTS

During her court martial, Ms. Manning gave expansive testimony about her role in and knowledge of events and actors relevant to disclosing information on "asymmetric warfare" to the public. She was exhaustive and truthful in her testimony, and after her own statements, she was subject to further questioning by the government. United States v. Manning, U.S. Army 1st Judicial Circuit, Colonel Lind Presiding (2013), transcript at pp. 6705-6918; Appellate Exhibit 499, 34 page, single-spaced Statement of PFC Manning. Nothing further is to be gained by compelling her to answer yet more questions about these subjects. Ms. Manning has no undisclosed knowledge relevant or material to an investigation of any other federal offense.

In the event that the government seeks information about which she has *not* already given

testimony, Ms. Manning must assume that such questions involve her own or other peoples'

lawful and constitutionally protected activities, associations, and expressions. It has long been

held that the First Amendment *does* apply to grand jury proceedings. Compelled disclosure "can

seriously infringe on privacy of association and belief guaranteed by the First Amendment."

Hispanic Leadership Fund, Inc. v Fed. Election Com'n, 897 F Supp. 2d 407, 420 (E.D. Va. 2012);

Buckley v. Valeo, 424 U.S. 1, 64 (1976); Gibson v. Florida Legislative Comm., 372 U.S. 539

(1963); N.A.A.C.P. v. Button, 371 U.S. 415 (1963); Shelton v. Tucker, 364 U.S. 479 (1960);

N.A.A.C.P. v. Alabama, 357 U.S. 449 (1957). Because of the possible "chilling effect" such

compelled disclosure may have on protected rights, the government's request for such disclosure

must survive "exacting scrutiny." Buckley v. Valeo, *supra*, N.A.A.C.P. v. Alabama, at 463;

Weiman v. Updegraff, 344 U.S. 183 (1952). In the event that a viable First Amendment claim is

made, it is the government's burden to show that its interests in disclosure are both legitimate

and compelling, and that there is a "relevant correlation" between the government's interest and

the precise information to be disclosed. "The public's undoubted "right to every man's evidence,"

does not give government, for example, 'an unlimited right of access to [private parties'] papers

with reference to the possible existence of [illegal] practices.'." In re Grand Jury Subpoena:

Subpoena Duces Tecum, 829 F2d 1291, 1297 (4th Cir 1987) internal citations omitted;

Brown v. Hartlage, 456 U.S. 45 (1982); Buckley v. Valeo, *supra*, at 64; DeGregory v. Attorney

General, 383 U.S. 825 (1966); Gibson v. Florida Legislative Comm., *supra*; In re First National

Bank, Englewood, Colo., 701 F.2d 115 (10th Cir. 1983) (grand jury proceedings); Smilow v.

United States, 465 F.2d 802 (2d Cir. 1973); Bursey v. United States, 466 F.2d 1059 (9th Cir.

1972).

First, there is a likelihood that this grand jury to be used expressly to disrupt the integrity

of the journalistic process by exposing journalists to a kind of accessorial liability for leaks

attributable to independently-acting journalistic sources. This administration has been quite

publicly hostile to the press, and there is reason to believe that this grand jury may function to

interfere profoundly with the operation of a free press. As the Court stated in Branzburg v.

Hayes, "Official harassment of the press undertaken not for purposes of law enforcement, but to

disrupt a reporter's relationship with his news sources would have no justification." 408 U.S.

665, 707-08 (1973).

In addition to concerns about the implications of this subpoena for journalism generally if

Ms. Manning testifies, she fears that she may be compelled to disclose protected information

about lawful First Amendment protected associations and activities. This is particularly troubling

where, as here, she might be called upon to divulge names and political affiliations, despite

having no information legitimately necessary for purposes of investigating crime. Ms. Manning

objects on First Amendment grounds to the subpoena in its entirety, and in any event reserves the

right to object to individual questions on the same grounds.

While this circuit has left the "First Amendment versus Grand Jury dilemma" for another

day, the Ninth Circuit's test for objecting to potential First Amendment violations in the context

of specific grand jury questions is instructive. See In re Grand Jury 87-3 Subpoena Duces Tecum,

955 F2d 229, 234 (4th Cir 1992); Bursey v. United States, *supra*. According to Bursey, where

First Amendment interests are threatened by grand jury questions, the government must establish

that their interest is "immediate, substantial, and subordinating;" that there is a "substantial connection between the information it seeks... and the overriding government interest in the subject matter:" and that the use of the grand jury to compel the desired testimony is "not more drastic than necessary to forward the asserted governmental interest." Bursey at 1083.

This test will likely be relevant for Ms. Manning, in the event that the government wishes to inquire into her recent, lawful, and constitutionally protected political activities. Since her release, Ms. Manning has been an active and public participant in lawful community organizing against prosecutorial overreach, and rising neofascism, as well as running as a candidate for elected office. Ms. Manning is acutely aware that her public political activity has displeased the current government, including those holding immense executive power. She is aware that the community activities in which she has been involved have been subject to physical and electronic surveillance. She is also aware that as a result of her participation in this activity, she herself has been subject to physical and electronic surveillance. She believes one goal of this surveillance is to chill her exercise of constitutionally protected activity.

While the first amendment imposes constraints on the state's exercise of power to punish a person for their political ideals or associations, the subpoena power has in the past been used as an end run around the first amendment's promise. Gibson v. Florida Legislative Comm., *supra;* N.A.A.C.P. v. Alabama, *supra;* Bursey, *supra,* at 1084; In re Verplank, 329 F.Supp. 433 (C.D. Cal. 1971). By issuing a grand jury subpoena, the government may inquire into aspects of a witness' knowledge, life, beliefs, and associations, in ways that would not otherwise be permissible. The subpoena may not be issued in bad faith, with the primary intent to go on a "fishing expedition." A subpoena issued for purposes of gathering information about protected

activities and associations, or for purposes of discouraging protected activities and associations, is infirm, and must be quashed. Furthermore, individual questions that are clearly irrelevant to the investigation being conducted, and that infringe upon specifically political associational rights, fall afoul of the First Amendment, and must be disallowed. Ealy v. Littlejohn, 569 F.2d 219 (5th Cir. 1978), United States v (Under Seal), (stating that "practices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden") 714 F2d 347, 349 (4th Cir. 1983).

Ms. Manning's concerns about the use of this particular Grand Jury subpoena as a mechanism for fishing into her protected political activity or simply to harass her are not the narcissistic paranoia of a naive activist. The history of the use of grand juries to gather intelligence on or quell political dissent is well-documented, and grand juries are particularly susceptible to overreach.

Almost none of the procedural protections guaranteed to defendants in criminal trials are available during grand jury proceedings, a practice that runs counter to the purpose of the grand jury to act as a check on the executive's prosecutorial power. The enormous discretion held by prosecuting authorities in the United States allows them to use the law for political and other ends. Norman Dorsen & Leon Friedman, *Disorder in the Court: Report of the Association of the Bar of the City of New York Special Committee on Courtroom Conduct,* 170 (1973). Historically, the grand jury system was used to indict outspoken opponents of slavery for sedition, and then to harass and indict black people and Reconstruction officials attempting to gain suffrage. Richard D. Younger, *The People's Panel: The Grand Jury in the United States,* 163-1974, 85-133 (1963).

In the mid-20th century, the grand jury system was improperly used to frame labor organizers and union leaders. Deutsch, *supra,* at 1171-73, 1175-78. During the Nixon

administration, over one thousand political activists were subpoenaed to more than one hundred grand juries investigating lawful anti-war, women's rights, and black activist movements. *Id.* at 1179.

In 2012, the FBI issued 14 grand jury subpoenas to activists after the 2008 Republican National Convention in Minneapolis, MN, and proceeded to question them without ever issuing any indictments. The same year, a grand jury ostensibly investigating property damage at a demonstration asked activist Katherine Olejnik more than 50 questions about people's political beliefs and their relationships. The government did not question her about criminal conduct *as they knew she had no knowledge of the crimes they were supposed to be investigating.* In 2013, 23 year old Gerald Koch was summoned before a grand jury on the purported basis that he might have overheard a discussion in 2009 about some high profile property damage that had occurred in 2008. This culminated in his eight-month confinement on civil contempt, and cast a palpable chill over the political activities of New York City activists. In 2017, anti-pipeline activist Steve Martinez was subpoenaed to appear before a grand jury in North Dakota to testify about an injury law enforcement had caused to a young activist. The prosecution asked no questions at all about unlawful conduct or the relevant injury.

The government, and especially this administration, has shown unambiguously their hostility to political dissidents, and their willingness to treat certain political beliefs and associations as functionally criminal. In sum, there is a clear and uninterrupted history of the government misusing and abusing the grand jury apparatus. From COINTELPRO to the PATRIOT ACT, and the revelations of the scope and nature of the NSA's data collection on ordinary citizens, the history of government intrusion into activities that are not only constitutionally protected, but politically *valuable*, is historically consistent, and demonstrably true. There is no reasonable dispute that this kind of targeted retaliation occurs; it is in fact so

relevant to this particular witness that to fail to raise it as a possibility would be a dereliction of counsel's professional obligations.

Ms. Manning is not simply aware of surveillance, she is in fact, and as the government well knows, uniquely equipped to identify it. There is simply no doubt that she has been the subject of keen and intrusive observation efforts by the government. Her belief that this subpoena could be used to investigate constitutionally protected activity is consistent not only with the long history of grand jury abuse detailed above, but her own experience of government surveillance and disruption.

Furthermore, such intrusion, rather than being based on a reasonable belief that Ms. Manning is engaging in unlawful conduct, is likely a retaliatory move stemming from the government's publicly expressed frustration at her release. While the government may not have any good faith belief that she has knowledge of a federal crime, they may well be interested in inquiring into whether she has any knowledge of people, relationships, and strategies relative to political and activist communities. Relief from this subpoena is therefore justified, inasmuch as it has issued with the knowledge that it will chill political speech and association among Ms. Mannings community members and intrude upon the ability of this nation to maintain a free and open press.

Investigations or individual subpoenas that concern matters of journalism and political activities and associations, are subject to First Amendment limitations. Given that Ms. Manning is not possessed of any information not already disclosed during her trial that could be of use to any federal criminal investigation, any information she is in a position to give would likely touch on first amendment protected activities and associations. Such information is protected by the

first amendment so as to excuse her from answering questions related to those subjects. The case before Your Honor is highly suspect and should be put to the utmost judicial scrutiny.

C.    THE SUBPOENA IMPERMISSIBLY SEEKS TO COMPEL TESTIMONY FOR AN IMPROPER PURPOSE, AND IS AN ABUSE OF THE GRAND JURY PROCESS

The grand jury satisfies an investigative function, specifically to investigate federal crimes. While this grand jury has presumably convened to investigate a possible federal offense, Given Ms. Manning's history, discussed *supra*, she reasonably fears that the reason she specifically has been summoned falls outside the recognized boundaries of the grand jury's legitimate investigative function.

Ms. Manning, having already given thorough and truthful testimony about the subjects that might be properly investigated by this grand jury, fears that this subpoena will instead be used to compel testimony about other subjects, including subjects unrelated to any federal crime. As detailed above, there is a distinct possibility that her testimony before this grand jury could be used to harass her, intimidate her or chill her political speech and associations.

Additionally, in light of the vitriol directed at her by arguably the most powerful human being on Earth, it is not unreasonable for her to fear that this subpoena may be motivated by the government's desire to find a way to manufacture a case against her, by coercing perjury or contempt, neither of which are forestalled by an immunity order. Because she has already given exhaustive testimony, it is entirely possible that efforts at repeated questioning are intended or designed to "coax [her] into the commission of perjury or contempt, [and] such conduct would be an abuse of the grand jury process." Bursey v. United States, 466 F.2d 1059, 1080 n.10 (9th Cir. 1972); United States v. Caputo, 633 F.Supp 1479 (E.D. Pa. 1986); United States v. Simone,

627 F. Supp. 1264 (D.N.J. 1986); People v. Tyler, 413 N.Y.S.2d 295 (1978). See also Gershman,

The "Perjury Trap" 192 U. Pa. L. Rev. 624 (1981).

Furthermore, it is possible that this subpoena represents an effort on the part of the FBI or

another investigative agency in collaboration with government prosecutors to compel by grand

jury process testimony that would otherwise be inaccessible. United States v. Ryan, 455 F.2d 728

(9th Cir. 1972). In the years leading up to the issuance of this subpoena, the intelligence

community expended enormous time, energy, and resources investigating unauthorized

disclosures of government information, including but not limited to those in which Ms. Manning

was involved in 2010. Evidence adduced at Ms. Manning's court martial was the source of some

of this information. She is of the opinion that while her testimony was truthful and complete, it

did not function to corroborate the narrative proposed by the government, or to serve the

government's goals. Therefore, it would be in the interest of the government to elicit more

statements from her, either to discredit her, or to extract from her a set of statements that are

more in line with their own theory.

The FBI attempted unsuccessfully to speak with Ms. Manning in late 2010, while she was

at Quantico, despite the fact that she was represented by counsel. As her military case is ongoing,

and she remains represented, they are yet unable to access and question her. The US Attorney,

however, may use his power to compel her to appear, and may thus gain access otherwise

unavailable to the agencies. To acquire access in this manner and for this purpose would also be

an improper use of subpoena power, but by no means would it represent a unique instance of

such conduct. In re September 1971 Grand Jury (Mara v. United States), 454 F.2d 580, 585 (7th

Cir. 1971) (rev'd on other grounds by <u>United States v Mara</u>, 410 U.S. 19 (1973)), <u>In re Sylvia Brown</u>, No. 14-72-H-2 (W.D. Wash., May 17, 1972).

It is axiomatic that "the grand jury is not meant to be the private tool of the prosecutor." <u>United States v. Fisher</u>, 455 F.2d 1101, 1105 (2d Cir. 1972), <u>United States v (Under Seal)</u>, 714 F2d 347, 349 (4th Cir 1983). Nor is it proper for the government to use its subpoena power to conduct "a general fishing expedition," for the prosecution or any other government office. In the event that the grand jury or its subpoena power is being used in any manner that exceeds it legitimate scope, the Court must excuse Ms. Manning's testimony. As the Court stated in <u>United States v. Dionisio</u>, 410 U.S. 1 (1973), "The Constitution could not tolerate the transformation of the grand jury into an instrument of oppression."

In any case, the prosecution knows or should know that Ms. Manning has no further information to disclose. They know, moreover, that Ms. Manning's previous testimony at her own court martial may undercut their agenda. This suggests then that their purpose in calling her before the grand jury is not to discover further and more helpful information (which she does not have). It suggests rather that they will attempt to elicit statements that could be construed as inconsistent with her prior statements. Doing so would enable them to undermine her credibility as a potential defense witness, while also creating the possibility of a criminal case against her for perjury. To do so with this intent would constitute an absolutely improper use of the grand jury, and the court must exercise its oversight to ensure such abuse is not allowed to occur under its supervision.

While there may be a legal presumption of regularity as to grand jury proceedings, this presumption disappears once evidence of abuse has been introduced, and the prosecution bears

the burden of demonstrating regularity. Mullaney v. Wilbur, 421 U.S. 684, 702 ns. 30 and 31

(1975). Given the secrecy in which grand juries are shrouded, and the extreme discretion granted

the prosecution in the exercise of subpoena power, the burden of showing this regularity must lie

with the prosecution. The only information available to Ms. Manning is that the most powerful

actors in the federal government are greatly displeased at her release and have made efforts to

undermine and harass her. Regardless of the general purpose of this grand jury, it is completely

reasonable to harbor concerns about the purpose of this particular subpoena.

     D.     MS. MANNING BELIEVES THE SUBPOENA WAS PROPOUNDED ON THE
BASIS OF UNLAWFUL ELECTRONIC SURVEILLANCE, SUCH AS WOULD
CONSTITUTE "JUST CAUSE" FOR REFUSING TO TESTIFY

     Attached hereto and made a part thereof, please find Chelsea Manning's declaration,

setting forth with specificity facts tending to suggest that she and others have been subjected to

unlawful electronic surveillance.

     These facts set forth in the Manning declaration include phone numbers and email

addresses that she has reason to believe were subject to surveillance, and the range of dates on

which such surveillance may have occurred; various places that may have been subject to

surveillance, and the names of the lessees/licensees of those premises.

     There can be little doubt that local police, federal agencies, and possibly the military have

been involved in surveilling and communicating about Ms. Manning, people with whom she is

lawfully associated, and the entirely lawful activities in which they engage. Likewise, there is

reason to believe that non-state actors may have enabled the state to circumvent legal constraints

on electronic surveillance, by surveilling Ms. Manning, and then conveying their intelligence to

state actors. Unfortunately, this is not unheard of. Such a thing happened, for example, during

the prosecution of the 230 people arrested at the inauguration on January 20, 2017, where individuals from the disingenuously named Project Veritas secretly taped a community meeting and conveyed the footage to prosecutors. As Ms. Manning has encountered at least one individual who appeared to tape her while attempting to goad her into conversations about unlawful uses of technology, she reasonably fears that this or something similar is happening to her.

The information provided by Ms. Manning in her declaration constitutes at the very least a colorable basis supporting her belief that she has been subject to unlawful electronic surveillance. Such surveillance violates the Fourth Amendment, as well as her statutory rights under 18 U.S.C. §§2515 and 3504. Such surveillance constitutes a complete defense to contempt, and should trigger an obligation of the part of the government to either affirm or deny that such surveillance occurred. 28 U.S.C. §1826(a) (stating that a witness may refuse to testify for "just cause.").

Also well-documented is a history of suspicious electronic activity and widespread surveillance of Ms. Manning, her friends, political associates, professional contacts, and technologist peers. For example, technologists at riseup.net and May First/People Link have been subject to surveillance, despite never having been charged with a crime. Technologists at Boston University's BUILDS space were summoned before at least one grand jury despite having no material information about federal offenses. It would be difficult to deny that a great deal of electronic surveillance has taken place and been directed at Ms. Manning. It is likely that at least some of it was relevant to the propounding of this subpoena. Ms. Manning is not in a position to know whether any of it occurred in the absence of a warrant or other legal authority.

Finally, after Ms. Manning gave thorough, accurate, and complete testimony about the matters presumably being investigated by this grand jury, she thereafter made it a policy not to speak about the substance of those matters. In preliminary discussions, the prosecution indicated that they had reason to believe that Ms. Manning may have made statements inconsistent with her prior testimony. It is incumbent upon the court to direct the government to disclose not only electronic surveillance of Ms. Manning, but whether they intercepted communications authored and sent by third parties, as there are no such statements by Ms. Manning herself that would be at variance with her previous testimony. See Manning Dec. at Para.14. The concern here is that the subpoena as a whole is the product of unlawful - and possibly misunderstood - electronic surveillance.

This showing creates a colorable claim of electronic surveillance and requires that the government review not only the evidence gathered by their own actors and actually in the possession of the US Attorney's Office, but canvass all other agencies that may have engaged in such surveillance. They must then either issue an unequivocal and specific denial that such surveillance took place, or they must affirm that it did, in which case an expanded hearing on the issue of possible taint to the propounding of the subpoena and questions must be held. The government's representation ought to be in a sworn writing, and must be "responsive, factual, unambiguous, and unequivocal." United States v. Alter, 482 F.2d 1016 (9th Cir. 1973) note 110, at 1027; United States v Apple, 915 F2d 899, 908 (4th Cir. 1990) (finding that where "there was no question that a state wiretap was involved ... a check of only federal agencies was not an adequate response."). The government's response must furthermore include an "explicit assurance indicating that all agencies providing information relevant to the inquiry were

canvassed." In re Quinn, 525 F.2d 222 (1st Cir. 1975), United States v. Apple, *supra*, ("The government's denial ... is usually based on inquiries to the relevant government agencies ... [t]he predicate for acceptance of the government's denial is that the government official making the denial have sufficient information upon which a reasonable response can be based.").

As it is well-settled that electronic surveillance is relevant to a grand jury proceeding only where it is unlawful, and directly connected to subpoena or questions, it is not at this time necessary to request such a hearing. The Court, now, must hold the government to its minimal responsibility, simply to determine whether, and unambiguously affirm or deny, that there has been such surveillance.

It is by no means settled in this circuit that a witness must do more than make a mere assertion in order to trigger the government's obligations. In re Grand Jury Subpoena (T-112), 597 F3d 189, 200 (4th Cir. 2010), finding that the government satisfied its obligation by denying that *any* electronic surveillance was conducted; Wikimedia Found. v Natl. Sec. Agency/Cent. Sec. Serv., 335 F Supp 3d 772, 786 (D.Md. 2018) (affirming that a claim of unlawful electronic surveillance automatically triggers an obligation to render a simple affirmation or denial by the government). Nevertheless, the facts recited in the annexed declaration of Ms. Manning, even by the most stringent standard, set forth a colorable claim sufficient to require that the government unequivocally either affirm or deny that such surveillance took place. Critically, because a witness is not in position to know the details of a governmental investigation, the claim need only be "colorable," and not "particularized." The existence of unlawful electronic surveillance constitutes "just cause" excusing the appearance of a witness before a grand jury. Gelbard v. U.S., 408 U.S. 41, 51, 92 (1972), see 28 U.S.C. §1826(a), which contemplates "just cause" for

refusal to testify, as well as 18 U.S.C. §2515, mandating that "no part of the contents of [unlawfully intercepted] communication and no evidence derived therefrom may be received in evidence... before any ... grand jury."

Furthermore the evidentiary prohibitions of 18 U.S.C. §2515 are not only intended to protect individuals' privacy, but to ensure that the court itself does not become a party to illegal conduct on the part of the government. Because of the heightened secrecy of the grand jury, the need for the court to forestall even the appearance of impropriety becomes yet more acute. Thus, upon a colorable claim, it is absolutely incumbent upon the court to ensure that the government satisfies its obligation to either affirm or deny the allegations, in a sufficient form, and to make all necessary disclosures. United States v. James, In re Quinn, 525 F.2d 222, 225 (1st Cir. 1975). Failure to do so will constitute a fatal defect in procedure.

Judge Learned Hand stated in United States v. Coplon, "few weapons in the arsenal of freedom are more useful than the power to compel a government to disclose the evidence on which it seeks to forfeit the liberty of its citizens." Id. 185 F.2d 629, 638 (2d Cir. 1950)., cert. denied, 342 U.S. 920 (1952). Nowhere is this so true as it is in the context of the grand jury, shrouded as it is in secrecy. If in fact Ms. Manning has been subject to the practices that Justice Holmes pointedly described as "dirty business" - and there is little doubt that she has been - the government must disclose that fact, and the Court must itself assiduously avoid complicity by insisting upon that prompt and full disclosure. In the event that the prosecution is unwilling to make the necessary disclosures, they must withdraw the subpoena, or the court must quash it.

## MOTION FOR DISCLOSURE OF MINISTERIAL DOCUMENTS

Federal Rule of Criminal Procedure 6(e) makes quite clear that information about what occurs in the presence of the grand jury is protected against public disclosure, absent a compelling need. Information, however, regarding the empanelment of the grand jury, its term, and its mechanical operation, is beyond the scope of Rule 6(e)'s protections. In re Special Grand Jury(for Anchorage, Alaska), 674 F.2d 778 (9th, Cir. 1982); United States v. Alter, 482 F.2d 1016, 1028-29 (9th Cir. 1973) ("Alter was entitled to know the content of the court's charge to the grand jury. The proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.") See, Judicial Conference of the United States, Administrative Office of the U.S. Courts, Handbook for Federal Grand Jurors, HB 101 Rev 4/12.

Disclosure of ministerial information does not violate the freedom and integrity of the deliberative process of the grand jurors. Furthermore, American courts have long recognized a general right of access to court records." In re Grand Jury Investigation, 903 F.2d 180, 182 (3rd Cir. 1990)(citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 8 S.Ct. 1306, 55 L.Ed.2d 570 (1978)); Washington v Bruraker, 3:02-CV-00106, 2015 WL 6673177, at *1 (WD Va Mar. 29, 2015) (reiterating that the common law and the First Amendment presume a right to inspect and copy judicial records and documents); Reporters Comm. for Freedom of Press to Unseal Criminal Prosecution of Assange, 1:18-MC-37 (LMB/JFA), 2019 WL 366869, at 2 (ED Va Jan. 30, 2019), (confirming that "the public and the press share a qualified right to access civil and criminal proceedings and the judicial records filed therein.")

Orders reflecting 1) the beginning or extension of the terms of a grand jury, 2) the instructions even a grand jury upon empanelment, and 3) records setting forth the method by which the grand jury was empaneled (including the manual of forms, procedures, and checklists uses to compile the master and qualified jury wheels) are to be disclosed upon request for the reason that such records 'would not reveal the substance or essence of the grand jury proceedings," "pose no security threat to past, current, or prospective jurors," and "do not infringe upon the freedom and integrity of the deliberative process." United States v. Diaz, 236 F.R.D. 470, 477-478 (N.D. California 2006).

The ministerial records of the grand jury requested by Ms. Manning and her counsel do not in any manner violate the principle of grand jury secrecy.

Ms. Manning here requests all such ministerial information with respect to the following categories of documents be disclosed. To wit:

1) documents reflecting the commencement and termination dates of the current grand jury,

2) any orders extending the term of the current grand jury,

3) all written instructions given to the current grand jury at the time of empaneling,

4) attendance roles of each session of the current grand jury with names of the grand jurors redacted, and

5) the oath of the current grand jury, and 6) records setting forth the method by which the grand jury was empaneled (including the manual of forms, procedures, and checklists used to compile the master and qualified jury wheels but excluding any names of individuals summoned for the grand jury).

Should the Court decline to sign the attached order, counsel respectfully advises the Court that such a discovery denial is appealable by way of mandamus, prior to any contempt proceedings, and requests that all further proceedings be stayed pending interlocutory challenge.

## MOTION TO INSTRUCT THE GRAND JURY

There is no question but that the grand jury is an appendage to the Court, and is not a "mere tool of the prosecutor." In re Grand Jury Subpoena to Cent. States, Se. & Sw. Areas Pension Fund, Aug. Term, 1963, 225 F. Supp. 923, 925 (N.D. Ill. 1964). Although a grand jury is a hybrid proceeding, because the possibility of civil contempt looms over Ms. Manning, certain precautions must be taken to ensure that the grand jurors understand their power and purpose. It is critical that they are made aware of the Constitutional and testimonial privileges enjoyed by the witness, in particular (a) the power and authority of the grand jury to question witnesses and hear evidence as emanating from the court;(b) the nature and extent of this power; (c) the role of the United States Attorney as an assistant to the grand jury; (d) a witness' right to assert the Fifth Amendment prior to the grant of immunity, the lack of counsel in the grand jury room, and the legal effect of an immunity grant. United States v. Alter, 482 F.2d 1016, 1029 (9th Cir. 1973). Furthermore, the grand jurors must be made aware that they are not to draw adverse inferences from the invocation of those rights and privileges. Finally, they ought to be advised of their own power to decline to continue to question the witness.

Annexed hereto, please find a set of proposed supplementary grand jury instructions. It is beyond question that the Court has the authority to instruct the grand jury as to their powers, and as to the rights of the witness. Should the Court decline to do so, and should the existing

instructions to the grand jury be found inadequate according to established law, counsel

respectfully advises the Court that the inadequate instruction will be challenged.

## MOTION TO DISCLOSE PRIOR STATEMENTS

When an individual is asked the same question repeatedly, there is "always the hovering

possibility that inconsistency in his answer may expose him to prosecution for perjury." Bursey

v. United States, 466 F.2d 1059 (9th Cir. 1972), Matter of Ferris, 512 F.Supp 91 (D. Nev. 1981).

Courts have therefore ruled that transcripts of previous testimony, including secret grand jury

testimony, and sometimes even 302 material produced in interviews with the FBI, should be

produced even to an immunized to a witness at least 72 hours prior to their scheduled

appearance. In re Sealed Motion, 880 F2d 1367, 1370-71 (D.C. Cir. 1989), (holding that

"because the right to secrecy in grand jury proceedings belongs to the grand jury witness, a grand

jury witness ... is entitled to a transcript of his own testimony absent a clear showing by the

government that other interests outweigh the witness' right to such transcript"); In re Grand Jury,

490 F3d 978, 986 (D.C. Cir. 2007) (affirming that "federal courts have the authority under Rule

6(e)(3)(E)(i) to order disclosure to grand jury witnesses of their own transcripts.") See also In re:

Russo, 52 F.R.D. 564 (C.D. Cal 1971); Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970),

United States v. Nicoletti, 310 F.2d 359 (7th Cir. 1962). Since it is unlawful for a prosecutor to

ask a witness questions with the purpose of enticing them into committing perjury, providing

such prior statements may go far in guarding against this possible misuse of the grand jury.

## CONCLUSION

Based upon the foregoing facts, and the application of relevant law thereto, Ms. Manning

brings this motion to quash on the basis that the subpoena represents an abuse of grand jury

process, may intrude upon First and Fifth Amendment protections and privileges, and if applicable, on the basis that the subpoena was propounded on the basis of unlawful electronic surveillance in violation of the Fourth, and possible Sixth Amendments, and related statutory prohibitions against warrantless electronic surveillance. Ms. Manning furthermore proffers her declaration and other evidence in support of her motion to quash on the basis of unlawful electronic surveillance, requiring here, at the very least, a thorough canvass of relevant agencies to determine whether there has been any electronic surveillance, lawful or otherwise; affirmation or denial on the part of the government, and any relevant disclosures; and if necessary, an expanded hearing on the issue.

Ms. Manning furthermore demands production of all ministerial documents`related to this grand jury, suggests a set of supplemental grand jury instructions, and requests disclosure of any prior statements she has made. In all events, Ms. Manning, through counsel, requests a full stay of all proceedings until the above questions are fully resolved through any necessary litigation, including , where permissible, collateral appeals and extraordinary writs.

Respectfully Submitted,
By Counsel

Dated: March 1, 2019

/s/ *Sandra Freeman*
SANDRA C. FREEMAN (VSB# 78499)
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

*/s/ Chris Leibig*
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

*/s/ Moira Meltzer-Cohen*
MOIRA MELTZER-COHEN
*(pro hac vice pending)*
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

*/s/ Vincent J. Ward*
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias & Ward,
P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com