1       Specification 7:  between on or about 5 January 2010 and 3

2   February 2010, you, without authorization, had possession of, access

3   to, or control over more than 20 classified records from the Combined

4   Information Data Network Exchange-Afghanistan database.

5       Specification 9:  on or about 8 March 2010, you, without

6   authorization, had possession of, access to, or control over more

7   than three classified records from a United States Southern Command

8   database.

9       Specification 10:  between on or about 10 April 2010 and 12

10  April 2010, you, without authorization, had possession of, access to,

11  or control over more than five classified records relating to a

12  military operation in Farah Province, Afghanistan, occurring on or

13  about 4 May 2009.

14      And Specification 15:  on or about 8 March 2010, you,

15  without authorization, had possession of, access to, or control over

16  a classified record produced by a United States Army intelligence

17  organization, dated 18 March 2008.

18      Elements common to all specifications, element two:

19      That you willfully communicated the classified records,

20  classified memorandum, videos, and files described for each

21  specification in element one to a person not authorized to receive

22  it; and

1        Three:  that under the circumstances, your conduct was to

2   the prejudice of good order and discipline in the armed forces or was

3   of a nature to bring discredit upon the armed forces.

4        All right.  Some definitions that apply to these offenses

5   are:

6        "Conduct prejudicial to good order and discipline" is

7   conduct which causes a reasonably direct and obvious injury to good

8   order and discipline.

9        "Service discrediting conduct" is conduct which tends to

10  harm the reputation of the service or lower it in public esteem.

11       With respect to good order and discipline, the law

12  recognizes that almost any irregular or improper act on the part of a

13  service member could be regarded as prejudicial in some indirect or

14  remote sense.  However, only those acts in which the prejudice is

15  reasonably direct and palpable is punishable under this article.

16       With respect to service discrediting, the law recognizes

17  that almost any irregular or improper act on the part of a

18  Servicemember could be regarded as service discrediting in some

19  indirect or remote sense.  However, only those acts which would have

20  a tendency to bring the service into disrepute or which tend to lower

21  it in public esteem are punishable under this article.  Under some

22  circumstances, your conduct may not be prejudicial to good order and

23  discipline, but, nonetheless, be service discrediting as I've

1   explained those terms.  Likewise, depending on the circumstances,

2   your conduct could be prejudicial to good order and discipline but

3   not be service discrediting.

4          An act is done willfully if it is done voluntarily and

5   intentionally and with the specific intent to do something the law

6   forbids, that is, with a bad purpose to disobey or disregard the law.

7          "Possession" means the act of having or holding property or

8   the detention of property in one's power or command.  Possession may

9   mean actual, physical possession or constructive possession.

10  "Constructive possession" means having the ability to exercise

11  dominion or control over an item.  Possession inherently includes the

12  power or authority to preclude control by others.  It is possible for

13  more than one person to possess an item simultaneously as when

14  several people share control of an item.

15         A person has unauthorized possession of documents,

16  photographs, videos, or computer files when he possesses such

17  information under circumstances or in a location which is contrary to

18  law or regulation for the conditions of his employment.

19         If this was before a trier of fact, whether the person

20  received the information was entitled to have it, the trier of fact

21  would consider all the evidence introduced at trial, to include any

22  evidence concerning the classification status of the information, any

23  evidence relating to the laws and regulations governing

1    classification and declassification of national security information,

2    its handling and distribution, as well as any evidence relating to

3    regulations governing the handling, use, and distribution of

4    information obtained from classification systems.

5            The term "person" means any individual, firm, corporation,

6    education institution, financial institution, government entity, or

7    legal or other entity.

8            Do you understand the elements and the definitions as I've

9    read them to you?

10       ACC: Yes, Your Honor.

11       MJ:  Do you have any questions about them?

12       ACC: No, ma'am.

13       MJ:  You understand that your plea of guilty admits that these

14   elements accurately describe what you did?

15       ACC: Yes, Your Honor.

16       MJ:  Do you believe and admit that the elements and definitions,

17   taken together, correctly describe what you did?

18       ACC: Yes, Your Honor.

19       MJ:  All right.  Now, do you understand that, as we talked about

20   before, that you're -- If I accept your plea to these lesser included

21   offenses and the government decides to go forward with the greater

22   offenses, your plea is going to establish some -- the elements we

23   talked about earlier -- some of the elements for the greater offense.

1          Do you understand that?

2      ACC: Yes, Your Honor.

3      MJ:  Okay.  All right.  Why don't we go -- we'll just go in

4  order, here.  Why don't we start with Specification 2 of Charge II?

5  But, before we get there, let's just talk in generalities.  You went

6  over some of this in your statement and, as we go through this, I may

7  be asking you just to orient me in your statement where you talked

8  about the particular specifications involved.

9      ACC: Yes, Your Honor.

10      MJ:  But, just in the beginning, you told me earlier -- you

11  testified earlier that you were in the Army for about 5 1/2 years, is

12  that accurate?

13      ACC: Just under, yes, ma'am.

14      MJ:  Okay.  And were you in -- at -- stationed at Fort Drum, New

15  York before you deployed?

16      ACC: I was in training before I deployed -- well -- yes, Your

17  Honor.

18      MJ:  Okay.  Well, just briefly walk me through, then.  You came

19  into the Army and you said your basic training lasted a little bit

20  longer than usual?

21      ACC: Yes, Your Honor.

22      MJ:  And then when did you go to AIT?

23      ACC: That would've been April of 2008, Your Honor.

1        MJ:  Okay.  And you were an intelligence analyst?

2        ACC: Yes, Your Honor.

3        MJ:  And, just in a nutshell, what do intelligence analysts --

4    what do they train you to do with classified information?

5        ACC: Well, one of the first things that they teach at -- or

6    whenever I went through training was -- one of the first things that

7    they teach us -- is information security which is mostly talking

8    about classified information, specifically, Your Honor.

9        MJ:  In your training, did they tell you -- who gets to classify

10   information in the United States?

11       ACC: The original classification authorities, they have the

12   actual authority, although they can delegate that authority from my

13   understanding, Your Honor.

14       MJ:  Okay.  And if a person isn't an original classification

15   authority or delegate, do they have the authority to classify

16   information?  At the original level?

17       ACC: At the original level, no, Your Honor.

18       MJ:  What about to declassify information?

19       ACC: I don't know that, Your Honor.  I think it requires the

20   original classification authority's approval, Your Honor.

21       MJ:  Okay.  So, you went to AIT and you learned about

22   information security?

23       ACC: Yes, Your Honor.

1      MJ:  And then what happened?  Where did you go after AIT?

2      ACC: I went -- I traveled to Fort Drum and then I stayed there

3  until I deployed, Your Honor.

4      MJ:  And you were still on a training status at that time?

5      ACC: We weren't officially -- I mean, I was in garrison, Your

6  Honor, but we spent most of our time -- I spent most of my time at

7  Fort Drum in some kind of training, Your Honor.

8      MJ:  You mean like Soldierly training as opposed to intelligence

9  class training?

10     ACC: Yes, Your Honor.

11     MJ:  Okay.

12     ACC: So we had TDY to different locations and we went to Fort

13  Polk for 2 months, Your Honor.

14     MJ:  Okay.  So your unit was gearing up to deploy, then, is that

15  right?

16     ACC: Yes, Your Honor.

17     MJ:  Okay.  And when did you deploy?

18     ACC: We deployed October of 2009, Your Honor.

19     MJ:  Okay.  And when you deployed, you said -- you testified you

20  were on FOB Hammer and that's in Iraq?

21     ACC: Yes, Your Honor.

22     MJ:  Okay.  What was your job there?

1       ACC: I was an analyst that had -- I had a particular problem set

2   as my assigned thing that I did.  It was -- we were militia -- I was

3   a militia expert -- there's a different name for it, but we didn't go

4   by that publicly, Your Honor.

5       MJ:  Okay.  And -- I'm not trying to elicit any classified

6   information, so if I'm heading that way, please stop me.

7       ACC: Yes, Your Honor.

8       TC[MAJ FEIN]:  Yes, ma'am.

9       MJ:  All right.  So, you are in Iraq -- where do you -- when

10  you're doing this intelligence analyst work, where are you doing it?

11      ACC: We were doing it in the temporary SCIF -- the temporary

12  Sensitive Compartmentalized Information Facility at the brigade

13  headquarters building that we had at FOB Hammer, Your Honor.

14      MJ:  So that's called a "SCIF"?

15      ACC: A T-SCIF, Your Honor.

16      MJ:  T-SCIF?  What's a SCIF?

17      ACC: A SCIF is a Sensitive Compartmentalized Information

18  Facility where information at higher -- there is a higher level of

19  sensitivity that the government has authorized these particular

20  locations to hold this information, Your Honor.

21      MJ:  Can anybody go into a SCIF?

22      ACC: No, Your Honor.

23      MJ:  What's a -- what are the requirements to go into a SCIF?

1    ACC: Generally, a -- you need to have an SCI or -- you have to

2    have an SCI clearance -- caveat to your security clearance or an

3    escort and they can lower -- you can make a SCIF clean -- you can

4    clean a SCIF for temporary visitors, Your Honor.

5    MJ:  Okay.  But you worked there permanently, is that correct?

6    ACC: Yes, Your Honor.

7    MJ:  And what was your clearance level at the time?

8    ACC: Top Secret, Your Honor.

9    MJ:  And what's the difference between a SCIF and -- you said

10   you worked in a T-SCIF?

11   ACC: Yes, Your Honor.

12   MJ:  What's the difference between a SCIF and a T-SCIF?

13   ACC: T-SCIF are locations that are assigned by a government

14   agency to hold this information temporarily, so they're not designed

15   to be permanent structure locations so they have some -- they don't

16   always meet all the requirements that a full SCIF has because of --

17   because it's in the field or something.

18   MJ:  Okay.  So, when you are in the SCIF and you are working,

19   what kind of automation do you use?  Do you have just a regular

20   computer or is it something different?

21   ACC: We have lots of computers, Your Honor.

22   MJ:  Okay.  If you have -- well -- what is a -- let's go to

23   SIPRNET.  What is SIPRNET?

1    ACC: SIPRNET is Internet protocol system that we have at the

2   Secret level where we can transfer information up to that level of

3   information, Your Honor.

4    MJ:  Okay.  Do the charged documents that we're talking about at

5   issue, were they all on SIPRNET?

6    ACC: Yes, Your Honor.

7    MJ:  Okay.  So, they didn't come from any other -- SIPRNET is a

8   system on a particular computer, is that right?

9    ACC: Yes, Your Honor, the ----

10   MJ:  I mean, you can't have your regular computer and access

11  SIPR through that, can you?

12   ACC: No, no, Your Honor.

13   MJ:  Okay.  So, it's a separate computer, basically -- is it to

14  hold Secret-level classified information?

15   ACC: Up to that level, yes, Your Honor.

16   MJ:  Okay.

17   ACC: It can be lower, but ----

18   MJ:  Can it be unclassified?

19   ACC: You can hold unclassified information on there, yes, Your

20  Honor.

21   MJ:  Okay.  So, if you're working with SCIF and you have

22  unclassified information -- or working in a SCIF and you're using

1    SIPRNET and you have unclassified information that's on SIPRNET, are

2    you allowed to print that off and take it with you?

3        ACC: If it's unclassified ----

4        MJ: Yes.

5        ACC: ---- and the paper has "Unclassified" on the top and

6    bottom, then yes, Your Honor.

7        MJ: Okay. Now, what if it has -- or there's a paragraph in it

8    that has the Secret classification or a -- but first of all, before

9    we get there, can you explain to me the difference between

10   classification levels at the Confidential level, at the Secret level,

11   and the Top Secret level?

12       ACC: Generally, yes, Your Honor, so the -- information at the

13   Confidential level, which the military -- we don't usually use

14   Confidential, but Confidential usually involves a lower sensitivity

15   of documents and I think that you don't have to, necessarily, always

16   have it in a -- you don't always have to lock it up; you can leave

17   some of it on your desk and things like that, Your Honor.  But for

18   Secret, you can -- you have to lock it up and there always has to be

19   somebody that has control over that level and then, at the TS level,

20   there is so many -- there's a lot of different types of handling

21   instructions, Your Honor.

1      MJ:  Okay.  Well, with Secret level, if you're working in the T-

2  SCIF like you were and you have -- you're working with Secret level

3  documents that, I guess, there are -- hard copy ----

4      ACC: Yes, Your Honor.

5      MJ:  ---- and you finish work or you leave the SCIF to go for

6  dinner or something like that, do you have to store those in a

7  particular place or the fact that they're in a SCIF is enough?

8      ACC: Yes, yes, Your Honor.  Secret information -- it's called a

9  Secret Collateral Area, you can keep up to Secret information -- just

10  as a habit, sitting around, Your Honor, as long as it's in a SCIF or

11  a certified T-SCIF.

12      MJ:  Okay.  So, just to make sure I'm -- clear me up if I'm

13  wrong, if you have information that's classified at the Secret level

14  and you're some place other than a SCIF, does it have to be in a safe

15  or some locked place?

16      ACC: Normally, yes, Your Honor, or as long as you -- as long as

17  it's in a container, you can have -- as long as it contained within

18  two ----

19      MJ:  Like one of those carry bags?

20      ACC: The courier bags and -- or, again, you could -- sometimes

21  you have -- there are certain circumstances where you could have a

22  Secret collateral area outdoors, but it's very -- that's only a field

23  situation, Your Honor.

1      MJ:   Okay.   But would such an area have to be designated by

2  someone with authority to do that?

3      ACC: Yes, Your Honor.

4      MJ:   I mean, you can't just decide -- can you just decide,

5  "Okay, I'm going to designate this an area where I'm putting all

6  Secret documents out in the open"?

7      ACC: Correct, you need to have authority for that, Your Honor.

8      MJ:   Okay.   So, when you're, then, in your -- so, if I'm

9  understanding you, when you're working in your T-SCIF, it's --

10  because it's a SCIF in and of itself, you can come and go and leave

11  the documents or the CD-ROMs, or anything that you just discussed,

12  basically out for other people working in the SCIF to see and use, is

13  that correct?

14      ACC: Yes, Your Honor.

15      MJ:   Okay.   Now, let's move on, then, to Specification 2 of

16  Charge II.   Can you show me where in your statement that you're

17  talking about that

18      ACC: Your Honor, we start talking about Charge -- or

19  Specification 2 at -- pretty much, closer to the middle.   It's the --

20  --

21      MJ:   Let me ask you a question ----

22      ACC: ---- Paragraph 8 at ----

1    MJ:  ---- PFC Manning, do you think it would be easier to get

2   through this if we go chronologically by, you know -- as you sort of

3   did in your statement; the first things that you downloaded and how

4   it evolved?  Would that be easier for you or ----

5    ACC: Oh, we can go by specification.

6    MJ:  ---- would specification by specification?  All right.  So,

7   just then tell me where Specification 2 is.

8    ACC: Specification 2 is at Page 19.

9    MJ:  Okay.  All right, now, we talked about -- earlier, when I

10  asked you, with respect to the video at Specification 2 of Charge II,

11  you told me that that was not classified, is that correct?

12   ACC: Yes, Your Honor.

13   MJ:  Where did you access that video?  How did you have access

14  to it?

15   ACC: Well, it was on our shared T-drive, Your Honor, that S-6

16  operated on SIPR.

17   MJ:  Okay.  So, it was on SIPR?  So, tell me about how -- so,

18  you had access to that video.  Now, were you authorized to give that

19  video to anyone outside of the service who didn't have a clearance?

20   ACC: No, Your Honor.

21   MJ:  Why not?  It wasn't classified.

22   ACC: I thought it was classified.  I looked at the

23  classification matrix for -- at the corps level whenever I was

1    reviewing the video and I thought it would -- I thought that the OCA

2    would have said the same thing -- that it would have been classified

3    at the Secret level, Your Honor.

4        MJ:  Was it marked in any way?

5        ACC: It didn't have markings, Your Honor, but it -- going by the

6    matrix, you can -- because it didn't have markings, that's why I went

7    to the classification matrix, Your Honor.

8        MJ:  And what is a classification matrix?

9        ACC: It's sort of a quick-hand -- a short-hand guide for

10   derivative classification -- for people with derivative

11   classification to classify documents within the guidelines of the

12   original classification authority when you don't have an OCA there to

13   determine, specifically, what it is at that time.

14       MJ:  Just to make sure I understand this, we talked earlier

15   about if you're doing an original classification, it has to be by an

16   OCA or his delegee, right?

17       ACC: Yes, Your Honor.

18       MJ:  And then if you -- I guess you create your own -- you

19   create products down the road using some of that originally

20   classified information?  Is that what derivative classification is?

21       ACC: Yes, Your Honor.

22       MJ:  Okay.  And who has authority to derivatively classify?

1    ACC: Anybody with that level of security clearance and as long

2    as you can point to where you're getting the authority from the

3    original classification authority, then you can do that, Your Honor.

4        MJ:  And the matrix is where you would look to see that?

5    ACC: Yes, in the Army, or in the -- downrange, in the DoD

6    environment, we have matrices --I t's a table that tells you what the

7    classification level is for this particular type of information, Your

8    Honor.

9        MJ:  Okay.  So what did you do -- when did you first see the

10   video?

11   ACC: This would have been in January or late February -- it was

12   mid-February of 2010, Your Honor.

13       MJ:  Okay.  And what did you -- you said you originally saw the

14   video and ----

15   ACC: Yes, Your Honor.

16       MJ:  ---- some people in your office were talking about it?

17   ACC: Yes, Your Honor.

18       MJ:  Okay.  And this was the video that you described as "war

19   porn"?

20   ACC: Yes, Your Honor.

21       MJ:  Okay.  And what was going on in the video that you can talk

22   about?

1      ACC: It was aerial weapons team -- it was from the camera

2   onboard of an aerial team aircraft that also record the flight crew

3   audio, Your Honor, and they're just -- in the course of duties,

4   they're engaging some -- engaging some targets and then there's two

5   separate engagements and then there's a third section to the video

6   for a third one, later.

7      MJ:  Okay.  And you testified when you were reading your

8   statement that some news organizations were interested in getting

9   that video from the Freedom of Information Act?

10     ACC: Yes, Your Honor.

11     MJ:  And did you know why they were interested in getting that

12  video?

13     ACC: Just based upon what I could see online on some open source

14  reporting that I was looking up, Your Honor.

15     MJ:  And what did that say?

16     ACC: It said that the company, Reuters, had made the request and

17  that those requests were not necessarily being denied, but they were

18  being -- they were receiving responses to that, but not getting the

19  video, Your Honor.

20     MJ:  Okay.  And what did you do with the video?  You said you

21  did some research here to find out what the facts were with respect

22  to the video and that caused you to reach some conclusions -- and

23  what were those conclusions that you reached?

1    ACC: Conclusions -- I mean -- conclusions about?

2    MJ:  Well, about -- you made a decision -- did you make a

3    decision, at some point, then you needed to give that video to the

4    news media?

5    ACC: Yes, Your Honor, probably about a week or so after first

6    viewing it, Your Honor.

7    MJ:  Okay.  And did you, at some point, give that video -- I

8    mean, what did you do -- did you take it out of the T-SCIF?  Let's

9    start there.

10   ACC: Yes, Your Honor, I burned the video to a CD-RW and then I

11   took that out of the T-SCIF put it onto my personal computer, Your

12   Honor.

13   MJ:  Okay.  Now, is a CD-RW ----

14   ACC: Or it could have been ----

15   MJ:  ---- a CD-ROM?

16   ACC: Yes, Your Honor.

17   MJ:  It's just a disc?

18   ACC: Some of them might be DVD-RWs, but I'm just using compact

19   discs in general, Your Honor.

20   MJ:  Okay.  And so you took it out and put it on your own

21   personal computer?

22   ACC: Yes, Your Honor.

23   MJ:  Now, were you authorized to do that?

1    ACC: No, Your Honor.

2    MJ:  What is the guidance given to people like you working in a

3    T-SCIF with regard to information that comes from SIPRNET?

4    ACC: If it's coming from a CD -- if it's on a CD, there's -- I

5    mean, there are two thoughts on how it's done, Your Honor.  Some

6    people think that if you just burn only unclassified information onto

7    the CD and then you mark the CD as unclassified, then you can do

8    whatever with it, but then there's a lot of -- but the more proper

9    way of doing it would be to verify and there are some technical

10   personnel that can verify that nothing -- no other digital,

11   potentially Secret information might be inside of that first before

12   you transfer it over, Your Honor.

13   MJ:  So, if I'm understanding you correctly, if you have

14   completely unclassified information, it's okay to -- and it's

15   verified, it's okay to take it out of the T-SCIF and put it on your

16   own personal computer?

17   ACC: Yes, Your Honor, but it's -- there's different ways --

18   there's different ideas on how it's verified.  Some -- I've seen

19   where you need a memorandum sometimes and I've seen where you just

20   needed somebody to -- with the right rank to say it's okay, Your

21   Honor.

22   MJ:  What rank were you at the time?

23   ACC: I was a specialist, Your Honor.

10644

1      MJ:  Were you, as a specialist, at that time, authorized to

2   verify?

3      ACC: No, Your Honor.

4      MJ:  So, if you wanted to take information, even unclassified

5   information, out of the SCIF and put it on your personal computer,

6   you would've had to go to somebody higher in the chain?  Is that what

7   I'm understanding that, at a minimum, to get verification?

8      ACC: Yes, Your Honor, I would've had -- I think the S-2 would

9   have been the person that I would have gotten guidance from, Your

10  Honor.

11     MJ:  Did you do that with respect to this video before you took

12  it?

13     ACC: No, Your Honor.

14     MJ:  Okay.  So, did you have any authorization to take the video

15  out of the T-SCIF?

16     ACC: No, Your Honor.

17     MJ:  Did you have any authorization to put it on your personal

18  computer?

19     ACC: No, Your Honor.

20     MJ:  All right.  Once it was there, what did you do with it?

21     ACC: It was -- I kept it on -- I left it on the computer for a

22  few days, Your Honor.  I wasn't sure what I was going to do with it.

23  I thought -- I mean, I think I had just come back off mid-tour leave,

1   Your Honor, and I wasn't -- I thought I would just keep it and I

2   intended on giving -- on somehow getting it to Reuters at some point

3   so they can see it, but I didn't know how.  It took me a few days

4   until I decided to upload it to the website, Your Honor.

5      MJ:  Okay.  I believe you testified earlier how you did that,

6   but just briefly go -- recount that once again -- how you uploaded

7   it.

8      ACC: I just went to the website -- the WikiLeaks website, in

9   this case, and I went -- and I clicked around and I found a

10  submission form and I uploaded the video using the submission form,

11  Your Honor.

12     MJ:  And to your knowledge -- I mean, you were submitting at

13  that point, were you submitting it to a particular person or to the

14  organization of WikiLeaks?

15     ACC: Just the organization, Your Honor.

16     MJ:  Now, did you -- were any of those people cleared, to your

17  knowledge, to receive this?

18     ACC: No, Your Honor.

19     MJ:  Did anybody from WikiLeaks have a need to know, as defined

20  by the United States government ----

21     ACC: No, Your Honor.

22     MJ:  ---- for classified information?

23     ACC: Not to my knowledge, Your Honor, no.

1    MJ:  Okay.  And you believed, actually, that this video was

2  classified at the time?

3    ACC: Yes, Your Honor, I did.

4    MJ:  Now, as I understand from both parties, the video actually

5  wasn't classified, is that correct?  Government?

6    TC[MAJ FEIN]:  Yes, ma'am, after a classification review was

7  conducted it was determined not to be classified.

8    CDC[MR.COOMBS]:  That's correct, ma'am.

9    MJ:  Then if it ultimately was determined not to be classified,

10  why was it wrong for you to take -- why was it unauthorized for you

11  to take it out of the SCIF and to send it to WikiLeaks?

12    ACC: Well, first, Your Honor, it -- at the time, I thought it

13  was -- I believed it was classified and then, also, the digital

14  method -- you're supposed to have verification and I didn't have

15  anybody to verify and ensure that that information was okay to put

16  onto a -- to downgrade its level to an unclassified network, Your

17  Honor.

18    MJ:  And you had to have that authority to do that?

19    ACC: Yes, Your Honor.

20    MJ:  Even if it wasn't classified, ultimately, you still had to

21  have the authority to do that with that information at the SCIF at

22  that time, is that correct?

1      ACC: Yes, Your Honor, whether verbal or on paper, Your Honor,

2   yes.

3      MJ:  Okay.  Now, here, your element two is that you willfully

4   communicated the video to a person not entitled to receive it.  Was

5   WikiLeaks entitled to receive the video?

6      ACC: No, Your Honor.

7      MJ:  In your statement, you talk about, on Page 20, that you

8   transfered the video because you were disturbed, basically, by its

9   contents and you thought it should be out in the public because

10  people were killing kids -- or killed kids, is that correct or do you

11  want to articulate that for a little bit better?

12     ACC: Just to -- I found it -- I mean, I find it trouble -- I

13  found the video troubling at the time, Your Honor, and I still do,

14  but it's just my opinion, Your Honor.

15     MJ:  Okay.  Going to go over this little bit with you all the

16  way through, but let's start here.  There's certain potential

17  defenses and when we get into -- that may or may not be raised by the

18  evidence if this case actually went into trial, but -- and it goes a

19  little bit with your willfulness element because you have to be --

20  willfulness has -- if you're acting willfully, you have to act

21  intentionally with the bad purpose to disobey the law.  Now, in your

22  case, did you know it was not lawful to -- were you intending to

23  violate the law when you said that video to WikiLeaks?

1    ACC: Yes, Your Honor, I knew that, yes Your Honor.

2    MJ:  Okay.  Now, there is also a potential defense -- well,

3  there is two of them.  One of them is called "justification" and what

4  that is -- is it excuses a crime if it's done in the proper

5  performance of a legal duty.  Did you believe you had a legal duty to

6  transmit that video -- take it to your personal computer and give it

7  to WikiLeaks?

8    ACC: No, Your Honor.

9    MJ:  Okay.  So, do you believe the defense of justification

10  applies in your case?

11    ACC: I do not, Your Honor, no.

12    MJ:  All right.  And, lastly, I want to talk to you about the

13  necessity defense and what that is -- is it's not formally recognized

14  in the Uniform Code of Military Justice, but the appellate courts

15  have said it's a form of a duress defense.  What a duress defense is

16  -- is when a third party -- where there's a threat of serious,

17  imminent harm to you or somebody else caused by a third-party.

18  Necessity is a little bit different because it's the circumstances --

19  it's the choice of evils defense.  The typical example that's given

20  for necessity is if you have to trespass over -- if there's somebody

21  who is drowning in a pond and you have to trespass over somebody's

22  yard to get to that pond to save that person and there's nobody else

23  around to save that person so if you don't trespass over that

1  person's yard, that person -- the other person in the pond drowns.

2  So, that's the defense of necessity, basically; it's a choice of

3  evils defense.  So, you have to commit your crime to -- because of

4  the threat of serious, imminent harm to somebody else.

5          In your case, do you believe the necessity defense applies

6  when you transferred that video?

7  ACC: No.  No, Your Honor, I don't believe it applies in this

8  case, Your Honor.

9  MJ:  Okay.  Now, the third element to this offense is that the

10  conduct has to be prejudicial to good order and discipline or service

11  discrediting conduct.  Do you believe that your transmission of this

12  video to WikiLeaks was prejudicial to good order and discipline?

13  ACC: Yes, Your Honor.

14  MJ:  Why?

15  ACC: Well, in the military we have rules and regulations and

16  structures designed to safeguard sensitive information, whether it be

17  classified or unclassified and I circumvented those and, thereby --

18  you know, by circumventing them on my own authority without -- I'm

19  not the right pay grade to make these decisions or anything, so, by

20  doing that, I violated some orders and regulations and that's

21  prejudicial to good order and discipline.

22  MJ:  Okay.  So, what you're telling me is sometimes referred

23  into the law as "Self-help."  And so, if somebody else has the

1    authority to make the rules and you don't agree with them, you elect

2    a self-help remedy to basically do -- go against the law because you

3    believe, personally, it's for a greater good.  Is that kind of

4    describing what you did a little bit?

5        ACC: Yes, Your Honor.

6        MJ:  Okay.  You just told me that that kind of conduct is

7    prejudicial to good order and discipline because the military has a

8    command structure that's established to make those rules and people

9    in the military need to follow them, is that what you're telling me?

10       ACC: Yes, Your Honor.

11       MJ:  Okay.  Now, what about service discrediting?  Do you think

12   that your conduct in giving the video to WikiLeaks is service

13   discrediting?

14       ACC: Yes, Your Honor.

15       MJ:  Why?

16       ACC: Well, there's -- for the service discrediting, it's about

17   public perception of the military and the services and our ability to

18   -- and their trust and their perception that we can safeguard our

19   sensitive information for their protection.  So, by not abiding by

20   those -- by the system, it undermines our -- our service, Your Honor,

21   and their perception of how we operate, Your Honor.

22       MJ:  Okay.  So, basically, if I'm understanding what you're

23   saying correctly, people should -- the military would hope that

1   people have confidence in the system and the people in it to follow

2   the rules and, basically, if you don't have any rules or people

3   aren't following the rules -- I mean, if there is more than one

4   person that's doing what you're doing then the whole system crashes?

5       ACC: Yes, Your Honor.

6       MJ:  And I don't want to put words in your mouth, I mean, I'm

7   just sort of paraphrasing what I thought you told me.  Is that a

8   little ----

9       ACC: You got it.

10      MJ:  ---- bit, in essence, of what you're telling me?

11      ACC: Yes, Your Honor.

12      MJ:  Okay.  How do you know WikiLeaks wasn't entitled to receive

13  the video?

14      ACC: Well, Your Honor, it wasn't over an -- to start off with,

15  it wasn't using an authorized means of--for transferring this

16  information as far as I was aware.  I mean, this was over a non-

17  secure network, so I have no guarantees that anybody is authorized to

18  receive it on the other end and I'm not aware that -- I mean, I know

19  that they're -- I'm not aware of them being a U.S organization -- or

20  U.S. government entity, so -- and then, also, I'm not aware of any of

21  them having any type of security clearances or anything, Your Honor.

22      MJ:  Okay.  And I know you talked about it earlier in your

23  statement not going to try to get you to rehash your entire

1   statement, but, just briefly, what's your understanding of WikiLeaks?

2   What kind of -- what's -- how did you discover it and what did you

3   come to think of it?

4        ACC: I discovered it in November -- around the Thanksgiving

5   timeframe of 2009 when they published some SMS text -- or text

6   messages or -- and then I did some research into them after that

7   based upon the fact that I had heard of the website before, but never

8   visited it prior to that, but I was interested -- I became interested

9   in it after that and I became familiar with the organization and how

10  it operated and what they were publishing and all the rest of it

11  after a few weeks of going through it -- going through stuff, both on

12  the open-source Google site on my personal computer and using my

13  access to Secret documents, Your Honor.

14       MJ:  Okay.  You said an "SMS text."  What's that?

15       ACC: It's a Short Messaging System -- it's basically -- whenever

16  you text message on cell phones, those are -- that's the kind of

17  message.  But, before hand, it used to be pagers -- it's the same

18  standard that they still haven't updated for modern phones, yet, Your

19  Honor.

20       MJ:  Okay.  And you said you did some intelligence and you came

21  to learn about WikiLeaks and its organization.  What did you learn?

22       ACC: I learned about how -- I learned -- I was trying to learn

23  how it was structured, where their servers were, who operated it,

1   just for my -- because it -- they're not as open about that stuff as

2   normal -- or as normal websites and publishers are so I found that

3   interesting, Your Honor.  I don't know if I missed the question, Your

4   Honor?

5       MJ:  No, no, you answered it.  Did WikiLeaks ultimately release

6   the video?

7       ACC: Yes, Your Honor.

8       MJ:  Okay, is that what you said in your ----

9       ACC: In April.

10      MJ:  ---- statement, here, in 5 April of 2010 ----

11      ACC: Yes, Your Honor.

12      MJ:  Okay, I believe you've already answered this, but let me

13  just ask one more time, did you willfully communicate that video to

14  WikiLeaks?

15      ACC: Yes, Your Honor.

16      MJ:  Does either side believe any further inquiry is required

17  with respect to Specification 2 of Charge II?

18      CDC[MR.COOMBS]:  Nothing from the defense, Your Honor.

19      TC[MAJ FEIN]:  One moment please, Your Honor.

20      MJ:  Uh-huh.

21      TC[MAJ FEIN]:  No, just a factual clarification for the record.

22  It might be worth the Court asking if there's a difference between

1   COS Hammer and FOB Hammer because the two terms are being used

2   interchangeably.

3       MJ:  What Hammer?  What's the first one you said?

4       TC[MAJ FEIN]:  Forward Operating Base Hammer, ma'am, or Combined

5   Operating Station -- Contingency Operating Station; FOB and COS

6   Hammer.

7       MJ:  Okay.  PFC Manning, what is the difference between FOB and

8   COS Hammer?

9       ACC: They are the same location, Your Honor, but -- and we never

10  really understood what -- when the change was, but it was used

11  interchangeably while we were there as well, Your Honor.

12      MJ:  So they're both the same place?

13      ACC: Yes, Your Honor.

14      MJ:  Just have different names at different times?

15      ACC: I believe Corps came down with the change, but we didn't

16  adopt it, Your Honor.

17      MJ:  Okay.  So, in your -- the charges and specifications at

18  issue here, they're all charged with happening at F-O-B Hammer, I

19  believe.

20      ACC: Combined Operating Station, Your Honor.

21      MJ:  Oh -- that's -- hold on.  I'm sorry, Contingency Operation

22  -- was it Combined Operating Station or Contingency Operating

23  Station?

1    ACC: I don't -- it's Contingency Operating Station, Your Honor.

2    MJ:  Okay, and is that what it was called when you were there?

3    ACC: There was a lot of different names for it, Your Honor.

4    MJ:  Okay, was that one of them?

5    ACC: That was one of them, yes, Your Honor.

6    MJ:  When you look at that, when it says -- look at the -- when

7    it says, "that, at or near Contingency Operating Station Hammer,

8    Iraq," does that mean to you where you were in Iraq or does that mean

9    to you that that's someplace else?

10   ACC: That's where I was, Your Honor.

11   MJ:  Okay.  And Specification 2, did you actually -- when you

12   transferred the video, what was base that you did that?

13   ACC: That was at Contingency Operating Station Hammer, Your

14   Honor.

15   MJ:  Okay.  And was that between 14 February of 2010 and 21

16   February 2010 when you transferred the video?

17   ACC: Yes, Your Honor.

18   MJ:  Does other side believe any further inquiries required?

19   TC[MAJ FEIN]:  No, ma'am.

20   CDC[MR.COOMBS]:  No, Your Honor.

21   MJ:  Okay.  Let me just ask you one thing, PFC Manning, I should

22   have asked you a little bit earlier, are you on any medications

23   today?

1      ACC: No, Your Honor.

2      MJ:  Is there anything preventing you and I from having an

3   intelligent back-and-forth dialogue?

4      ACC: No, Your Honor.

5      MJ:  Let's move on Specification 3 of Charge II.  Specification

6   3 addresses the classified memoranda produced by a United States

7   government intelligence agency.  Can you orient me to where in your

8   statement that we talk about that?

9      ACC: It's Paragraph 10 at Page 5, Your Honor.  I'm sorry, 29.

10     MJ:  Page 29?

11     ACC: Yes, Your Honor.

12     MJ:  So, this is -- this document that we're talking about,

13   here, for Specification 3, where did you come across that?

14     ACC: I don't know if I can say, Your Honor.

15     MJ:  Oh, okay, well, let's not.  Was it in the T-SCIF?

16     ACC: It was, Your Honor.

17     MJ:  Okay.  Was it something that you were authorized to take

18   out of the T-SCIF?

19     ACC: It was not, Your Honor.

20     MJ:  Okay.  Did you take it out of the T-SCIF?

21     ACC: Yes, Your Honor.

22     MJ:  How did you do that?

1      ACC: Using the same method -- a CD-RW or it might have been a

2   DVD-RW -- or a DVD-W, sorry -- RW.

3      MJ:  Okay.  And where -- when you took it out of the SCIF, where

4   did you take it?

5      ACC: To my -- to the Compartmentalized Housing Unit -- to my

6   personal area.

7      MJ:  And what did you do with it?

8      ACC: I put it onto a computer -- my personal computer and I

9   uploaded it using the submission form, Your Honor -- no, the drop --

10   I used the drop box, as I ----

11      MJ:  And where did you -- you used the drop box to do what?

12      ACC: To upload, Your Honor, the documents.

13      MJ:  And whose drop box was it?

14      ACC: It was somebody within the WikiLeaks organization.  I never

15   got a full identification as to who, but pointed me to that and it

16   resolved -- the IP address resolved to that website, Your Honor.

17      MJ:  Okay.  What does that mean?

18      ACC: It means that -- it -- well, the IP address that was

19   attached to that, wasn't attached to the domain name wikileaks.org if

20   I used the IP address, Your Honor.

21      MJ:  Okay.  So, this drop box, would that be a place where, if

22   someone wanted to send something to WikiLeaks, they would send it

23   there?

1     ACC: Yes, Your Honor, during ----

2     MJ:  And then WikiLeaks would retrieve it?

3     ACC: Yes, Your Honor, they -- as they were changing something, I

4     think, they were changing how they were doing it, Your Honor.

5     MJ:  Okay, because you were talking to me, before, about some of

6     the ways that you transmitted these documents was anonymous and some

7     wasn't, is that what I heard you say earlier?

8     ACC: Yes, Your Honor, well, I was -- I would -- I received over

9     the IRC and then later the Jabber -- I would ask for how do I send

10    something and then they would give me directions to where I needed to

11    send it, although I wouldn't say what it was, Your Honor ----

12    MJ:  And that was the drop box ----

13    ACC: ---- that I was sending.

14    MJ:  ---- that you were talking about, right?

15    ACC: Yes, Your Honor.

16    MJ:  Okay.  So, rather than repeat my questions for each of

17    these specifications, was -- when we talk about all of the

18    specifications, was -- when we talk about all of the specifications

19    that you're pleading guilty to today, was WikiLeaks authorized to

20    receive anything that you sent?

21    ACC: No, Your Honor.

1       MJ:   Okay.   And were you authorized to send anything you sent in

2   these specifications that we're talking about, that you're pleading

3   guilty to, to WikiLeaks?

4       ACC: No, Your Honor.

5       MJ:   And other than the video in Specification 2, was everything

6   else classified?

7       ACC: Yes, Your Honor.   Well, not everything -- for the charged

8   documents, yes, Your Honor.

9       MJ:   For the charged documents?

10      ACC: Yes, Your Honor.

11      MJ:   But some of the Department of State cables, I believe in

12  Specification 13 of Charge II, you testified earlier, not all of them

13  were classified, right?

14      ACC: Yes, Your Honor.

15      MJ:   But the charged documents that we are talking about were?

16      ACC: Yes, Your Honor.

17      MJ:   Now, with Specification 3, when you sent that -- the

18  document that we're talking about for that specification -- or the

19  two documents, did you willfully transmit those documents to

20  WikiLeaks?

21      ACC: Yes, Your Honor.

22      MJ:   So you did it intentionally?

23      ACC: Yes, Your Honor.

1    MJ:  Okay.  And we talked earlier, you didn't have any authority

2    to do it, is that correct?

3    ACC: that is correct, Your Honor.

4    MJ:  Okay.  Now, I asked you about conduct -- was your conduct

5    prejudicial to good order and discipline, earlier, with respect to

6    Specification 2 of Charge II.  Is your answer any different for this

7    specification?

8    ACC: Not really, Your Honor; it's a blanket statement for all of

9    the specifications under the charge.

10   MJ:  So, for all the specification you are pleading guilty to,

11   the reasons that you gave me that -- so you believe -- first of all,

12   do you believe all the specifications that you're pleading guilty to,

13   that your conduct was prejudicial to good order and discipline in the

14   armed forces?

15   ACC: Yes, Your Honor.

16   MJ:  And was that for the reasons we discussed when we talked

17   about Specification 2 of Charge II?

18   ACC: Yes, Your Honor.

19   MJ:  Now, do you believe all of the conduct that you're pleading

20   guilty to is prejudicial -- was service discrediting?

21   ACC: Yes, Your Honor.

22   MJ:  And is that for the same reason we talked about for

23   Specification 2 of Charge II?

10661

1      ACC: Yes, Your Honor, I mean ----

2      MJ:  Okay, so, if I ask you these questions for each

3  specification, are you going to give me an answer that's any

4  different than you gave me for that?

5      ACC: No, Your Honor, they're all going to be along the same

6  lines, Your Honor.

7      MJ:  Okay.  Was there more than one classified memorandum in

8  Specification 3 that you transmitted?

9      ACC: There were two, your Honor.

10      M:   Okay.  And when did you transmit that?

11      ACC: That would have been ----

12      MJ:  You can look at your statement.

13      ACC: Okay.  22 March, your Honor.

14      MJ:  Of what year?

15      ACC: 2010, Your Honor.

16      MJ:  Okay.  And for all these specifications, these

17  transmissions are -- at least for Specification 3 is also -- is it

18  Contingency Operations Station Hammer?

19      ACC: Yes, Your Honor.

20      MJ:  Does either side believe any further inquiry is required

21  with respect to Specification 3 of Charge II?

22      ATC[CPT MORROW]:  Your Honor, the accused stated earlier that

23  "the content of two of these documents upset me greatly.  I had

1   difficulty believing what the session was discussing." It may be

2   helpful to the Court just to explore the defenses again with respect

3   to these documents.

4       MJ:  Okay.  Now, you looked at these documents -- your statement

5   says that the contents upset you greatly.  We talked earlier about,

6   you know, to willfully communicate something, you have to be doing it

7   with a bad purpose to violate the law.

8       ACC: Correct.

9       MJ:  And you talked to me earlier about that you intentionally

10  communicated these two documents.  Did you know you were violating

11  the law when you did that?

12      ACC: Yes, Your Honor.

13      MJ:  Okay.  We also talked about, earlier, justification is

14  something that is in the proper performance of a legal duty.  Did you

15  believe that you were acting in the proper performance of a legal

16  duty?

17      ACC: No, Your Honor.

18      MJ:  We also talked about necessity.  Do you believe, in your

19  case, that your conduct was necessary -- basically your choice of

20  evils, there, that you had to believe that your actions were

21  necessary, they must have been -- your belief must've been reasonable

22  in their must've been no other alternative to committing your crime

23  to prevent death or imminent injury.

1       Do believe that the necessity defense applies in your case?

2       ACC: Yes, Your Honor, I had a lot of alternatives.

3       MJ:  Okay.  Let me ask -- maybe my question was bad.  Do you

4    believe the defense of necessity applies in your case?

5       ACC: No, Your Honor.

6       MJ:  Okay.  And you said you believed you had a lot of

7    alternatives.  What other -- describe some of them for me.

8       ACC: Well, not necessarily for this-that specification, but

9    speaking generally for the other -- for two, as well, Your Honor.

10      MJ:  Okay.  Why don't you speak generally and just tell me what

11   alternatives you could have ----

12      ACC: Well, for -- I had the chain of command as a first

13   alternative.  I could've went to the chain of command and asked for

14   guidance on how to release certain information.  I had -- the public

15   affairs office was -- I knew where the public affairs office was and

16   they actually have the authority to officially release sensitive

17   information and -- I mean, there is also the Freedom of Information

18   Request -- Freedom of Information Act and other -- there were other

19   avenues to approach, Your Honor.

20      MJ:  Okay.  And you didn't exercise those?

21      ACC: No, Your Honor.

22      MJ:  Any further inquiry?

23      TC[CPT MORROW]:  No, Your Honor.

1       CDC[MR.COOMBS]:  No, Your Honor.

2       MJ:  All right.  Let's move on, then, to Specification -- it's

3    were jumping, now, to Specification 15 of Charge II.  And where in

4    your statement is that discussed?

5       ACC: Page 24, Your Honor.

6       MJ:  Okay.  Maybe I am confused, I thought that was

7    Specification 9?  Specification 15 -- we're talking about ----

8       ACC: There was a mix-up, here, Your Honor.  It's in this

9    paragraph, yes, Your Honor; Paragraph 9 -- Section 9.

10      MJ:  Oh, it's in Section 9?  Okay.

11      ACC: Yes, Your Honor.  But its first talked about earlier on in

12   there, as well, like the contents of it Your Honor.

13      MJ:  Okay where you -- where do you first begin to address it --

14   and that would be the -- it would be a classified record produced by

15   United States Army intelligence agency, dated 18 March 2008.  Is that

16   the information we're talking about that specification?

17      ACC: Yes, Your Honor.

18      MJ:  Okay.  And where do you first address in your statement?

19      ACC: It's Section 5, Paragraph Delta, on Page 10.

20      MJ:  On Page 10?  Okay.  All right, so were you working at the

21   T-SCIF when you were -- it says you were conducting a search to look

22   for information and you found this?  Were you working in the T-SCIF?

23      ACC: Yes, Your Honor.

1      MJ:  Okay.  And did you -- was this information classified?

2      ACC: Yes, Your Honor, it is.

3      MJ:  Okay.  Did you take that information -- did you take it off

4  of where you found it and put it on a CD like you did the last two

5  pieces of information that we talked about?

6      ACC: It was a CD, yes, Your Honor.

7      MJ:  Okay.  And did you take it out of the T-SCIF?

8      ACC: Yes, Your Honor.

9      MJ:  And where did you bring it?

10     ACC: Again to my personal housing -- my housing area and then to

11  -- LSA Dragon and then onto my personal computer, Your Honor.

12     MJ:  And what did you do with it?

13     ACC: Then, I uploaded it using the drop box, again, as I

14  described, Your Honor.

15     MJ:  Okay.  Did you willfully and intentionally do that?

16     ACC: Yes, Your Honor.

17     MJ:  Did you have authority to do it?

18     ACC: I did not.

19     MJ:  And we already talked about -- you said for all of these

20  specifications WikiLeaks was not an authorized receiver of any of

21  this information.  Does that apply to this too?

22     ACC: Yes, Your Honor.

1       MJ:  And as we talked about earlier, was your conduct

2    prejudicial to good order and discipline and service discrediting?

3       ACC: Yes, Your Honor.

4       MJ:  And for the reasons we earlier discussed or for some other

5    reason?

6       ACC: Same reasons, Your Honor.

7       MJ:  And that was, once again -- was that at Contingency

8    Operating Station Hammer?

9       ACC: Yes, Your Honor.

10      MJ:  And was that where you did the transmission to the drop box

11      ACC: Correct, Your Honor.

12      MJ:  And that was over the Internet?

13      ACC: Yes, Your Honor.

14      MJ:  What were the dates that you did that?

15      ACC: That would have been 7th through 8th of March, Your Honor.

16      MJ:  So, on or about 8 March of 2010?

17      ACC: Yes, Your Honor.

18      MJ:  Okay.  Does either side believe any further inquiry is

19   required?

20      TC[MAJ FEIN]:  May we have a moment, Your Honor?

21      MJ:  Yes.  Mr. Coombs, while they're having their moment, does

22   the defense believe any further inquiry is required?

23      CDC[MR.COOMBS]:  No, Your Honor.

1       MJ:   Okay.

2       TC[MAJ FEIN]:   Ma'am, the only question the government has is if

3    the Court needed to explore the willful component for this

4    specification.   I guess we still don't remember if he did it for all

5    specifications or not when you were questioning him.

6       MJ:   Okay.   Well, PFC Manning, let's cover that again.   The -- I

7    asked you earlier if your conduct was willful, that is, intentional

8    with an intent to violate the law.   Was it in this case?

9       ACC: Yes, Your Honor.

10      MJ:   Okay.   Did you know you are violating the law when you

11   transmitted that information?

12      ACC: Yes, Your Honor.

13      MJ:   Now, is that correct for all of these specifications that

14   were going to discuss today?   Did you act willfully and intentionally

15   when you transmitted all of these -- this information?

16      ACC: Yes, Your Honor, I was familiar with how we were supposed

17   to be doing -- safeguarding this information and the channels and the

18   authorities that are in place for it, yes.

19      MJ:   So, for all of this information in Specifications 2, 3, 5,

20   7, 9, 10, 13, 14, and 15, did you willfully and intentionally

21   transfer this information to WikiLeaks?

22      ACC: Yes, Your Honor.

1    MJ:   Did you know you were violating the law when you

2    transferred all of the information in these specifications?

3    ACC: Yes, Your Honor.

4    MJ:   Okay.   And when you transferred all of these -- this

5    information in these specifications I mean, we already asked this

6    question, but I'm going to ask it again:   was WikiLeaks entitled to

7    receive any of it?

8    ACC: No, ma'am.

9    MJ:   And for any of these specifications, was your conduct not

10   prejudicial to good order and discipline?

11   ACC: No, ma'am.

12   MJ:   It was prejudicial to good order and discipline?

13   ACC: It was all prejudicial to good order and discipline, Your

14   Honor.

15   MJ:   If I asked you why, what would you tell me?

16   ACC: It's prejudicial to good order and discipline, again,

17   because of the rules and regulations that were in place to safeguard

18   sensitive information, whether it be classified or not.

19   MJ:   All right.   Same question for service discrediting -- for

20   any of these specifications, was -- were any of these specifications

21   not service discrediting -- your conduct in transmitting these

22   documents WikiLeaks?

23   ACC: No, Your Honor.

1    MJ:  And why would that be?  So, it was service discrediting is

2  what you're telling me ----

3    ACC: Yes, Your Honor.

4    MJ:  ---- for each of these specifications.  And why would that

5  be?

6    ACC: Well, I -- again, just service discrediting -- for

7  something to be service discrediting, it has to undermine the public

8  perception as well as the service's perception of itself, Your Honor,

9  and that -- misconduct undermines that, Your Honor.

10    MJ:  Okay.  I guess where I'm going with this, Government -- I

11  can ask the same question for each specification, if I'm going to get

12  the same answer that we just got, I don't really see the point unless

13  you do?

14    TC[MAJ FEIN]:  No, no, ma'am, not at all.

15    MJ:  Okay.  So, your conduct through all of these specifications

16  was -- you willfully acted to -- and you knew you were in violation

17  of the law, is that what you're telling me?

18    ACC: Yes, Your Honor.

19    MJ:  And you're telling me for all of these specifications, your

20  conduct was prejudicial to good order and discipline and service

21  discrediting for the reasons you told me when we first discussed

22  Specification 2 of Charge II?  Is that right?

23    ACC: That is correct, Your Honor.

1    MJ:  Okay.  Does either side see any need for me to ask any more
2    of those willfulness or service discrediting or prejudice to good
3    order and discipline questions with respect -- when I'm going through
4    the factual predicate for the other offenses?

5    TC[MAJ FEIN]:  No, ma'am, not the general questions.  The
6    government might have specific ones based off of prior -- what was
7    said in the statement per spec, but that will come up later ma'am.

8    MJ:  No, my intent, now -- and this is where I want to explore
9    it with the parties -- is to go over with PFC Manning the facts
10   regarding each of the additional transmissions, but I don't intend --
11   you know, I'll ask just the leading question, "was it willful, was it
12   service discrediting, and prejudice to good order and discipline,"
13   but what I'm understanding what PFC Manning has told me is the same
14   reasons apply.  All of the conduct was willful and the same reasons
15   apply for prejudice to good order and discipline and service
16   discrediting conduct as he first described to me for Specification 2
17   of Charge II.

18   TC[MAJ FEIN]:  Sounds good, ma'am.

19   CDC[MR.COOMBS]:  That's correct, ma'am.

20   MJ:  All right.  I guess now we are moving on, then, to
21   Specification 5 of Charge II.  Where would I find that?

22   ACC:  It's first mentioned on Page 3 and then again on Page 5,
23   Your Honor.

1    MJ:  All right.  And for Specification 5, we are talking about

2    more than 20 classified records from the Combined Information Data

3    Network Exchange-Iraq.  Now, you spent some time talking about that

4    when you read your statement earlier in the day.  Can you just

5    briefly describe what that database is?

6    ACC: Again, Your Honor, it's a database that exists -- have the

7    -- on SIPR -- on SIPRNET and it -- there's two -- I mean there's two

8    separate ones.  There was one for each theater, at the time, for both

9    Iraq and Afghanistan and it holds a large amount of data that is

10   exchanged between the -- between different units within DoD and the

11   different sections of the different branches of the military -- or

12   different branches of government -- or different agencies within the

13   government, Your Honor.

14   MJ:  All right.  And were -- was this information found on the

15   SIPRNET computer?

16   ACC: Yes, Your Honor.

17   MJ:  Was it classified?

18   ACC: Yes, Your Honor.

19   MJ:  At what level?

20   ACC: Not all the information in -- contained within CIDNE is

21   classified, but the information within was often classified up to

22   Secret, Your Honor.

10672

1       MJ:  Okay.  Was that information you are authorized to take out

2  of the T-SCIF?

3       ACC: No, Your Honor.

4       MJ:  All right.  Did you take it out of the T-SCIF?

5       ACC: Yes, Your Honor.

6       MJ:  And how did you do that?

7       ACC: I -- it was -- I had already created a back-up of the

8  entire -- for both -- for a particular section of that database, the

9  Significant Activities tables and I placed them onto two separate

10  DVD-RWs -- I believe -- yeah, DVD-RWs and stored them in to the

11  conference area of the SCIF and I physically took that from the SCIF,

12  Your Honor.

13       MJ:  Okay.  Were there more than 20 records that you physically

14  took out the SCIF?

15       ACC: Yes, Your Honor, there were about 100,  Your Honor.

16       MJ:  Were there more than 20 classified records?

17       ACC: Charged records, yes, Your Honor.

18       MJ:  Okay.  So, the number in the charge in specification is

19  accurate, then?  More than 20?

20       ACC: Yes, Your Honor.

21       MJ:  Okay.  And you took it out of the CD and brought it -- did

22  you bring it back to your personal computer?

23       ACC: I did, Your Honor.

1    MJ:  Okay.  And what did you do with it?

2    ACC: I took the information and I uploaded it, again -- I mean,

3    this was the first thing that I ever uploaded to the WikiLeaks

4    website.  I uploaded it using their submission form.

5    MJ:  So, this was -- out of all of these specifications, even

6    though it's in middle in Specification 5, this was the first time you

7    uploaded to WikiLeaks, is that correct?

8    ACC: Correct, Your Honor.

9    MJ:  Okay.  Did you do the Afghanistan database at the same time

10   or a different time?

11   ACC: They were -- yes, they -- I -- they were on -- they were

12   both on the same DVD-RW that I took from the conference room of the

13   SCIF.

14   MJ:  Okay.  Well, let's talk about Specification 5 and

15   Specification 7 together, then.  Did you -- you downloaded the

16   Afghanistan and Iraq CIDNE databases at the same time or ----

17   ACC: It was sequential.  So, I got Iraq first and then I

18   downloaded Afghanistan, Your Honor.

19   MJ:  Okay.  Was it on the same CD?

20   ACC: Yes, it should have been on the -- I labeled the CD "CIDNE

21   SIGACTs," Your Honor.

22   MJ:  Okay.  Now, Specification 7 also says "more than 20

23   classified records."  Are the records -- did you download more than

1    20 classified -- or is it more than 20 records from the Afghanistan

2    database to your CD also?

3        ACC: Yes, Your Honor.

4        MJ:  Were there more than 20 classified records?

5        ACC: Yes, Your Honor.

6        MJ:  Okay.  So, did you take the Afghanistan records and the

7    Iraq database records out of the T-SCIF together on one CD?

8        ACC: Yes, Your Honor.

9        MJ:  Okay.  And you said -- you testified you went back to your

10   personal computer and uploaded it?

11       ACC: Well, I copied -- this wasn't immediately, no.

12       MJ:  Okay.

13       ACC: This was -- I copied it onto -- I copied it onto my

14   personal computer and then I put it onto -- it's like a little SD

15   card for cameras.  So, I didn't have it on the laptop anymore, but I

16   could put it on there.  And then I took the actual CD that I took it

17   from back into the SCIF and I set it back in the conference room.

18       MJ:  Okay.  So, once you have this on that -- what did you call

19   it?  The ----

20       ACC: SD card.

21       MJ:  The SD card -- you said in your camera?

22       ACC: Yes, Your Honor.  Digital camera.

23       MJ:  All right.  What did you do with it then?

1      ACC: I took it with me on my mid-tour leave to my ----

2      MJ:  And this is when you went to your aunt's house and then you

3  went up to Massachusetts and then you came back and got stuck in the

4  blizzard?

5      ACC: Yes, Your Honor, but I didn't bring my camera case with me

6  to Massachusetts.

7      MJ:  Okay.  So, you -- but you did bring your camera case with

8  that SD card to your aunt's house?

9      ACC: Yes, Your Honor.

10     MJ:  And that was in Maryland?

11     ACC: Yes, Your Honor.

12     MJ:  And did you -- what did you do with that information -- or

13  SD card at your aunt's house?

14     ACC: I -- after deciding what I was going to do with it, I

15  eventually put it on to a -- put it on -- back on to my laptop and I

16  uploaded it -- I uploaded it to the WikiLeaks website at some point

17  during my mid-tour leave, Your Honor.

18     MJ:  So, when you were ----

19     ACC: At the end -- towards the end.

20     MJ:  When you uploaded the Iraq and Afghanistan databases to the

21  WikiLeaks website, were you in Contingency Operating Station Hammer,

22  Iraq or were you at your aunt's house in Maryland?

23     ACC: I think I was actually at a Barnes & Nobles, Your Honor.

1      MJ:  In -- I assume there's no Barnes & Nobles in Contingency

2   Operating Station Hammer, Iraq, so would this be in Maryland?

3      ACC: Yes, Your Honor, this was Rockville, Maryland.

4      MJ:  Rockville, Maryland?

5      ACC: Or it could have been North Bethesda; it's right between

6   the two, Your Honor.

7      MJ:  All right.  Mr. Coombs, I don't believe that the plea by

8   exceptions and substitutions changed the location, did it?

9      CDC[MR.COOMBS]:  The way that it -- and I covered this with my

10  client -- the way we looked at the location, ma'am, was that's where

11  he had the unauthorized possession of it and the actual disclosure of

12  it was in the United States.  However, the way the specification is,

13  he has the unauthorized possession at or near Contingency Operation

14  Station Hammer, Iraq.  I've discussed with him that the actual

15  disclosure was in the United States.  Looking at it, I did not

16  believe that would require us to do exceptions and substitutions for

17  the location, however I have covered that with my client and the

18  defense is prepared to enter, by exceptions and substitutions, if the

19  Court believes that's warranted.

20     MJ:  Well, reading it here that Contingency Hammer Station,

21  Iraq, that you had unauthorized possession.  Just to make the --

22  Specification 5 and 7 clear -- are those -- first of all, PFC

23  Manning, are those the only specifications -- Specifications 5 and 7

1    of Charge II, where you transmitted the data from Barnes & Noble in

2    Maryland or anywhere in Maryland?

3         ACC: Yes, Your Honor.

4         MJ:  Okay.  So all of the other transmission were done from

5    Contingency Operating Hammer, Iraq?

6         ACC: Correct, Your Honor.

7         MJ:  Well, I'm thinking it might just be prudent to say ----

8         CDC[MR.COOMBS]:  Just put an "and" in ----

9         MJ:  For the -- well, you're not really excepting words, though,

10   there, you're adding words.

11        CDC[MR.COOMBS]:  Correct, Your Honor, so we would not object to

12   adding -- when you look at "at or near Contingency Operation Station

13   Hammer, Iraq" and just putting the "and" -- conjunction "and

14   Maryland" -- in this case, it would be Rockville, Maryland, United

15   States adding that to both Specifications 5 and 7.

16        MJ:  All right.  Government, do you have any objection if the

17   defense modifies their plea?

18        TC[MAJ FEIN]:  Ma'am, it might be even easier -- we could just

19   amend it also -- the actual charge sheet for those two specs.

20        MJ:  All right.  So, I assume if the government is going forward

21   with the greater offense, that the government is going forward with

22   those locations as well, is that correct?

1    TC[MAJ FEIN]:  Well, the greater offense -- it would be a common

2   element of a greater offense anyways, Your Honor, so, yes.

3    MJ:  Okay.  Well, this is a good time for a brief recess anyway,

4   so why don't we go ahead and take a recess and then you all discuss

5   how you want to move ahead and just come see me before we call the

6   court back to session and let me know what you decide to do.

7    TC[MAJ FEIN]:  Yes, Your Honor.

8    MJ:  How long would you like?

9    TC[MAJ FEIN]:  Can we go at 1530, ma'am?

10   MJ:  All right.  The court is in recess until 1530.

11   **[The Article 39(a) session recessed at 1515, 28 February 2013.]**

12   **[The Article 39(a) session was called to order at 1542, 28 February**

13   **2013.]**

14   MJ:  This Article 39(a) session is called to order.  Let the

15  record reflect that all parties present when the court last recessed

16  are again present in court.

17       Government has what has happened with the charge sheet?

18   TC[MAJ FEIN]:  Yes, ma'am, the parties discussed this issue,

19  ma'am, and the United States, I guess, has amended, with the

20  concurrence of the defense, the two charges, Specification 5 and 7,

21  of a copy of the original charge sheet which will now become the new

22  original.  Specification 5 has been amended to say, "In that Private

23  First Class Bradley E. Manning, U.S. Army, did, at or near

1    Contingency Operating Station Hammer, Iraq and at or near Rockville,

2    Maryland," and then the remaining portion.  And then the same

3    amendment has occurred in Specification 7, Your Honor.

4        MJ:  All right.  Defense, do you have any objection to this

5    amendment?

6        CDC[MR.COOMBS]:  No, Your Honor.

7        MJ:  PFC Manning, have you had an opportunity to look at the

8    amended charge sheet?

9        ACC: Yes, Your Honor.

10       MJ:  Do you have any objections to it?

11       ACC: No, Your Honor.

12       MJ:  Okay.  It was amended, basically, based on yours and my

13   dialogue and what you have in your statement to be factually correct.

14       ACC: Yes, Your Honor.

15       MJ:  Okay.  Now, Government, normally, after someone has been

16   arraigned, we don't normally -- the original charge sheet is supposed

17   to stay the same.  So, do it one of two ways:  either put the

18   original charge sheet back in the record somehow ----

19       TC[MAJ FEIN]:  Ma'am, it was fortuitous that we did not have the

20   original charge sheet, so it will remain in the record with this

21   amended charge sheet on top of it.

22       MJ:  Okay.  Great.  And the amended words are "at or near

23   Contingency Hammer Station [sic], Iraq and at or near Rockville,

1   Maryland," for Specifications 5 and 7 of Charge II. ·Is that the

2   parties' understanding?

3        CDC[MR.COOMBS]:  Yes, Your Honor.

4        TC[MAJ FEIN]:  Yes, Your Honor.

5        MJ:  All right.  Is there anything else I need to address with

6   this issue?

7        CDC[MR.COOMBS]:  No, Your Honor.

8        TC[MAJ FEIN]:  No, Your Honor.

9        MJ:  Okay.  PFC Manning, as we discussed, the charge sheet was

10  amended based on yours and my discussion with respect to these two

11  specifications and, as I understand what you told me on what's in

12  your statement, you got the Iraq and Afghanistan databases from the

13  T-SCIF at Contingency Operating Base Hammer in Iraq ----

14       ACC: Yes, Your Honor.

15       MJ:  ---- you put them on your CDs -- or your CD, brought it

16  home -- brought it back to your CHU·-- your personal computer ----

17       ACC: CHU.

18       MJ:  ---- at the CHU and then you -- Containerized Housing?

19  What's the ----

20       ACC: Containerized Housing.

21       MJ:  Containerized Housing Unit?  Okay.  It's been a while.

22  Okay.  So, then, you uploaded that onto the CD -- or the SD card in

23  your camera and then you brought that back to Maryland?  Is that my

1    understanding of your testimony?  And then in a Barnes & Noble

2    somewhere near Rockville, Maryland, you transmitted that data to

3    WikiLeaks?

4         ACC: Yes, Your Honor.

5         MJ:  Okay.  And, once again, you've already been asked the

6    willful questions, did you do -- did you transmit that data -- the

7    Iraq and Afghanistan databases to WikiLeaks willfully as well?

8         ACC: Yes, Your Honor.

9         MJ:  And was your conduct prejudicial to good order and

10   discipline and service discrediting?

11        ACC: Yes, Your Honor.

12        MJ:  And would that be for the same reasons you told me before

13   or something different?

14        ACC: Yes, Your Honor, the same reasons, Your Honor.

15        MJ:  Okay.  Does either side believe any further inquiry is

16   required with respect to Specifications 5 or 7?

17        TC[MAJ FEIN]:  Yes, ma'am, based off of Page 14, what has been -

18   - it is based off Private First Class Manning's statement, but Page

19   14, Paragraph J, at the bottom.  The United States believes that

20   further inquiry into the potential defenses of necessity and

21   justification for these specific specifications, Your Honor.

22        MJ:  Okay.  Look at Page 14, there, at -- Paragraphs I and J.

23   It talks about -- that you began to get depressed with the situation.

1  Now, was it -- when you got depressed with the situation, that was

2  when you were in Maryland after you'd already taken these databases,

3  is that correct?

4      ACC: It's more of a general, broad feeling that I had over a

5  period of time, Your Honor.

6      MJ:  Okay.  Now, was that -- when you took these databases out

7  of Iraq and you took them back home with you on leave, as I

8  understand your statement, were you still deciding what you were

9  going to do with them?

10     ACC: Yes, Your Honor, I was looking at different -- and trying

11 to figure out different people that I could possibly give this to,

12 Your Honor.

13     MJ:  Did you plan to ----

14     ACC: I didn't know how ----

15     MJ:  ---- give it to somebody or -- had you already made that

16 decision that you were going to give it to somebody?

17     ACC: Yes, Your Honor.  Before I left Iraq, I knew I was going to

18 probably give it to some news organization, Your Honor.

19     MJ:  You just -- at that point -- so, you left Iraq, did you

20 know which news organization you're going to give it to?

21     ACC: My preference would have been the Washington Post, Your

22 Honor.

1     MJ:  Okay.  And I remember your statement, earlier -- I think --

2  were these the -- was this the information you were trying to give to

3  the Washington Post?

4     ACC: Yes.

5     MJ:  Or was that something different?

6     ACC: Yes, Your Honor, that was the way it started out, Your

7  Honor.

8     MJ:  Okay.  So, that's what's on 15 of your statement, then?

9  You just tried to do it -- to give it to the Washington Post, you

10  talked to somebody there and they said, well, they might be

11  interested but they have to see it first?

12     ACC: Yes, Your Honor, and I never went down, physically, to

13  there but I thought of -- I considered actually going to the

14  Washington Post downtown, Your Honor.

15     MJ:  And, at some point, did you make a decision that that

16  wasn't a good idea?

17     ACC: I was nervous, Your Honor, yes.

18     MJ:  Okay.  And then did you -- what was the next thing you were

19  thinking about doing?

20     ACC: I thought about -- well, after, I made a phone call -- I

21  made a few phone calls -- I made at least one phone call to the

22  Washington Post and then I called the New York Times and sort of got

23  the same response.  And then I also thought about going -- there's

1    Allbritton Communications Office where Politico operates and I

2    thought about going down there, Your Honor.

3         MJ:  Okay.  And, ultimately, what decision did you make?

4         ACC: By -- with time running out on my mid-tour leave, I decided

5    that I was going to upload it to the WikiLeaks website before I lost

6    a good Internet connection -- before I lost a really strong broadband

7    Internet connection, Your Honor.

8         MJ:  Did you need a really strong broadband to transmit that

9    data?

10        ACC: Yes, Your Honor.

11        MJ:  Okay.  And is that why you went to Barnes & Noble?

12        ACC: There was a blizzard as well, so we lost our -- at the

13   house, we lost our heating and our Internet access.  We still had

14   some power, though, Your Honor.

15        MJ:  Okay.  So, you -- did you actually transmit those -- the

16   Iraq and Afghanistan databases from Maryland to WikiLeaks?

17        ACC: Yes, Your Honor.

18        MJ:  Okay.  Now let's go back to Page 14 where it says you

19   became depressed at the situation.  What situation -- are you talking

20   about the situation in Iraq and Afghanistan?

21        ACC: Yes, Your Honor.

22        MJ:  Okay.  And remember we talked earlier about -- I believe

23   that you're--also, here, in Paragraph J, you said you released this

1   information to spark a debate.  Were you authorized to release this

2   information to spark a debate?

3       ACC: No, Your Honor, I was not.

4       MJ:  Okay.  When it talks about you being depressed about this -

5   - we went over the defenses of justification and necessity.  Earlier,

6   I defined them for you.  Do you want me to redefine them for you?

7       ACC: No, Your Honor.

8       MJ:  Okay.  Do you believe that either justification or

9   necessity -- those defenses apply in your case?

10      ACC: No, Your Honor, not for that.

11      MJ:  Why not?

12      ACC: It's just a general feeling; it wasn't a depression

13  depressed, it was just a general feeling of what was going on was not

14  good, generally so.

15      MJ:  Well, if -- even if -- and remember, we talked about self-

16  help, before, and ----

17      ACC: Right.

18      MJ:  ---- even if you, personally, believed maybe you weren't in

19  favor of some of the policies that were going on for some of the

20  things that were happening in Iraq and Afghanistan, do you believe

21  that that gave you the authority to go ahead and download these

22  databases and then bring them to Maryland and transmit them to

23  WikiLeaks?

1    ACC: Correct, Your Honor.

2    MJ:  Do you believe it gave you authority to do that?

3    ACC: No, Your Honor.

4    MJ:  Okay.  So, in the military, in the chain of command

5    structure, if -- or in the government structure in general, if

6    someone disagrees with policies that are made by senior people more

7    senior to them in charge of making those policies, are you allowed

8    just to take self-help and violate the rules and give somebody

9    classified information?

10    ACC: No, Your Honor.

11    MJ:  Okay.  Now, let's talk a little bit about -- you said you

12    became depressed -- you said you weren't -- you were depressed, but

13    not "depressed" depressed.  Tell me what that means?

14    ACC: I wasn't like -- for -- that general feeling I'm describing

15    is not attached to depression as a mental issue, although -- so I'm

16    not raising that for that portion, Your Honor.  For that paragraph.

17    MJ:  Okay.  Well, let's talk a little bit about that because

18    this is during the period of time when you were in Contingency

19    Operating Station Hammer and back at Fort Drum, too, you had received

20    some mental health treatment for anxiety issues ----

21    ACC: Yes.

22    MJ:  ---- is that correct?

23    ACC: Yes, Your Honor.

1      MJ:  And that's come through when we talked about the Article 13

2  motion and a little bit in the speedy trial even.  Have you gone over

3  with Mr. Coombs the defense of lack mental responsibility or lack of

4  *mens rea* due to partial mental responsibility?

5      ACC: Yes, Your Honor, we have.

6      MJ:  Okay.  Mr. Coombs, have you gone over that with PFC

7  Manning?

8      CDC[MR.COOMBS]:  I have, Your Honor.

9      MJ:  There has been an R.C.M. 706 board in this case, right?

10     CDC[MR.COOMBS]:  That is correct, Your Honor.

11     MJ:  And actually a pretty extensive one?

12     CDC[MR.COOMBS]:  Yes, Your Honor.

13     MJ:  When the board came back, what were the short-form results?

14     CDC[MR.COOMBS]:  The short form indicated that he was not

15  suffering from a lack of mental responsibility, either at the time of

16  the incident or presently.

17     MJ:  Was he suffering from a serious mental disease or defect at

18  that time?

19     CDC[MR.COOMBS]:  No, Your Honor.

20     MJ:  Okay.  These offenses all require a willful intent.  So,

21  before we -- so, Mr. Coombs, am I hearing from you, then, you fully

22  explored the issue of lack of mental responsibility?

23     CDC[MR.COOMBS]:  That is correct, Your Honor.

1      MJ:  Okay.  And do you believe there's anything else left to

2  explore with respect to that issue?

3      CDC[MR.COOMBS]:  No, Your Honor.

4      MJ:  All right.  PFC Manning, do you agree with that?

5      ACC: I agree, Your Honor.

6      MJ:  Okay.  Now, let's talk about the willful aspect of these

7  specifications.  Mr. Coombs, have you fully investigated the issue of

8  whether PFC Manning suffered from a mental disease or defect or

9  impairment or condition or character behavior disorder that prevented

10  him from forming -- or basically willfully acting in this case?

11      CDC[MR.COOMBS]:  I have, Your Honor.

12      MJ:  Okay.  And what were your conclusions from ----

13      CDC[MR.COOMBS]:  That he was not, Your Honor.

14      MJ:  All right.  PFC Manning, do you agree with that?

15      ACC: Yes, Your Honor.

16      MJ:  Okay.  Now, did Mr. Coombs -- or did your defense team

17  explain to you that partial lack of mental responsibility can negate

18  the intent required for offenses we call "specific-intent" or

19  "knowledge" offenses?

20      ACC: Yes, Your Honor, we have.

21      MJ:  Okay.  So, this willful intent falls within that?  Okay.

22  So, at the time you made these transmissions, were you seeing mental

23  health professionals at that time?

1       ACC: I had seen one a few weeks before, yes, Your Honor.

2       MJ:  Okay.  Were you on any medications?

3       ACC: No, Your Honor.

4       MJ:  So, was there any -- so you were not on any medications at

5    the time?

6       ACC: That is correct.

7       MJ:  And did you continue to perform your military -- was there

8    anything about your state of mind that made you unable to perform

9    your military duties at that time?

10      ACC: No, Your Honor.

11      MJ:  So, you're going to work and going home just like everybody

12   else?

13      ACC: Yes, Your Honor.

14      MJ:  Were you acting differently than you normally act during

15   that period of time?  I mean, was there anything strange that you

16   noticed about your mental health behavior?

17      ACC: Trouble sleeping, that's it, Your Honor.

18      MJ:  So, do you believe that you were fully capable of acting

19   willfully in making these communications?

20      ACC: Yes, Your Honor.

21      MJ:  Do you believe you were of sound mind when you did that?

22      ACC: Yes, Your Honor.

1    MJ:  Does either side believe any further inquiry is required

2    with respect to mental responsibility or partial mental

3    responsibility?

4      TC[MAJ FEIN]:  Yes, ma'am, just maybe a little bit more -- and

5    if the Court remembers and we can get these for the Court if needed -

6    - the Master Sergeant Adkins memos, they used some pretty specific

7    details -- I'm not asking the Court to go through that, but some

8    behaviors that were going on concurrent with the charged misconduct

9    that might just be -- they're already on the record to be explored

10   and make sure that doesn't necessarily go to the willful aspect

11   either.

12     MJ:  I don't ----

13     TC[MAJ FEIN]:  I'm sorry, Your Honor, the question, just now, to

14   Private First Class Manning was:  "Was there any mental condition at

15   the time that would have affected the *mens rea*, essentially" -- that

16   -- there's documentation that there could have been, so just

17   exploring whether that mental -- his state of mind at that time would

18   have affected the charged misconduct.

19     MJ:  All right, I don't have the Adkins documents in front of

20   me.  What we can do is -- can someone make a Xerox copy of them and

21   give them to me and ----

22     TC[MAJ FEIN]:  We can keep going, Your Honor, and we'll get

23   that.

1      MJ:  ---- we'll keep going and if you can make that happen,

2    we'll come back to that.

3      TC[MAJ FEIN]:  Yes, ma'am.

4      MJ:  Okay.  So, PFC Manning, we're going to put that piece of

5    the discussion -- table it for a little while and then continue on,

6    here.

7      ACC: Yes, Your Honor.

8      MJ:  All right.  So any further questions with respect to

9    Specifications 5 and 7 of Charge II?

10     TC[MAJ FEIN]:  No, ma'am.

11     CDC[MR.COOMBS]:  No, Your Honor.

12     MJ:  All right.  Let's move on to Specification 9 of Charge II.

13   Where would I find that in your statement?

14     ACC: Page 24, Your Honor.

15     MJ:  Now, Specification 9 of Charge II involves more than three

16   classified records from the United States Southern Command database.

17   What are those records?

18     ACC: They are Detainee Assessment Briefs, Your Honor.

19     MJ:  Okay.  And what is that?

20     ACC: They are documents that, generally, outline and describe

21   detainees that were held at Joint -- Joint Task Force Guantánamo,

22   Your Honor.

23     MJ:  Okay.

1     ACC: Held under.

2     MJ:  Where did you find these documents?

3     ACC: These were on a U.S. Southern Command portal, Your Honor.

4     MJ:  And was that portal on SIPRNET?

5     ACC: Yes, Your Honor.

6     MJ:  Where they -- where these documents classified?

7     ACC: Yes, Your Honor.

8     MJ:  Okay.  And what did you do with these documents -- and were

9    there more than three of them?

10    ACC: There were five, I think, Your Honor -- or charged, Your

11   Honor.

12    MJ:  All right.  And what did you do with them?

13    ACC: I -- as I was downloading I mean, as I was going through

14  some things, I segregated them some of them and went through them and

15  then I downloaded them -- or I downloaded all of them that I could

16  and then I put them onto a CD and they took them to my housing unit

17  and put it into -- put it onto my personal laptop and uploaded it

18  using the drop box that I described, Your Honor.

19    MJ:  Okay.  Now, your statement talks about getting an

20  interpreter and all of that -- what happened there?

21    ACC: That was a separate -- that's a separate incident that

22  happened, but it made me sort of look into detainments as a whole

23  after some detainees were found at -- down in the Karada Peninsula of

1    Baghdad -- the Federal Police -- it was a joint operation in which 15

2    detainees were, basically, taken into the -- and they were turned

3    over to the FPs and -- at the -- and going -- and I was assigned to

4    do some research into this matter and it got me thinking about

5    detainments and things, Your Honor.

6         MJ:  Okay.  So you said it got you thinking about detainments

7    and is that why you took those records out of the SCIF?

8         ACC: Is one of the reasons that I found them and -- I found them

9    again and then, after reviewing them, then I took them, Your Honor.

10        MJ:  All right.  In this particular case, with these records, do

11   you think that there was -- was your conduct willful?

12        ACC: Yes, Your Honor.

13        MJ:  Did you know you are violating the law when you gave those

14   records -- when you took them out -- the classified records out of

15   the T-SCIF, put them on your personal computer, and transmitted them

16   to WikiLeaks?

17        ACC: Yes, Your Honor.

18        MJ:  And you did transmit those to WikiLeaks, too?

19        ACC: To the drop box that was associated with them, yes, Your

20   Honor.

21        MJ:  Okay.  We talked about justification and necessity before.

22   Do you think that you had any -- you have any justification or

23   necessity defense with respect to these records?

1       ACC: No, Your Honor.

2       MJ:  Okay.  Why not?

3       ACC: I knew that I was -- I knew I was doing and I knew that I

4    was breaking the rules and not going by the regulations, Your Honor.

5       MJ:  When you are submitting these detainee assessments -- I

6    mean, you weren't doing -- were you doing that to save somebody in

7    imminent danger at that time?

8       ACC: No, Your Honor, nobody was in imminent danger.

9       MJ:  And was it a part of your official military duties?

10      ACC: No, Your Honor, it was not.

11      MJ:  Does either side believe any further -- well, first of all,

12   was it -- was your conduct prejudicial to good order and discipline

13   and service discrediting?

14      ACC: Yes, Your Honor.

15      MJ:  And was that for the same reasons we talked about before or

16   different reasons?

17      ACC: The same reasons, Your Honor.

18      MJ:  And when did you make this transmission to WikiLeaks of

19   these documents?

20      ACC: This was 8 -- it was -- I downloaded them and took them on

21   the 7th of March; it was the election for Iraq and then the day after

22   is whenever I uploaded them, Your Honor.

1    MJ:  And then were you authorized to transmit those documents to

2    WikiLeaks?

3    ACC: No, Your Honor.

4    MJ:  And were they entitled to receive them?

5    ACC: No, Your Honor.

6    MJ:  All right.  Does either side believe any further inquiries

7    required with respect to Specification ----

8    TC[MAJ FEIN]:  Can we have a moment, Your Honor?

9    MJ:  Yes.

10    CDC[MR.COOMBS]:  Nothing from the defense, Your Honor.

11    ATC[CPT MORROW]:  Your Honor, I just refer the parties and the

12    Court to Page 26, Paragraphs M and N.  It may be beneficial for the

13    Court to explore the answers with respect to prejudicial to good

14    order and discipline with the statement made in those two paragraphs.

15    MJ:  All right.  Look at page -- Paragraphs M and N in your

16    statement.

17    ACC: Yes, Your Honor.

18    MJ:  When it talks about, here, that you'd always been

19    interested in the moral efficacy of the actions in JTF-GTMO and you

20    always understood the need to detain and interrogate individuals who

21    might harm the United States and allies, and you felt that that's

22    what we're trying to do at JTF-GTMO, but then, as you became educated

23    on the topic, you believed that the United States was holding an

1    increasing number of individuals indefinitely that we -- that you

2    believed were innocent, low-level foot Soldiers that didn't have

3    useful intelligence who would be released if they were still held in

4    theater and, then, that you remember back in early 2009, the newly

5    elected president, Barack Obama, said he would close JTF-GTMO and the

6    facility compromised our standing in the world and diminished our

7    moral authority and after you familiarized yourself with the DABs,

8    that you agreed.

9            Now, even if -- this is kind of -- what you're saying is

10   that you had your own personal, noble motive in doing what you did.

11   Do you believe -- and you also testified that you believed that this

12   conduct is service discrediting in prejudicial to good order and

13   discipline.  How can that coexist?

14   ACC: Your Honor, it's -- regardless of my opinion on -- or my

15   assessment on documents such as this -- you know it's beyond my pay

16   grade, it's not my authority to make these decisions and there are --

17   again, there are channels that you are supposed to go through and I

18   didn't even look at the possible channels of doing -- having this

19   information released properly.  So, that's not how we do business

20   Your Honor, and it's so ----

21   MJ:  So, my understanding -- your testimony -- are you telling

22   me that even though you, personally, have a disagreement with how

23   policy was being formed and implemented, that your conduct, to

1    further your personal goals, could still be prejudicial to good order

2    and discipline and service discrediting conduct?

3        ACC: Yes, Your Honor, and, just clarify, I mean -- for the

4    policy standpoint, it's not necessarily my issues with the policies

5    that were the driver, it was my concerns about not -- about the lack

6    of openness about the policies, Your Honor.  But, regardless my

7    opinions on those, again, I don't have the authority.

8        MJ:  Okay.  It was the fact that you acted without that

9    authority -- is that what made your conduct prejudicial to good order

10   and discipline?

11       ACC: Yes, Your Honor.

12       MJ:  Was that when made your conduct service discrediting?

13       ACC: What made my service discrediting is the fact that these --

14   the public sees this -- sees that these documents have been released

15   and then you know, it damages their perception and their feeling

16   about whether the armed services, as a whole, can safeguard

17   information at all.

18       MJ:  All right.  Does the government have any -- desire any

19   further inquiry?

20       TC[MAJ FEIN]:  No, Your Honor.

21       MJ:  All right.  Let's move on to Specification 10.  Where am I

22   in your statement?

23       ACC: Page 33, Your Honor.

1    MJ:  All right, Specification 10 involves more than five

2    classified records relating to a military operation in Farah

3    Province, Afghanistan occurring on or about 4 May of 2009.  Now, did

4    you have -- acquire unauthorized possession of, access to, or control

5    over more than five classified records relating to that military

6    operation?

7    ACC: Yes, Your Honor.

8    MJ:  And where did those records come from?

9    ACC: Those records came from the U.S CENTCOM portal under their

10   Judge Advocate General folder.

11   MJ:  Was that from the SIPRNET computer too?

12   ACC: Yes, Your Honor.

13   MJ:  And were those more than five records classified?

14   ACC: Yes, Your Honor.

15   MJ:  Okay.  And what did you do -- what did they involve ----

16   ACC: They ----

17   MJ:  ---- that you can tell me?

18   ACC: They reference an event that occurred in 2009, Your Honor,

19   in which they were -- there are reports of civilian casualties at an

20   event.

21   MJ:  Okay.  And when you came across this information, was it a

22   15-6 investigation or did that include a 15-6 investigation?

1      ACC: It might have been 15-6 -- I think it was DoD that -- it

2   was under DoD, but I don't remember if -- whether it was the Army

3   regulation that they went by or not, Your Honor.

4      MJ:  Was there some kind of investigation into this incident

5   that you're talking about?

6      ACC: It was at least a 15-6-type investigation, Your Honor.

7      MJ:  Are those the records that you took, or did you take some

8   different ones?

9      ACC: And the supporting annexes and supplements and things like

10  that, Your Honor.

11     MJ:  Okay.  So, that's what you -- did you download that from

12  the SIPRNET onto something?

13     ACC: Yes, Your Honor.

14     MJ:  What something was it?

15     ACC: First, my work computer, then a CD-RW and then I uploaded -

16  - and then I placed that onto my personal computer in the CHU and

17  uploaded that sometime later, Your Honor, a few days later at least.

18     MJ:  So, the specification has the time frames of between on or

19  about 10 April 2012 and 12 April -- 10 April 2010, excuse me, and 12

20  April 2010.  Are those the accurate dates?

21     ACC: Yes, Your Honor.

22     MJ:  Those are the dates that you downloaded that information

23  and then you gave it to WikiLeaks?

1    ACC: Yes, Your Honor, so it would have been 11 April of 2010.

2    MJ:  You talked about something -- you didn't use the TOR

3    anonymizer?  I think I'm pronouncing this right.

4    ACC: It's anonymizer.

5    MJ:  Anonymizer?  Okay, we'll get there.  So, what did you use?

6    ACC: I used a new version of the form that was up on the website

7    because they changed the website -- how they had the website set up

8    and I just used a new version of that and it had like a bar in which

9    you could see how far it was downloaded and you didn't have to use

10   the annoymizer, Your Honor.

11   MJ:  Okay.  Did you act willfully?

12   ACC: I did, Your Honor.

13   MJ:  Did you know you were violating the law?

14   ACC: Yes, Your Honor.

15   MJ:  Did you -- was your conduct prejudicial to good order and

16   discipline?

17   ACC: Yes, Your Honor.

18   MJ:  Was it service discrediting?

19   ACC: Yes, Your Honor.

20   MJ:  For the same reasons we talked about before, or for

21   different reasons?

22   ACC: For the same reasons, Your Honor.

1    MJ:  Does either side believe any further inquiry is required

2  with respect to Specification 10?

3    TC[MAJ FEIN]:  Could we have a moment, Your Honor?

4    MJ:  Yes.

5    CDC[MR.COOMBS]:  The defense does not, Your Honor.

6    ATC[CPT MORROW]:  Your Honor, just briefly, I think, but on Page

7  33, Paragraph B.  Again, it might be helpful for the Court to explore

8  service discrediting and PGOD aspect to this as compared to what's in

9  the statement.

10    MJ:  All right.  PFC Manning, well, first of all, just before we

11  even get there, you weren't authorized to take any of this

12  information out of the SCIF, were you?

13    ACC: No, I was not, Your Honor.

14    MJ:  Okay.  So, were you authorized to load it on your personal

15  computer?

16    ACC: No, Your Honor.

17    MJ:  Were you authorized to transmit it to WikiLeaks?

18    ACC: No, Your Honor.

19    MJ:  Were they cleared to receive it?

20    ACC: No, Your Honor.

21    MJ:  Now, looking at Page 33, here, it talks about, in

22  Paragraphs A and B that this information -- you said it was reported

1   in the press, here, that's up to 100 to 150 Afghan civilians were

2   accidentally killed?

3       ACC: That was just the press, Your Honor.

4       MJ:  Okay.  So, you transmit this information to WikiLeaks --

5   why?

6       ACC: What was that, Your Honor?

7       MJ:  Why did you transmit this information to WikiLeaks?

8       ACC: I felt -- I mean -- I just felt that the report was

9   different than -- I felt that there were things within the report

10  that might help enlighten the general public of what happened and how

11  it happened.

12      MJ:  Okay.  And this report was classified at the time, is that

13  correct?

14      ACC: Yes, Your Honor, it was, Your Honor.

15      MJ:  All right.  And, at least in accordance with the people

16  that had authority to classify this report, nobody with authority to

17  classify this report had made a determination that it should be

18  unclassified and disseminated to the general public, is that correct?

19      ACC: That is correct, Your Honor.

20      MJ:  Okay.  Now, we talked earlier about, sort of, the

21  difference that even though you think something is a good idea, that

22  the people who are authorized to make those choices don't think

23  that's a good idea, and you act in accordance with your personal

1  idea, that that conduct can be prejudicial to good order and

2  discipline.

3       ACC: Certainly, Your Honor, yes.

4       MJ:  Do you think, in this case, that that's true?

5       ACC: Yes, Your Honor.

6       MJ:  Okay.  And for the same reasons we talked about before?

7       ACC: Yes, Your Honor.

8       MJ:  And what about service discrediting conduct?  If you

9  personally think that you're doing something for the greater good,

10  but the people with the authority to make those decisions hadn't made

11  the same decision you did, do you think that your conduct can still

12  be service discrediting?

13       ACC: Yes, Your Honor.

14       MJ:  Do you think it was service discrediting in this case?

15       ACC: Yes, Your Honor it was.

16       MJ:  And for this specification as well?

17       ACC: For this specification, yes.

18       MJ:  Okay.  And for different reasons or reasons we talked about

19  earlier?

20       ACC: For the same reasons.

21       MJ:  All right.  Government, anything else?

22       TC[MAJ FEIN]:  No, Your Honor.  Also, Your Honor, the government

23  has a copy of the Adkins memos, although, after reviewing the memos,