1    the inquiry that the Court already had about the extensive R.C.M. 706

2    board and findings the board should cover this material; it's

3    probably not needed.

4         MJ:   All right.   I'm just going to do -- I don't need to see the

5    material, but, PFC Manning, there were a couple of incidents around

6    the time you were making these disclosures where there was maybe a

7    little bit of outburst behavior.   How did that impact your -- did

8    that impact your mental state, in any way, when you were making these

9    decisions to willfully disclose this classified information?

10        ACC: No, Your Honor.

11        MJ:   Okay.   Were you of -- I mean, was your mind clear when you

12   are making these decisions?

13        ACC: Yes, Your Honor.

14        MJ:   Okay.   Do you think that there was anything that was

15   influence -- that was of any kind of mental health issue or mental

16   condition that was influencing your decisions to transmit these

17   documents willfully?

18        ACC: I think I had some issues, but I don't think it would

19   impact my performance or my ability to perform my duties, Your Honor,

20   so, no.

21        MJ:   All right.   Any further inquiry?

22        TC[MAJ FEIN]:   No, ma'am.

23        MJ:   Okay.   Mr. Coombs?

1      CDC[MR.COOMBS]:  No, Your Honor.

2      MJ:  All right.  Lastly, for this charge and specification,

3   let's talk about -- oh, we already talked about Specification 15,

4   didn't we?  All right.

5      ACC: Yes, Your Honor.

6      MJ:  Any other remaining specifications for charges under 18 --

7   the lesser included offenses for 18 United States Code, Section

8   793(e)?

9      TC[MAJ FEIN]:  No, ma'am.

10      CDC[MR.COOMBS]:  No, Your Honor.

11      MJ:  All right.  PFC Manning, do you admit that, at or near

12   Contingency Operation Station Hammer, Iraq, and for Specifications 5

13   and 7, also, at or near Rockville, Maryland, for Specification 2,

14   between on or about February 2010 [sic] and 21 February 2010, you,

15   without authorization, had possession of, access to, or control over

16   a video file named, "12 Jul 07 CZ Engagement Zone 30GC anyone.avi"?

17      ACC: Yes, Your Honor.

18      MJ:  Do admit, for Specification 3 of Charge II, that between on

19   or about 17 March 2010 and 22 March 2010, you, without authorization,

20   had possession of, access to, or control over more than one

21   classified memorandum produced by a United States government

22   intelligence agency?

23      ACC: Yes, ma'am.

1      MJ:  For Specification 5, to admit that, at or near Contingency

2   Operation Station Hammer, Iraq and at or near Rockville, Maryland

3   that you, without authorization, had possession of, access to, or

4   control over more than 20 classified records from the Combined

5   Information Data Network Exchange-Iraq database?

6      ACC: Yes, ma'am.

7      MJ:  Do admit, for Specification 7, that, at or near Contingency

8   Operation Station Hammer, Iraq, and at or near Rockville, Maryland,

9   between on or about 5 February -- or 5 January 2010 and 3 February

10  2010, you, without authorization, had possession of, access to, or

11  control over more than 20 classified records from the Combined

12  Information Data Network Exchange-Afghanistan database?

13     ACC: Yes, ma'am.

14     MJ:  For Specification 9, do admit that, at or near Contingency

15  Hammer Station, Iraq [sic], that on or about 8 March 2010, you,

16  without authorization, had possession of, access to, or control over

17  more than three classified records from the United States Southern

18  Command database?

19     ACC: Yes, ma'am.

20     MJ:  For Specification 10, do admit that, at or near Contingency

21  Operating Station Hammer, Iraq, between on or about 10 April 2010 and

22  12 April 2010, you, without authorization, had possession of, access

23  to, or control over more than five classified records relating to a

1   military operation in Farah Province, Afghanistan occurring on or

2   about 4 May 2009?

3        ACC: Yes, ma'am.

4        MJ:  For Specification 15, do you admit that, at or near

5   Contingency Hammer -- Operating Station Hammer, Iraq, on or about 8

6   March 2010, you, without authorization, had possession of, access to,

7   or control over a classified record produced by a United States Army

8   intelligence organization, dated 18 March 2008?

9        ACC: Yes, ma'am.

10        MJ:  All right.  For all of the specifications, do you admit

11   that you willfully communicated the classified records, classified

12   memorandum, videos, and files described for each specification

13   described in element one to a person not entitled to receive it?

14        ACC: Yes, Your Honor.

15        MJ:  And do you admit that, under the circumstances, your

16   conduct was to the prejudice of good order and discipline in the

17   armed forces or the nature to bring discredit upon the armed forces?

18        ACC: Yes, Your Honor.

19        MJ:  All right.  Let's move into Specifications 13 and 14 of

20   Charge II which are the lesser included offenses to the offenses

21   charged as a violation of 18 United States Code, Section 1030(a)(1),

22   and Article 134.

1      All right, Specifications 13 and 14 of Charge II allege the

2  offense of fraud and related activity in connection with computers in

3  violation of Title 18, United States Code, Section 1030(a)(1) and

4  Article 134, UCMJ.  Your counsel has entered a plea of guilty by

5  exceptions and substitutions for you to the lesser included offense

6  of conduct prejudicial to good order and discipline and service

7  discrediting conduct in violation of Article 134, UCMJ, clauses one

8  and two.

9      Now, your plea of guilty admits that the following elements

10  are true and accurately describe what you did:

11      One, that at or near Contingency Operation Station Hammer,

12  Iraq, for Specification 13 between on or about 28 March 2010 and on

13  or about 4 May 2010; for Specification 14, between on or about 14

14  February 2010 and 15 February 2010, you knowingly accessed a computer

15  on a Secret Internet Protocol Router Network.

16      Element two, that you obtained information that has been

17  determined by the United States government, by executive order or

18  statute, to require protection against unauthorized disclosure for

19  reasons of national defense or foreign relations, to wit:

20  Specification 13, more than 75 classified United States Department of

21  State cables; in Specification 14, a classified Department of State

22  cable titled "Reykjavík 13."

1          Element three, that you communicated, delivered,

2     transmitted, or caused to be communicated, delivered, or transmitted

3     the information to a person not entitled to receive it.

4          Element four, that you acted willfully.

5          And element five, that under the circumstances, your

6     conduct was to the prejudice of good order and discipline in the

7     armed forces or was of a nature to bring discredit upon the armed

8     forces.

9          The same definitions for "prejudice to good order and

10    discipline in the armed forces" and "of a nature to bring discredit

11    upon the armed forces" that I read for you for the offenses charged

12    in Specifications 2, 3, 5, 7, 9, 10, and 15 of Charge II also apply

13    to this offense.

14         Would you like me to read them to you again?

15    ACC:  No, Your Honor, that's not necessary.

16    MJ:  An act is done willfully if it is done voluntarily and

17    intentionally with a specific intent to do something the law forbids,

18    that is, with a bad purpose to disobey or disregard the law.

19         An act is done knowingly if it's done voluntarily and

20    intentionally and not because of a mistake or accident or other

21    innocent reason.

22         The term "computer" means an electronic, magnetic, optical,

23    electrochemical, or other high-speed data processing device

1  performing logical, arithmetic, or storage functions and includes any

2  data storage facility or communications facility directly related to,

3  or operating in conjunction with such device, but the term does not

4  include an automatic typewriter or typesetter, portable handheld

5  calculator, or a similar device.

6       All right.  Once again, in -- I defined "person" for you,

7  earlier; the same definitions apply.  Would you like me to read that

8  again?

9       ACC: No, Your Honor.

10      MJ:  All right.  And if this was going to a trier of fact, in

11  determining whether the person who received the information was

12  entitled to receive it, the trier of fact may consider all the

13  evidence introduced at trial, including any evidence concerning the

14  classification status of the information, any evidence relating to

15  law or regulations governing classification and declassification of

16  national security information, its handling use and distribution, as

17  well as any evidence relating to regulations governing the handling,

18  use, and distribution of the information obtained from the classified

19  systems.

20      Do you understand the elements and definitions as I read

21  them to you?

22      ACC: Yes, ma'am.

23      MJ:  Do you have any questions about them?

1      ACC: No, ma'am.

2      MJ:  Do you understand that your plea of guilty admits that

3   these elements accurately describe what you did?

4      ACC: Yes, Your Honor.

5      MJ:  Do you believe and admit that the elements and definitions,

6   taken together, correctly describe what you did?

7      ACC: Yes, Your Honor.

8      MJ:  Now, do you understand -- also, same for this offense as

9   the other offenses, that -- if -- your plea to the lesser included

10  offenses I just read is going to establish some of the elements for

11  the government if they intend to proceed with the greater offenses?

12     ACC: Yes, Your Honor.

13     MJ:  I just want to stop here and make sure both sides agree

14  with this.  Even though -- I distinguished the elements that -- what

15  your plea would establish and what the government had left to prove.

16  What I neglected to say is there is some discrepancy in the dates.

17  You pled by exceptions and substitutions to dates, so if the

18  government has a broader date range, even in an element you

19  established by your plea, the government still has to prove that

20  broader date range.  Okay?  Do you understand that?

21     ACC: Yes, Your Honor.

22     MJ:  Do both sides agree with that?

23     CDC[MR.COOMBS]:  Yes, Your Honor.

1          TC[MAJ FEIN]:  Yes, Your Honor.

2          MJ:  All right.  Let's talk about Specification -- well, let's

3     talk about Specification 14 first.  That's the Reykjavík cable?

4          ACC: Yes, Your Honor.

5          MJ:  All right.  Where is that in your ----

6          ACC: Its Page 17, Your Honor.

7          MJ:  Okay.  This was the cable where I believe you were talking

8     about you were beginning in -- to get interested in this Icesave?

9          ACC: Yes, Your Honor.

10         MJ:  Okay.  Now, what -- this cable entitled "Reykjavík," it's

11    from the Department of State Net-Centric Diplomacy portal.  What is

12    that?

13         ACC: It is the -- or was the SIPR -- one of the SIPR portals

14    that the Department of State had that published -- I guess their wide

15    distribution tables, Your Honor.

16         MJ:  So, did -- you had access to SIPRNET as part of your

17    duties?

18         ACC: Yes, Your Honor.

19         MJ:  And you were cleared to have access to that level of

20    information?

21         ACC: Yes, Your Honor.

22         MJ:  Now, you testified earlier that you had gone to SIPRNET to

23    get CENTCOM and SOUTHCOM and other database information.  Was this

1    Department of State site on the same SIPRNET -- you know -- could you

2    go to the Department of State just like you could go to CENTCOM or

3    SOUTHCOM?

4         ACC: Yes, Your Honor, you just change the address that you go

5    to, yes.

6         MJ:  So, were you authorized to go and get that Department of

7    State -- to access that portal?

8         ACC: Yes, Your Honor, I was actually told to go there, Your

9    Honor.

10        MJ:  And were you told by this Captain Lim to go there?

11        ACC: Yes, Your Honor.

12        MJ:  Okay.  Who is Captain Lim?

13        ACC: Captain Lim was originally the Assistant S-2 and after our

14   full-time S-2 shifted to a different position, he became -- he

15   covered down and became the brigade S-2, Your Honor.

16        MJ:  All right.  So, were you and the other analysts all

17   authorized to go to this database?

18        ACC: Yes, Your Honor.

19        MJ:  And did you use it in your intelligence analyst duties?

20        ACC: I did, Your Honor, yes.

21        MJ:  The information from it?

22        ACC: Yes, Your Honor.

1      MJ:   Okay.   Now, was this information -- you testified earlier

2    that not all of it was classified, but was this Reykjavík cable

3    classified?

4      ACC: It was, Your Honor.

5      MJ:   Now, what did you do -- so, then, were you authorized from

6    that portal to download it onto a portable medium and take it to your

7    house -- or your CHU?

8      ACC: No, Your Honor.

9      MJ:   Okay.   What did you do -- did you download that cable?

10     ACC: I did, Your Honor.

11     MJ:   On what?

12     ACC: I took the web page and I copied and pasted the data onto a

13   text file which I then burned to a CD containing some other things --

14   I don't remember what -- and then I took that to my CHU, Your Honor.

15     MJ:   And what did you do with that when you went -- when you got

16   to your CHU?

17     ACC: I put that onto my personal computer and then uploaded it

18   using the form, Your Honor.

19     MJ:   Using what form?

20     ACC: The website form for the WikiLeaks website.

21     MJ:   So, you uploaded that Reykjavík cable to your personal

22   computer and then -- am I understanding your testimony -- that you

23   sent that cable to WikiLeaks?

1     ACC: Correct, Your Honor.

2     MJ:  On the form that they told senders to use?

3     ACC: Yes, Your Honor.

4     MJ:  Okay.  And, once again, same as the other things, were you

5  acting willfully?

6     ACC: Yes, Your Honor.

7     MJ:  Did you know you are violating the law?

8     ACC: I did, Your Honor, yes.

9     MJ:  Okay.  Did you -- was WikiLeaks entitled to receive this

10  Department of State cable?

11     ACC: No, Your Honor.

12     MJ:  Were they authorized to receive it?

13     ACC: No, Your Honor.

14     MJ:  Okay.  Were you authorized to send it?

15     ACC: I was not, Your Honor.

16     MJ:  Were you authorized to take it out of the SCIF?

17     ACC: No, Your Honor.

18     MJ:  These offenses also have the element of conduct prejudicial

19  to good order and discipline and service discrediting conduct.  Do

20  you believe your conduct, in sending this Reykjavík cable to

21  WikiLeaks, was prejudicial to good order and discipline?

22     ACC: It was, Your Honor, yes.

1      MJ:  And was it for the same reason we talked about earlier or

2    different reasons?

3      ACC: Definitely the same reasons, Your Honor, yes.

4      MJ:  Do you believe it was service discrediting?

5      ACC: Yes, Your Honor.

6      MJ:  And for the same reasons we talked about earlier or for

7    different reasons?

8      ACC: The same reasons, Your Honor.

9      MJ:  Okay.  You talked about, here, in your statement that you,

10   basically, concluded that Iceland was being bullied, diplomatically,

11   by two larger European powers and out of viable solutions and coming

12   to the U.S. for assistance and it didn't appear that we were going to

13   do anything.  We're you in a position of authority to decide what the

14   United States government was going to do with respect to Iceland?

15     ACC: No, Your Honor.

16     MJ:  Did -- We talked about the defense of justification and

17   necessity already.  Do you believe the fact that you -- you had a

18   personal belief in this -- that that somehow gave you an authorized

19   military duty to send this cable to WikiLeaks?

20     ACC: I did not have that belief, no, Your Honor.

21     MJ:  Okay.  So, you had no military duty, then, to send this

22   cable to WikiLeaks?

23     ACC: No, Your Honor.

1    MJ:  Okay.  And did you believe -- do you believe the defense of

2    necessity, as I defined it before -- you know, were you preventing

3    imminent harm to somebody, like the drowning person in the lake, by

4    sending this cable?

5    ACC: Correct, Your Honor.  So it doesn't ----

6    MJ:  That's a bad question.

7    ACC: ---- apply.

8    MJ:  Did I -- let me ask it again a better way.  We talked about

9    the defense of necessity.

10   ACC: Yes, Your Honor.

11   MJ:  To talk about trespassing over somebody's house to rescue

12   the drowning person because there is nobody else who can do it.  When

13   you sent this cable, were you in that kind of situation?

14   ACC: No, Your Honor, I was not.

15   MJ:  Does the defense of necessity apply in your case?

16   ACC: No, Your Honor.

17   MJ:  For this specification, did the ----

18   ACC: Not this specification, no Your Honor.

19   MJ:  Okay.  Does either side believe any further inquiry is

20   required?  Except for the date of the specification, did you act on -

21   - just a minute, what's the date on the specification, here?  That

22   would be -- did you act on 15 -- between 15 February and 18 February

23   of 2010?

1      ACC: Yes, Your Honor, it was 14 February and 15 February, Your

2  Honor.

3      MJ:  Oh, I'm sorry, that's right.  Those are the words you said

4  -- 14 and 15 February 2010; that's the exceptions and substitutions

5  you made.  So, your conduct, here, in Specification 14, then, was

6  between 14 February 2010 and 15 February 2010?

7      ACC: Yes, Your Honor.

8      MJ:  Okay.  Now, does either side believe any further inquiry is

9  required?

10      ATC[CPT MORROW]:  Your Honor, on Page 18, Paragraph F, the

11  accused states, "I felt I might be able to right a wrong by having

12  them publish this document."  That line, in particular, tends to

13  contradict something being service discrediting, so it might be

14  something the Court wants to explore just one more time.

15      MJ:  All right.  Well, we went over a little bit and the

16  government would like me to go over this in more detail.  This is --

17  your statement that they're talking about is, "I decided the cable

18  was something that would be important and I felt I might be able to

19  right a wrong by having them publish this document."  So, you,

20  personally, believed that you are doing a good thing, is that fair?

21      ACC: I felt it could be, yes, Your Honor.

1    MJ:  Okay.  So, we talked about, earlier, that -- did you have

2    the authority to decide to declassify a cable and send it to

3    WikiLeaks because you think a policy is a good thing?

4    ACC: Your Honor, being a junior-enlisted specialist, you know,

5    in the Army, no, Your Honor.

6    MJ:  So -- I mean -- so does somebody else get to make those

7    decisions?

8    ACC: I imagine in this case it would be the Department of State

9    in their channels, Your Honor.

10   MJ:  So, if the Department of State determines that this cable

11   should be classified and should not be released to WikiLeaks and you

12   decide, as a personal matter, that you don't agree with that and you

13   think it should be released to WikiLeaks and you do release it to

14   WikiLeaks, the fact that you think you're doing the right thing, can

15   that still be service discrediting?

16   ACC: Yes, Your Honor.

17   MJ:  And why?

18   ACC: Because it -- if Soldiers in the position I had did that,

19   then it -- I mean, it damages our perception -- the public's

20   perception of how -- whether the military and the services can

21   safeguard information, Your Honor.

1      MJ:  So, with respect to prejudice to good order and discipline,

2  if -- is the military and organization that follows a chain of

3  command?

4      ACC: Yes, Your Honor.

5      MJ:  So, if someone at the top of the chain of command makes a

6  decision and people below decide, "Well, I don't agree with that

7  decision, so I'm going to live off of my own moral code and not

8  follow the rules and regulations that are set forth by the people

9  with authority to make those rules and regulations," what happens to

10  the organization?

11      ACC: It -- you can't operate in that -- I mean, you just have --

12  we would have junior ranks making decisions that contradict the

13  orders and so the system would seize up, Your Honor.

14      MJ:  So, do you think that could be prejudicial to good order

15  and discipline?

16      ACC: Absolutely, Your Honor, yes.

17      MJ:  All right.  And is that sort of what you were talking to me

18  -- when you were talking to me earlier about service discrediting

19  conduct that might cause people to lose confidence in an organization

20  if they see it sort of disintegrating like that?

21      ACC: Yes, Your Honor, it would be worrying, yes.

1       MJ:  All right.  And do you believe that your conduct in this

2   case, you know, contributed, I guess to, at least a minor part, to

3   that disorganization?

4       ACC: Yes, Your Honor.

5       MJ:  Okay.  Does the government believe any further inquiry is

6   required?

7       ATC[CPT MORROW]:  No, Your Honor.

8       CDC[MR.COOMBS]:  No, Your Honor.

9       MJ:  Now, let's look at Specification 13.  Now, that talks about

10   more than 75 classified cables.  Now, did you have access to more

11   than 75 classified cable -- Department of State cables?

12       ACC: Yes, Your Honor.

13       MJ:  All right.  Did you get those from the same portal that you

14   got the Reykjavík cable from?

15       ACC: I did, Your Honor.

16       MJ:  All right.  And was that also done -- was that done between

17   28 March 2010 and 4 May 2010?

18       ACC: It was done, I think, around the 10th of April, Your Honor.

19       MJ:  All right.  So, is the 10th of April between 28 March 2010

20   and on or about 4 May 2010?

21       ACC: Yes, it is, Your Honor; April.

1      MJ:  Okay.  So, it would be between those dates that -- I mean,

2  that's the way that your plea by exceptions and substitutions has

3  those dates.  Do you believe that those are accurate dates?

4      ACC: Yes, Your Honor, I do.

5      MJ:  Okay.  Now, where on your timeline are we talking about --

6  or in your statement are we talking about those cables in

7  Specification 13 of Charge II?

8      ACC: It's Page 30, Your Honor, Section 11.

9      MJ:  All right.  So, this is -- so, when you -- are these cables

10  the last thing that you uploaded and sent?

11      ACC: Yes, Your Honor.

12      MJ:  Okay.  So, we're getting, now, into the late March

13  timeframe and you said in your statement that you had begun

14  establishing a dialogue with some -- at least one person -- or two

15  people from WikiLeaks?

16      ACC: At least one user account.  I don't know what was on the

17  other side, Your Honor.

18      MJ:  Okay.  And I guess at some point in your statement you were

19  talking about -- you began to look at these Department of State

20  cables and you began to be really interested in them?

21      ACC: Yes, Your Honor.

22      MJ:  Okay.  Tell me about that.

1    ACC: Well, in the course of my duties, I previously started

2    looking at, as directed -- I started looking at cables, more

3    specifically, for the Baghdad series of cables and then things that

4    were tagged with "Iraq" -- so, the general area of Iraq and then I

5    went over to Afghanistan and then I started looking just wherever my

6    interest piqued, Your Honor.

7        MJ:  Okay.  And did you download any cables off of the SIPRNET?

8        ACC: Yes, Your Honor.

9        MJ:  And to what?

10       ACC: To, first, the -- my workstation, Your Honor, and then from

11   the workstation onto CD -- onto DVD-RW and then onto my personal

12   laptop.

13       MJ:  Okay.  So, did you do this, basically, the same way that --

14   and you were -- were you authorized to access the portal to get the

15   cable -- to look at the cables?

16       ACC: Yes, Your Honor.

17       MJ:  Were you authorized to download them to your personal

18   workstation?

19       ACC: To my workstation?  Yes, Your Honor.

20       MJ:  Were you authorized to download them to a CD?

21       ACC: Yes, Your Honor.

22       MJ:  Were you authorized to take them out of the SCIF?

23       ACC: No, Your Honor.

1    MJ:  All right.  Were you authorized put them on your personal

2    computer?

3    ACC: No, Your Honor.

4    MJ:  Were you authorized -- did you transfer them to WikiLeaks?

5    ACC: I re-did the documents to clean them up and then I uploaded

6    them.

7    MJ:  Okay.  When you said you re-did the documents to clean them

8    up, what does that mean?

9    ACC: There was a lot of, like, extraneous formatting that I

10   removed from the documents and I put it into a table, Your Honor.

11   MJ:  Other than formatting, did you take any -- did you change

12   any of the substance?

13   ACC: No substance changes, no, Your Honor.

14   MJ:  So -- what -- and these more than 75 cables were

15   classified, the charged cables?

16   ACC: Yes, Your Honor.

17   MJ:  And did you move anything -- remove anything from those

18   cables that would have made them unclassified?

19   ACC: No, Your Honor.

20   MJ:  So, when you sent them to WikiLeaks, were they still

21   classified?

22   ACC: They still had classification markings, yes, Your Honor.

1      MJ:  Well, if the substance didn't change, would the reason that

2  they had classification markings still be present?

3      ACC: Yes, Your Honor.

4      MJ:  Okay.  So, you didn't change the words?

5      ACC: Correct, Your Honor.

6      MJ:  You just changed the formatting, is that what I'm hearing?

7      ACC: Changed how it worked and how you accessed it, Your Honor.

8      MJ:  But the words of the substance from what you took out of

9  the State Department portal and what you, ultimately, wound up

10  sending to WikiLeaks was the same?

11      ACC: Yes, Your Honor.

12      MJ:  Okay.  Did you act willfully?

13      ACC: Yes, Your Honor.

14      MJ:  And was WikiLeaks entitled to receive the State Department

15  -- the classified State Department cables?

16      ACC: No, Your Honor.

17      MJ:  And, under the circumstances, was your conduct to the

18  prejudice of good order and discipline in the armed forces or of a

19  nature to bring discredit upon the armed forces?

20      ACC: No, Your Honor -- well, yes -- I think.  Yes, it is ----

21      MJ:  Okay.  Let me ask the question again ----

22      ACC: ---- prejudicial.

1       MJ:   Sometimes my questions can be confusing.   Was your conduct

2   to the prejudice of good order and discipline in the armed forces?

3       ACC: Yes, Your Honor.

4       MJ:   Was is of a nature to bring discredit upon the armed

5   forces?

6       ACC: Yes, Your Honor.

7       MJ:   Was -- are you answering "yes" because of the reasons we

8   spoke about earlier or for different reasons?

9       ACC: The same reasons, Your Honor.

10      MJ:   Okay.   So, am I -- what I'm hearing you tell me, is, then -

11  - basically, for all these specifications that we talked about today,

12  your conduct was prejudicial to good order and discipline and service

13  discrediting conduct for the same reason?

14      ACC: Yes, Your Honor.

15      MJ:   All right.   You also say here that you were talking about

16  looking at the Department of State cables and how they were --you

17  know, they're SIPDIS means it goes onto SIPRNET and a lot of people

18  have access to SIPRNET -- when classified documents are on SIPRNET

19  and a lot of people are cleared to have access to SIPRNET, does that

20  give you any authorization, justification, or excuse to -- does that

21  mean those can be downloaded off of SIPRNET to personal computers and

22  shipped to people who don't have clearances?

23      ACC: No, Your Honor.

1      MJ:   Okay.   So, even though a lot of people have access to

2    SIPRNET, it's a controlled access?   I mean, did somebody give them

3    authority to get onto SIPRNET or can any Tom, Dick, and Harry just go

4    onto SIPRNET?

5      ACC: If you have -- at the time, if you had access to a SIPRNET

6    computer and you were on SIPRNET, you have access to the Net-Centric

7    Diplomacy site, Your Honor.

8      MJ:   I guess where I'm going is -- to -- for a person to get

9    access to SIPRNET, you have to -- does someone have to give you a

10   username and password?

11     ACC: For our unit, it was the S-6 that would give us that, Your

12   Honor.

13     MJ:   All right.   So, say I walk into your unit at Contingency

14   Operation Base Hammer and I haven't been authorized by anybody to do

15   anything with respect to SIPRNET and I walk into the SCIF, can I go

16   on SIPRNET?

17     ACC: No, Your Honor, you would have to -- we wouldn't let you

18   in, Your Honor.

19     MJ:   But I guess where I'm going with this is to get onto

20   SIPRNET, are there some kind of controls so I can't get on it if I

21   walk into the SCIF on Contingency Operation Base Hammer?

22     ACC: In the SCIF?   Yes, Your Honor.

1    MJ:  Okay.  If there is SIPRNET anywhere other than the SCIF,

2  are there some controls on who can get on it and who can have access

3  to that information?

4    ACC: Sometimes no, Your Honor.

5    MJ:  No?  Okay.  So anybody can just get on and go use it?

6    ACC: For some workstations, yes, Your Honor.  Legally, no, but

7  the reality was yes.

8    MJ:  Okay.  WikiLeaks -- are they -- would they have any

9  authorization under any circumstances to access the SIPRNET computer?

10    ACC: No, Your Honor.

11    MJ:  So, when you downloaded that Department of State

12  information and brought it to your personal computer and when you

13  sent it to WikiLeaks, did you have any thought in your mind that they

14  were legally authorized to receive it?

15    ACC: No, Your Honor.

16    MJ:  Okay.  So you knew what you're doing was wrong?

17    ACC: Yes, Your Honor.

18    MJ:  And you knew it was against the law?

19    ACC: Correct, Your Honor.

20    MJ:  Does either side desire any further inquiry with respect to

21  the more than 75 classified cables?

22    TC[MAJ FEIN]:  No, Your Honor.

23    CDC[MR.COOMBS]:  No, Your Honor.

1    MJ:  All right.  Did you say something about these files were

2  corrupted and they had to be sent again or something of that nature?

3    ACC: The later ones -- although the ones that were available up

4  to February of 2010 and then March and April were corrupted, Your

5  Honor.

6    MJ:  Okay.  Well, what happened -- I thought you testified

7  earlier that, for Specification 13 of Charge II, you sent them in

8  April?

9    ACC: I did send them in April, but that was the ones up to

10  February, Your Honor.

11    MJ:  Oh, okay.  So you sent the ones up in February that were

12  not corrupted in April?

13    ACC: Yes, Your Honor, and then ----

14    MJ:  So, the more than 75 classified charged documents, were

15  they among the corrupted or the not corrupted?

16    ACC: The not corrupted, Your Honor.

17    MJ:  So they -- you sent them and they made it?

18    ACC: Yes, Your Honor.

19    MJ:  Okay.

20    ACC: And then I made an attempt to add two more months and that

21  never happened, Your Honor.

22    MJ:  Okay.  So, you actually did send them more than 75

23  classified cables to WikiLeaks?

1       ACC: Correct, Your Honor.

2       MJ:  Does either side believe any further inquiry is required

3   with respect to Specifications 13 and 14 of Charge II?

4       TC[MAJ FEIN]:  No, Your Honor.

5       CDC[MR.COOMBS]:  No, Your Honor.

6       MJ:  All right.  PFC Manning, then, do you admit that, at or

7   near Contingency Operating Station Hammer, Iraq, for Specification

8   13, between on or about 28 March and on or about 4 May 2010, that you

9   obtained information that has been determined by the United States

10  government, by executive order or statute, to require protection

11  against unauthorized disclosure for reasons of national defense or

12  foreign relations, to wit, for Specification 13:  more than 75 United

13  States Department of State cables?  And do you admit that, at or near

14  Contingency Operations Station Hammer, for Specification 14, between

15  on or about 14 February 2010 and 15 February 2010, you knowingly

16  accessed a computer on a Secret Internet Protocol Router Network and

17  that you obtained information that has been determined by the United

18  States government, by executive order or statute, to require

19  protection against unauthorized disclosure for reasons of national

20  defense or foreign relations, to wit, for Specification 14:  a

21  classified Department of State cable titled, "Reykjavík 13"?

22      ACC: Yes, Your Honor.

1    MJ:  All right.  For this element, too, were you talking about -

2    - the information has been determined by the United States

3    government, by executive order or statute, to require protection

4    against unauthorized disclosure for reasons of national defense or

5    foreign relations, does that mean classification?

6    ACC: Yes, Your Honor.

7    MJ:  Okay.  So, if a document is classified, does that fall into

8    that category, here?

9    ACC: It does, Your Honor.

10    MJ:  Do the parties agree?

11    CDC[MR.COOMBS]:  Yes, Your Honor.

12    TC[MAJ FEIN]:  Yes, Your Honor.

13    MJ:  Okay.  And do you admit, then, for Specifications 13 and 14

14    of Charge II that you communicated, delivered, transmitted, or caused

15    to be communicated, delivered, or transmitted, the information to a

16    person not entitled to receive it?

17    ACC: Yes, Your Honor.

18    MJ:  Do you admit that you acted willfully?

19    ACC: Yes, Your Honor.

20    MJ:  And do you admit that under the circumstances, your conduct

21    was to the prejudice of good order and discipline in the armed forces

22    or of a nature to bring discredit upon the armed forces?

23    ACC: Yes, Your Honor.

1      MJ:  All right.  We have one final specification to go over and

2   that's Specification 5 of Charge III.  Are the parties ready to

3   proceed?  PFC Manning, are you ready to proceed or do you want to

4   have a brief recess before we go into that one?

5      ACC: Continue, Your Honor.

6      MJ:  All right.  Now, do you have a copy -- I've asked your

7   counsel to make a copy for you of the first page of Army Regulation

8   380-5, dated 29 September 2000, as well as Paragraph 7-4, the

9   paragraph you're charged with violating in that regulation and

10  Paragraph 1-21, entitled "Sanctions."  Do you have a copy of all

11  three of those before you?

12     ACC: Yes, Your Honor.

13     MJ:  Let's talk about Specification 5 of Charge III.  In

14  Specification 5 of Charge III, you're charged with the offense of

15  violating a lawful general order in violation of Article 92, UCMJ.

16  Your defense counsel has entered pleas by exceptions and

17  substitutions for this offense as well.  By pleading guilty -- but

18  you're pleading guilty to the same offense, just different dates, I

19  believe, is the exceptions and substitutions.

20          By pleading guilty to this offense, you're admitting that

21  the following elements accurately describe what you did:

1     One, there was in existence a certain lawful general

2 regulation in the following terms:   Paragraph 7-4, Army Regulation

3 380-5, dated 29 September 2000.

4     Two, that you had a duty to obey that regulation.

5     And three, that at or near Contingency Operating Station

6 Hammer, Iraq, between on or about 8 January 2010 and on or about 10

7 May 2010, you violated this lawful general regulation by wrongfully

8 storing classified information.

9     Okay, give me one minute, here.

10 CDC[MR.COOMBS]:   Ma'am, the Court had stated 10 May for the end

11 date and it's 27 May

12 MJ:   27 May -- that's what -- I thought I saw that.   Okay.   So,

13 let's go -- let's just change that last element, here.   So, that

14 would be that, at or near -- the element three would be that, at or

15 near Contingency Operations Station Hammer, Iraq, between on or about

16 8 January 2010 and on or about 27 May 2010, you violated this lawful

17 general regulation by wrongfully storing information.

18     And general regulations are those regulations which are

19 generally applicable to an armed force in which are properly

20 published by the secretary of a military -- by a military department.

21 General regulations also include regulations which are generally

22 applicable to the command of the officer issuing them throughout the

23 command or a particular subdivision in which are issued by a general

1    officer having general court-martial jurisdiction or a general or

2    flag officer in command or a commander superior to one of those.

3         When a general regulation prohibits certain acts, except

4    under certain conditions, then your conduct must not have come in --

5    fallen within one of the exceptions to regulation.  And, once again,

6    you must have had a duty to obey that regulation.

7         To do something wrongfully means to do something without

8    legal justification or excuse.

9         Do you understand the elements and definitions as I read

10   them to you?

11       ACC: Yes, Your Honor.

12       MJ:  Do you have any questions about them?

13       ACC: Yes, Your Honor, or no, Your Honor, I don't have any.

14       MJ:  Do understand that your plea of guilty admits that these

15   elements accurately describe what you did?

16       ACC: Yes, Your Honor.

17       MJ:  Do you believe it admits that the elements and definitions,

18   taken together, correctly describe what you did?

19       ACC: Yes, ma'am.

20       MJ:  All right.  Now, let's -- were you still at Contingency --

21   were you still deployed at Contingency Operation Base Hammer, Iraq on

22   the dates that you -- between 8 January 2010 and 27 May 2010?

23       ACC: Yes, Your Honor.

10735

1        MJ:   Okay.   Now, you have a copy -- we talked about earlier of

2    the front page of the Army Regulation 380-5?

3        ACC: I do, Your Honor.

4        MJ:   Was the title of that regulation?

5        ACC: Department of Army Information Security Program.

6        MJ:   And who is it issued by?   It's on the bottom.

7        ACC: Headquarters, Department of the Army.

8        MJ:   Do you believe that this is a lawful general regulation?

9        ACC: Yes, Your Honor.

10       MJ:   All right.   Next, at Paragraph 21 -- 1-21, where it says,

11   "Sanctions" ----

12       ACC: Just, Your Honor.

13       MJ:   ---- do you believe that this -- a regulation has to be --

14   sometimes regulations provide guidance and sometimes they're

15   punitive.   Do you believe that AR 380-5 is a punitive regulation?

16       ACC: Yes, Your Honor.

17       MJ:   And what's this regulation meant to govern?

18       ACC: It governs information security, Your Honor.

19       MJ:   All right.   Let's look at -- it's Chapter 7 you also have a

20   copy of, it talks about storage and physical security standards and

21   part of that, in Section 2, is Paragraph 7-4 and that's the paragraph

22   that you are accused of violating.   Can you tell me how you violated

23   that paragraph?

1    ACC: Yes, Your Honor, by not abiding by 380-5 -- in this

2    paragraph -- in my -- in wrongfully storing and transferring

3    classified information -- properly classified information throughout

4    my period in Iraq.

5    MJ:  So, are you talking about -- is this information targeting

6    -- we spent the afternoon talking about how you transferred

7    everything from the Reykjavík cable all the way through and then

8    ending with the Department of State cables in each of the

9    specifications that we just discussed.

10    ACC: Yes, Your Honor.

11    MJ:  So, when you were telling me about taking the --

12    downloading the information from your computer to your workstation

13    and then to your CD and then leaving the SCIF and uploading that to

14    your personal computer and sending it out, basically, over the

15    unsecured Internet, is that the conduct that you're talking to me

16    about that violates this regulation?

17    ACC: Yes, Your Honor.

18    MJ:  Are you allowed, under this regulation, to take classified

19    information from a SIPRNET computer and take it to your home computer

20    and upload it?

21    ACC: No, Your Honor.

1      MJ:  Are you authorized to send classified information that

2  you've taken and downloaded on a CD and put on your personal computer

3  to send that over the general Internet waves?

4      ACC: No, Your Honor.

5      MJ:  All right.  When you do that, does this violate this

6  Paragraph 7-4 of Army Regulation 380-5?

7      ACC: Yes, Your Honor.

8      MJ:  All right.  Is it the parties' theory that this is -- in

9  this specification, that it's violated in some other fashion?

10     TC[MAJ FEIN]:  No, Your Honor.

11     CDC[MR.COOMBS]:  No, Your Honor.

12     MJ:  All right.  Do the parties believe -- and this was done

13  between the dates we talked about, here, between 8 January 2010 and

14  27 May 2010?

15     ACC: Yes, Your Honor.

16     MJ:  Okay.  Does either side believe any further inquiry is

17  required?

18     ATC[CPT MORROW]:  Your Honor, I may have missed this, but did

19  you explain divers occasions to the accused?

20     MJ:  Do I have divers occasions on here?

21     ATC[CPT MORROW]:  It is in the specification.

22     MJ:  No, I didn't even read it in the element, thank you.

1       All right, the written statement, I believe I have also

2   from you all, doesn't have the words "divers occasions" in it with

3   the elements.  So, PFC Manning, when I'm going over -- this is the

4   attachment to the statement that you gave me.  So, I just want to

5   make sure you understand what divers occasions means and that --

6   since you didn't except those words out, what you are pleading guilty

7   to.  You're charged with -- on divers -- your -- violating this

8   regulation on divers occasions between the dates we just discussed

9   which were 8 January 2010 and 27 May 2010.  Now, "divers occasions"

10  means two or more times.  So, did you violate this regulation,

11  between those dates, two or more times?

12      ACC:  Yes, Your Honor.

13      MJ:  Okay.  Because we discussed -- basically -- does your

14  conduct in Specifications 2, 3, 5, 7, 9, 10, 13, 14, and 15, all of

15  those specifications we just discussed involve you taking information

16  off of the SIPRNET, taking it out of the SIPR, and loading it either

17  onto your personal computer or your camera and sending those to

18  WikiLeaks.  So, the loading of the information in those

19  specifications on your personal computer, is that in violation of AR

20  380-5, Paragraph 7-4?

21      ACC:  Yes, Your Honor.

22      MJ:  Okay.  And you did that more than two times, right?

23      ACC:  Yes, Your Honor.

1      MJ:  Okay.  Same thing for sending the information from your

2    personal computer to, over the unsecure Internet, to WikiLeaks, you

3    did that more than two times, too, is that right?

4      ACC: Yes, Your Honor.

5      MJ:  Okay.  Does either side believe any further inquiry is

6    required?

7      ATC[CPT MORROW]:  No, Your Honor.

8      CDC[MR.COOMBS]:  No, Your Honor.

9      MJ:  All right.  PFC Manning, do you admit that there was in

10   existence a lawful general regulation in the following terms:

11   Paragraph 7-4, Army Regulation 380-5, dated 29 September 2000?

12     ACC: Yes, Your Honor.

13     MJ:  Do you admit that you had a duty to obey that regulation?

14     ACC: Yes, Your Honor.

15     MJ:  And do you admit that, on divers occasions, between on or

16   about 8 January 2010 and on or about 27 May 2010, at or near

17   Contingency Operating Station Hammer, you violated this lawful

18   general regulation by wrongfully storing classified information?

19     ACC: Yes, Your Honor.

20     MJ:  Does either side believe any further inquiry is required as

21   to any of this?

22     CDC[MR.COOMBS]:  No, Your Honor.

1    TC[MAJ FEIN]:  Your Honor, may we ask for a short recess before

2    you continue and before we answer that question?

3    MJ:  Certainly.  How long would you like?

4    TC[MAJ FEIN]:  15 minutes, Your Honor.

5    MJ:  All right.  If we start at 5 after, will 13 minutes give

6    you enough time to do what you need to do?

7    TC[MAJ FEIN]:  It will, ma'am.

8    MJ:  All right.  Court is in recess until 1705 or 5:05 PM.

9    **[The Article 39(a) session recessed at 1655, 28 February 2013.]**

10   **[The Article 39(a) session was called to order at 1708, 28 February**

11   **2013.]**

12   MJ:  This Article 39(a) session is called order.  Let the record

13   reflect all parties present when the court recessed are again present

14   in court.

15       PFC Manning, let me just ask you one more question on that

16   last -- your plea of guilty to Specification 5 of Charge III.  Did

17   you have a duty to obey that regulation?

18   ACC:  Yes, Your Honor.

19   MJ:  Government, any further inquiry?

20   TC[MAJ FEIN]:  Yes, ma'am, the first, really, is a question for

21   the Court, Your Honor.  Earlier the Court asked -- or made a

22   statement about the dates and how the government would have to prove

23   the greater date range versus the inclusive date range, but most of

1   the specifications are pled in between two dates.  So, I guess, the

2   government was unclear what the Court actually meant after looking

3   back at it.

4       MJ:  Well, if they're pled between two dates, that's fine.

5   Let's address that issue when it's ripe.

6       TC[MAJ FEIN]:  Yes, ma'am.

7       MJ:  If the evidence shows that it's -- if they're two broad

8   dates and the evidence shows it's two narrow dates, the Court could

9   find, by exceptions and substitutions, the narrower dates.  Or, if

10  they're different dates -- I don't know all of the -- I haven't

11  looked at this.  Are all of the lesser included offenses within the

12  dates charged by the government -- in the exceptions and

13  substitutions?

14      TC[MAJ FEIN]:  Yes, ma'am, that's why -- just making sure that

15  the Private First Class Manning understands that they're all

16  inclusive.

17      CDC[MR.COOMBS]:  The lesser included falls within their date

18  range, so the government's date ranges are wider than -- and what we

19  gave them were specific dates.

20      MJ:  All right.  So, I mean, PFC Manning, that's going to be a

21  fact-specific determination, you know, for the fact-finder at the

22  time.  You can plead guilty with a subset within a larger subset, but

23  your subset still is within a larger subset but it would be -- you

10742

1   know, the fact-finder could say, "Well, I just--truncate it and make

2   it on the evidence that has been presented."  So, do you have any

3   questions about that?

4        ACC: No, Your Honor.  I am good.

5        MJ:  Do the parties agree with my interpretation of this?  It's

6   really a fact-finding decision; it could be excepted and substituted

7   or left within the broader date range depending on how the facts come

8   out.

9        TC[MAJ FEIN]:  Yes, ma'am.

10       CDC[MR.COOMBS]:  Yes, Your Honor.

11       MJ:  Any further inquiry other than that?

12       TC[MAJ FEIN]:  Yes, ma'am, I defer to co-counsel.

13       ATC[CPT OVERGAARD]:  Ma'am, on Specification 13, you had

14  explored whether or not the cables were the same when they were

15  transmitted as they were when they were downloaded from the SIPRNET

16  and the government just wonders if the Court wants to explore that

17  with Specifications 5 and 7 as well because in Paragraph 6(t) on Page

18  16, there's reference to the possibility that the CIDNE-I and CIDNE-A

19  transmission had been sanitized between the download and the

20  transmission.

21       MJ:  All right.  Well, PFC Manning, let's talk about -- in all

22  of the specifications we talked about, let's look at it specification

1  by specification.   In Specification 2 of Charge II, was the video

2  altered in any way when you sent it?

3      ACC: No, Your Honor.

4      MJ:  So, you took what you got off the SIPRNET and that's what

5  you sent?

6      ACC: Yes, Your Honor.

7      MJ:  Specification 3, the two documents in Specification 3, the

8  classified memorandum, was that changed, in anyway, between the time

9  that you got it from SIPRNET and the time you sent it?

10      ACC: No, Your Honor.

11      MJ:  Specification 5, these are the two that the government

12  wants me to explore, Specifications 5 and 7; those are the two

13  databases -- the more than 20 documents.   Did you change those

14  between the time you took them off the SIPRNET and the time you sent

15  them to WikiLeaks?

16      ACC: Yes, Your Honor, I removed some extraneous information that

17  I did not feel needed to be in the version that I sent to whoever I

18  was going to send it to.

19      MJ:  When you talked about "you removed extraneous information,"

20  what extraneous information?

21      ACC: Specifically, IP addresses, usernames, a lot of other

22  information attached to the records, Your Honor.

1    MJ:  Would that -- the information that you removed, would that

2  have changed their status from classified to unclassified?

3    ACC: The -- I believe that the extraneous information that was

4  on there was classified -- that's my -- that was my impression and --

5  that, I removed.  So, I removed some classified information without

6  changing the other information, Your Honor.

7    MJ:  So, if the extraneous information you removed was

8  classified, were the cables -- the declassified cables that are

9  charged here that you sent ----

10    ACC: SIGACTs, Your Honor.

11    MJ:  ----- or the SIGACTs, I'm sorry.  Were they -- did they

12  remain classified because you took some of the classified information

13  out?

14    ACC: I did not remove the field -- the classification field, so

15  I don't know what status they are in because a lot of the documents

16  don't have classification markings separately.

17    MJ:  Okay.  Now, Government, the charged documents that we went

18  over at the beginning of the trial when PFC Manning was sitting over

19  here at the panel box, were they the charged documents as downloaded

20  from the SIPRNET or were they the charged documents as released?

21    TC[MAJ FEIN]:  Your Honor, the charged documents that were

22  printed and put in the binder in Appellate Exhibit 501 were the exact

1    documents printed from the SD card found at Private First Class

2    Manning's aunt's house.

3          MJ:  Okay.

4          TC[MAJ FEIN]:  So, as released.

5          MJ:  The charged documents on Specifications 5 and 7 that we

6    looked through, were those -- did they appear, when you viewed them,

7    in the same form as they were on the SD card in your aunt's camera?

8          ACC: Yes, Your Honor.

9          MJ:  Now, was that before or after they had been changed and the

10   extraneous information removed?

11         ACC: That's after, Your Honor.

12         MJ:  So, the charged documents, as they appear in that binder

13   that you looked at, are in the form that you had already changed and

14   the form that was sent to WikiLeaks?

15         ACC: Yes, Your Honor, it did.

16         MJ:  Were those documents, as you reviewed them in that binder,

17   are they classified?

18         ACC: Well, I would assume so because -- yes, Your Honor.

19         MJ:  Well, you're admitting, here, to a criminal offense that --

20   --

21         ACC: Yes.

1    MJ:  ---- you are transmitting classified documents so why don't

2    you take a couple of moments and talk to your counsel?  If they're

3    not classified, we may need to have another ----

4    ACC: They are classified, Your Honor.

5    MJ:  ---- conversation.

6    ACC: The original classification authority said that they're

7    classified, yes, Your Honor.

8    MJ:  And you're sure about that?

9    ACC: Yes, Your Honor.

10   MJ:  Okay.  So, at the time you sent them, they were classified?

11   ACC: Yes, Your Honor.

12   MJ:  All right.  And you're sure about that?

13   ACC: Yes, Your Honor.

14   MJ:  Okay.  Does other side believe any further inquiry is

15   required?

16   TC[MAJ FEIN]:  No, Your Honor.

17   CDC[MR.COOMBS]:  No, Your Honor.

18   MJ:  Trial Counsel, what did you calculate to be the maximum

19   punishment authorized in this case based solely on PFC Manning's

20   plea?

21   TC[MAJ FEIN]:  Your Honor, based solely on Private First Class

22   Manning's plea, the maximum punishment is to forfeit all pay and

1  allowances, to be reduced to Private (E1), to be confined for 20

2  years, and to be dishonorably discharged from the service.

3      MJ:  Defense Counsel, do you agree?

4      CDC[MR.COOMBS]:  Yes, Your Honor.

5      MJ:  All right.  PFC Manning, do you understand that, based on

6  your plea, alone, this court could sentence you to be reduced to the

7  grade of E1, to forfeit all pay and allowances, to be confined for up

8  to 20 years, and to be dishonorably discharged from the service?

9      ACC: Yes, ma'am.

10     MJ:  Is the government interested in a fine in this case?

11     TC[MAJ FEIN]:  Yes, Your Honor.

12     MJ:  And a potential fine also.  Do you have any question as to

13  the maximum sentence that could be imposed as a result of your guilty

14  plea?

15     ACC: No, Your Honor.

16     MJ:  And, Trial Counsel, is there any pre-trial agreement in

17  this case?

18     TC[MAJ FEIN]:  No, Your Honor.

19     MJ:  Even though, Counsel, there are no formal, written pre-

20  trial agreements, are there any unwritten agreements or

21  understandings in this case?

22     CDC[MR.COOMBS]:  No, Your Honor.

23     TC[MAJ FEIN]:  No, Your Honor.

1    MJ:  PFC Manning, has anybody made any agreement with you or

2  promise to you in order to get you to plead guilty?

3    ACC: No, Your Honor.

4    MJ:  Mr. Coombs and the rest of the defense team, have you had

5  enough time and opportunity to discuss this case with PFC Manning?

6    CDC[MR.COOMBS]:  Yes, Your Honor.

7    ADC [MAJ HURLEY]:  Yes, ma'am.

8    ADC [CPT TOOMAN]:  Yes, Your Honor.

9    MJ:  All right.  So, I've asked all three of you that; from now

10  on, I'll just -- Mr. Coombs if you can answer as lead counsel, then?

11    CDC[MR.COOMBS]:  Okay.

12    MJ:  PFC Manning, have you, in fact, consulted fully with your

13  defense team and received the full benefit of their advice?

14    ACC: Yes, Your Honor.

15    MJ:  Are you satisfied that your defense team's advice is in

16  your best interest?

17    ACC: Yes, Your Honor.

18    MJ:  Are you satisfied with your defense counsel?

19    ACC: Yes, Your Honor.

20    MJ:  Are you pleading guilty voluntarily and of your own free

21  will?

22    ACC: Yes, ma'am.

1      MJ:  Has anyone made any threat or in any way tried to force you

2  to plead guilty?

3      ACC: No, Your Honor.

4      MJ:  Do you have any questions as to the meaning and effect of

5  your guilty plea?

6      ACC: No, Your Honor.

7      MJ:  Do you fully understand the meaning and effect of your

8  guilty plea?

9      ACC: Yes, Your Honor.

10     MJ:  Do you understand that, even though you believe you are

11 guilty, you have a legal right to plead not guilty in place upon the

12 government the burden of proving your guilt beyond a reasonable

13 doubt?

14     ACC: Yes, Your Honor.

15     MJ:  Take a moment now consult, once again, with your defense

16 team and tell me if you still want to plead guilty.

17 **[The accused did as directed.]**

18     MJ:  All right.  Do you still want to plead guilty?

19     ACC: Yes, Your Honor.

20     MJ:  All right.  PFC Manning, I find your plea of guilty is made

21 voluntarily and with full knowledge of its meaning and effect.  I

22 further find you have knowingly, intelligently, and consciously

23 waived your rights against self-incrimination, to a trial of the

1  facts by a court-martial, and to be confronted by the witnesses

2  against you.  Accordingly, your plea of guilty is provident and is

3  accepted.  However, I advise you may request withdraw your plea at

4  any time before sentence is announced and, if you have a good reason

5  for your request, I will grant it.

6      Now, is the government going forward on the offenses to

7  which the accused has plead not guilty?

8      TC[MAJ FEIN]:  Ma'am, given the seriousness of Private First

9  Class Manning's charged conduct, the United States does intend to go

10  forward with all the charges as originally charged.

11     MJ:  All right, then, in that case the Court is not going to

12  make findings with respect to the guilty pleas at this point.  PFC

13  Manning, as we discussed earlier, what that means is the government

14  is going to go forward with the charges as charged.  Nothing you've

15  said today can be used by the government when they prove the case,

16  however, the elements that you've established in your plea, the

17  government does not have to present any proof of those.  Your plea

18  has established those elements so we just have the remaining elements

19  that are left, we've got the outstanding issue that the parties are

20  briefing with the 793(e) offenses as to the tangible/intangible

21  element that we discussed earlier, whether it's only intangible that

22  requires the reason to believe additional elements or whether both

23  do.  So, that's -- will be decided at the next Article 39(a) session.