# EXHIBIT F

## FILED UNDER SEAL

UNCLASSIFIED

Unmarked redactions were present when the Army received this document 29th January 2013

MEMORANDUM THRU Civilian Defense Counsel, 11 South Angell Street #317, Providence, RI 02906
Military Defense Counsel, U.S. Army Trial Defense Service (USATDS), Fort Belvoir, VA 22060

FOR Military Judge, U.S. Army First Judicial Circuit, Fort Meade, MD 20755
Trial Counsel, Joint Force Headquarters – National Capital Region/Military District of Washington (JFHQ-NCR/MDW), 103 3rd Avenue SW, Fort McNair, DC 20319-5058

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)

1. (U) The following facts are provided in support of the providence inquiry for my court-martial, United States v. PFC Bradley E. Manning.

2. (U) Personal Facts.

   a. (U) I am a twenty-five (25) year-old Private First Class in the United States Army, currently assigned to Headquarters and Headquarters Company (HHC), U.S. Army Garrison (USAG), Joint Base Myer-Henderson Hall, Fort Myer, Virginia. Prior to this assignment, I was assigned to HHC, 2nd Brigade Combat Team, 10th Mountain Division, Fort Drum, New York. My Primary Military Occupational Specialty (PMOS) is 35F, "Intelligence Analyst."

   b. (U) I entered Active Duty status on 2 October 2007. I enlisted with the hope of obtaining both real-world experience and earning benefits under the GI Bill for college opportunities.

3. (U) Facts Regarding My position as an Intelligence Analyst.

   a. (U) In order to enlist in the Army, I took the standard Armed Services Aptitude Battery (ASVAB). My score on this battery was high enough for me to qualify for any enlisted MOS position. My recruiter informed me that I should select an MOS that complimented my interests outside the military. In response, I told him I was interested in geopolitical matters and information technology. He suggested I consider becoming an intelligence analyst.

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


b. (U) After researching the Intelligence Analyst position, I
agreed that this would be a good fit for me.  In particular, I
enjoyed the fact that an analyst would use information derived
from a variety of sources to create work products that informed
the command on its available choices for determining the best
courses of action (COAs).  Although the MOS required a working
knowledge of computers, it primarily required me to consider how
raw information can be combined with other available
intelligence sources in order to create products that assisted
the command in its situational awareness (SA).  I assessed that
my natural interest in geopolitical affairs and my computer
skills would make me an excellent Intelligence Analyst.

c. (U) After enlisting, I reported to the Fort Meade Military
Entrance Processing Station (MEPS) on 01 October 2007.  I then
traveled to, and reported at Fort Leonard Wood on 02 October
2007 to begin Basic Combat Training (BCT).

d. (U) Once at Fort Leonard Wood, I quickly realized that I
was neither physically nor mentally prepared for the
requirements of BCT.  My BCT experience lasted six (6) months
instead of the normal ten (10) weeks.  Due to medical issues, I
was placed in a hold status.  A physical examination indicated I
sustained injuries to my right shoulder and left foot.  Due to
these injuries I was unable to continue BCT.

e. (U) During medical hold, I was informed that I may be out-
processed from the Army.  However, I resisted being "chaptered"
because I felt I could overcome my medical issues and continue
to serve.

f. On 20 January 2008, I returned to BCT.  This time I was
better prepared, and I completed training on 2 April 2008.  I
then reported for the MOS-specific Advanced Individual Training
(AIT) on 7 April 2008.

g. (U) AIT was an enjoyable experience for me.  Unlike BCT,
where I felt different than the other Soldiers, I fit in and did
well.  I preferred the mental challenges of reviewing a large
amount of information from various sources and trying to create
useful, or "actionable," products.  I especially enjoyed the
practice of analysis through the use of computer applications
and methods I was familiar with.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


h. (U) I graduated from AIT on 16 August 2008 and reported to
my first duty station, Fort Drum, New York on 28 August 2008.
As an analyst, Significant Activities (SIGACTs) were a frequent
source of information for me to use in creating work products.
I started working extensively with SIGACTs early after my
arrival at Fort Drum.  My computer background allowed me to use
the tools organic to the Distributed Common Ground System--Army
(DCGS-A) computers and create polished work products for the 2nd
Brigade Combat Team (2BCT) chain of command.

i. (U) The non-commissioned-officer-in-charge (NCOIC) of the
S2 section, Master Sergeant (MSG) David P. Adkins recognized my
skills and potential, and tasked me to work on a tool abandoned
by a previously assigned analyst, the "Incident Tracker."  The
Incident Tracker was viewed as a backup to the Combined
Information Data Network Exchange (CIDNE) and a unit historical
reference tool.

j. (U) In the months preceding my upcoming deployment, I
worked on creating a new version of the incident tracker, and
used SIGACTs to populate it.  The SIGACTs I used were from
Afghanistan, because at the time our unit was scheduled to
deploy to the Logar and Wardak provinces Afghanistan.  Later,
our unit was reassigned to deploy to eastern Baghdad, Iraq.  At
that point, I removed the Afghanistan SIGACTs and switched to
Iraq SIGACTs.

k. (U) As an analyst, I view the SIGACTs as historical data.
I believe this view is shared by other all-source analysts as
well.  SIGACTs give a first-look impression of a specific or
isolated event.  This event can be an Improvised Explosive
Devise (IED) attack, a Small Arms Fire (SAF) engagement with a
hostile force, or any other event a specific unit documented and
reported in real-time.  In my perspective, the information
contained within a single SIGACT, or group of SIGACTs is not
very sensitive.  The events encapsulated within most SIGACTs
involve either enemy engagements or casualties.  Most of this
information is publicly reported by the Public Affairs Office
(PAO), embedded media pools, or host-nation (HN) media.

UNCLASSIFIED.

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


1. (U) As I started working with SIGACTs, I felt they were
similar to a daily journal or log that a person may keep. They
capture what happens on a particular day and time. They are
created immediately after the event and are potentially updated
over a period of hours until a final version is published on
CIDNE.

m. (U) Each unit has its own standard operating procedure
(SOP) for reporting and recording SIGACTs. The SOP may differ
between reporting in a particular deployment, and reporting in
garrison. In garrison, a SIGACT normally involves personnel
issues, such as a Driving Under-the-Influence (DUI) incident, or
an automobile accident involving the death or serious injury of
a Soldier. The report starts at the company level, and goes up
to the battalion, brigade, and even up to the division level.
In a deployed environment, a unit may observe or participate in
an event and the platoon leader or platoon sergeant may report
the event as a SIGACT to the Company Headquarters through the
radio transmission operator (RTO). The commander or RTO will
then forward the report to the Battalion Battlecaptain or Battle
Non-commissioned officer (NCO). Once the Battalion
Battlecaptain or Battle NCO receives the report, they will
either:

(1) Notify the Battalion Operations Officer (S3).

(2) Conduct an action, such as launching the Quick
Reaction Force (QRF).

(3) Record the event and report further report it up the
chain of command to the Brigade.

The recording of each event is done by radio or over the Secret
Internet Protocol Router Network (SIPRNet), normally by an
assigned Soldier, usually junior enlisted (E-4 and below).

n. (U) Once a SIGACT is reported, the SIGACT is further sent
up the chain of command. At each level, additional information
can either be added or corrected as needed. Normally, within 24
to 48 hours, the updating and reporting of a particular SIGACT
is complete. Eventually, all reports and SIGACTs go through the
chain of command from Brigade to Division, and Division to
Corps. At Corps-level, the SIGACT is finalized and published.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


o. (U) The CIDNE system contains a database that is used by
thousands of Department of Defense (DoD) personnel, including
Soldiers, civilians, and contractor support.  It was the U.S.
Central Command (CENTCOM) reporting tool for operational
reporting in Iraq and Afghanistan.  Two separate but similar
databases were maintained for each theater, "CIDNE-I" for Iraq
and "CIDNE-A" for Afghanistan.

p. (U) Each database encompasses over a hundred types of
reports and other historical information for access.  They
contain millions of vetted and finalized records including
operational and intelligence reporting.  CIDNE was created to
collect and analyze battlespace data to provide daily operation
and intelligence community (IC) reporting relevant to a
commander's daily decision making process.

q. (U) The CIDNE-I and CIDNE-A databases contain reporting
and analysis fields from multiple disciplines including:

   (1) Human Intelligence (HUMINT) reports.

   (2) Psychological Operations (PSYOP) reports.

   (3) Engagement reports.

   (4) Counter-Improvised Explosive Device (CIED) reports.

   (5) SIGACT reports.

   (6) Targeting reports.

   (7) Social-Cultural reports.

   (8) Civil Affairs reports.

   (9) Human Terrain reporting.

r. (U) As an intelligence analyst, I had unlimited access to
the CIDNE-I and CIDNE-A databases and the information contained
within them.  Although each table within the databases is
important, I primarily dealt with HUMINT reports, SIGACT
reports, and CIED reports because these reports were used to
create the work product I was required to publish as an analyst.

5
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


s. (U) When working on an assignment, I looked anywhere and
everywhere for information.  As an all-source analyst, this was
something that was expected.  The DCGS-A systems had databases
built in, and I utilized them on a daily basis.  This includes
the search tools available on DCGS-A systems on SIPRNet such as
Query-Tree, and the DoD and Intelink search engines.

t. (U) Primarily, I utilized the CIDNE database, using the
historical and HUMINT reporting to conduct my analysis and
provide backup for my work product.  I did statistical analysis
on historical data, including SIGACTs, to back up analyses that
were based on HUMINT reporting and produce charts, graphs, and
tables.  I also created maps and charts to conduct predictive
analysis based on statistical trends.  The SIGACT reporting
provided a reference point for what occurred, and provided
myself and other analysts with the information to conclude a
possible outcome.

u. (U) Although SIGACT reporting is sensitive at the time of
their creation, their sensitivity normally dissipates within 48
to 72 hours as the information is either publicly released, or
the unit involved is no longer in the area and not in danger.
It is my understanding that the SIGACT reports remain classified
only because they are maintained within CIDNE, because it is
only accessible on SIPRNet.  Everything on CIDNE-I and CIDNE-A,
to include SIGACT reporting was treated as classified
information.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


4. (U) Facts Regarding Storage of SIGACT Reports.

   a. (U) As part of my training at Fort Drum, I was instructed
to ensure that I create back-ups of my work product.  The need
to create back-ups was particularly acute given the relative
instability of and unreliability of the computer systems we used
in the field and during deployment.  These computer systems
included both organic and theater-provided equipment (TPE) DCGS-
A machines.  The organic DCGS-A machines we brought with us into
the field and on deployment were Dell M-90 laptops, and the TPE
DCGS-A machines were Alienware brand laptops.

   b. (U) The M-90 DCGS-A laptops were the preferred machine to
use, as they were slightly faster, and had fewer problems with
dust and temperature than the TPE Alienware laptops.

   c. (U) I used several DCGS-A machines during the deployment
due to various technical problems with the laptops.  With these
issues, several analysts lost information, but I never lost
information due to the multiple back-ups I created.

   d. (U) I attempted to back-up as much relevant information as
possible.  I would save the information so that I, or another
analyst could quickly access it when a machine crashed, SIPRNet
connectivity was down, or I forgot where data was stored.  When
backing-up information I would do one or all of the following
things, based on my training:

      (1) (U) Physical Back-up.  I tried to keep physical backup
copies of information on paper, so information could be grabbed
quickly.  Also, it was easier to brief from hard-copies research
and HUMINT reports.

      (2) (U) Local Drive Back-up.  I tried to sort out
information I deemed relevant and keep complete copies of the
information on each of the computers I used in the Temporary
Sensitive Compartmented Information Facility (T-SCIF), including
my primary and secondary DCGS-A machines.  This was stored under
my user-profile on the "desktop."

      (3) (U) Shared Drive Backup.  Each analyst had access to a
"T-Drive" shared across the SIPRNet. It allowed others to access
information that was stored on it.  S6 operated the "T-Drive."

7
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


     (4) (U) Compact Disc Re-Writable (CD-RW) Back-up.  For
larger datasets, I saved the information onto a re-writable
disc, labeled the discs and stored them in the conference room
of the T-SCIF.

     e. (U) This redundancy permitted us the ability to not worry
about information loss.  If a system crashed, I could easily
pull the information from my secondary computer, the "T-Drive,"
or one of the CD-RWs.  If another analyst wanted access to my
data, but I was unavailable, she could find my published
products directory on the "T-Drive" or on the CD-RWs.  I sorted
all of my products and research by date, time, and group, and
updated the information on each of the storage methods to ensure
that the latest information was available to them.

     f. (U) During the deployment, I had several of the DCGS-A
machines crash on me.  Whenever the computer crashed, I usually
lost information, but the redundancy method ensured my ability
to quickly restore old backup data, and add my current
information to the machine when it was repaired or replaced.

     g. (U) I stored the backup CD-RWs of larger datasets in the
conference room of the T-SCIF or next to my workstation.  I
marked the CD-RWs based on the classification level and its
content.  Unclassified CD-RWs were only labeled with the content
type, and not marked with classification markings.

     h. (U) Early on in the deployment, I only saved and stored
the SIGACTs that were within or near our Operational Environment
(OE).  Later, I thought it would be easier just to save all the
SIGACTs onto a CD-RW.  The process would not take very long to
complete, and so I downloaded the SIGACTs from CIDNE-I onto a
CD-RW.  After finishing with CIDNE-I, I did the same with CIDNE-
A.  By downloading the CIDNE-I and CIDNE-A SIGACTs, I was able
to retrieve the information whenever I needed it, and not rely
upon the unreliable and slow SIPRNet connectivity needed to
"pull" them.  Instead, I could just find the CD-RW, and open the
preloaded spreadsheet.

     i. This process began in late-December 2009, and continued
through early-January 2010.  I could quickly export one month of
the SIGACT data at a time, and download in the background as I
did other tasks.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)

j. (U) The process took approximately a week for each table. After downloading the SIGACT tables, I periodically updated them by pulling only the most recent SIGACTs, and simply copying them and "pasting" them into the database saved on CD-RW.

k. (U) I never hid the fact I had downloaded copies of both the SIGACT tables from CIDNE-I and CIDNE-A. They were stored on appropriately labeled and marked CD-RWs stored in the open. I views the saved copies of the CIDNE-I and CIDNE-A SIGACT tables as being for both my use, and the use of anyone within the S2 section during SIPRNet connectivity issues.

l. (U) In addition to the SIGACT table, I had a large repository of HUMINT reports and CIED reports downloaded from CIDNE-I. These contained reports that were relevant to the area in and around our OE, in eastern Baghdad and the Diyala province of Iraq.

m. (U) In order to compress the data to fit onto a CD-RW, I used a compression algorithm called "BZip2." The program used to compress the data is called "WinRAR." WinRAR is an application that is free and can easily be downloaded from the Internet via the Non-secure Internet Relay Protocol Network (NIPRNet). I downloaded WinRAR on NIPRNet and transferred it to the DCGS-A machine user profile "desktop" using a CD-RW.

n. (U) I did not try to hide the fact that I was downloading WinRAR onto my SIPRNet DCGS-A computer. With the assistance of the BZip2 compression algorithm using the WinRAR program, I was able to fit all the SIGACTs onto a single CD-RW, and the relevant HUMINT and CIED reports onto a separate CD-RW.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry - U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

5. (U) Facts regarding my knowledge of the WikiLeaks
Organization (WLO)

a. (U) I first became vaguely aware of WLO during my AIT at
Fort Huachuca, AZ.  Though, I did not fully pay attention until
WLO released purported Short Messaging System (SMS) messages
from 11 September 2001 on 25 November 2009.  At that time,
references to the release and the WLO website showed up in my
daily Google News open source search for information related to
U.S. foreign policy.

b. (U) The stories were about how WLO published approximately
500,000 messages.  I then reviewed the messages myself, and
realized that the posted messages were very likely real given
the sheer volume and detail of the content.

c. (U) After this, I began conducting research on WLO.  I
conducted searches on both NIPRNet and SIPRNet on WLO beginning
in late November 2009 and early December 2009.  At this time I
also began to routinely monitor the WLO website.

d. (U) In response to one of my searches in December 2009, I
found the U.S. Army Counter-Intelligence Center (USACIC) report
on WLO.  After reviewing the report, I believed that this report
was the one that my AIT instructor referenced in early 2008.  I
may or may not have saved the report on my DCGS-A workstation.
I know I reviewed the document on other occasions throughout
early 2010, and saved it on both my primary and secondary
laptops.

e. (U) After reviewing the report, I continued doing my
research on WLO.  However, based upon my open-source collection,
I discovered information that contradicted the 2008 USACIC
report, including information indicating that, similar to other
press agencies, WLO seemed to be dedicated to exposing illegal
activities and corruption.  WLO received numerous awards and
recognition for its reporting activities.  Also, in reviewing
the WLO website, I found information regarding U.S. military
SOPs for Camp Delta at Guantanamo Bay, Cuba, and information on
then-outdated Rules of Engagement (ROE) in Iraq for cross-border
pursuits of former members of Saddam Hussein al-Tikriti's
government.

10
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry - U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


  f. (U) After seeing the information available on the WLO
website, I continued following it and collecting open-source
information from it.  During this time period, I followed
several organizations and groups, including wire press agencies
such as the Associated Press and Reuters and private
intelligence agencies including Strategic Forecasting
(STRATFOR).  This practice was something I was trained to do
during AIT, and was something that good analysts are expected to
do.

  g. (U) During the searches of WLO I found several pieces of
information that I found useful in my work as an analyst.
Specifically, I recall WLO publishing documents relating to
weapons trafficking between two nations that affected my OE.  I
integrated this information into one or more of my work
products.

  h. (U) In addition to visiting the WLO website, I began
following WLO using an Instant Relay Chat (IRC) client called
"X-Chat" sometime in early January 2010.  IRC is a protocol for
real-time internet communications by messaging or conferencing,
colloquially referred to as "chat rooms" or "chats."  The IRC
chat rooms are designed for group communication in discussion
forums.  Each IRC chat room is called a "channel."  Similar to a
television, you can "tune-in" to or "follow" a channel, so long
as it is open and does not require an invite.  Once joining a
specific IRC conversation, other users in the conversation can
see you have "joined" the room.  On the Internet, there are
millions of different IRC channels across several services.
Channel topics span a range of topics, covering all kinds of
interests and hobbies.

  i. (U) The primary reason for following WLO on IRC was
curiosity, particularly in regards to how and why they obtained
the SMS messages referenced above.  I believed collecting
information on the WLO would assist me in this goal.

  j. (U) Initially, I simply observed the IRC conversations.  I
wanted to know how the organization was structured, and how they
obtained their data.  The conversations I viewed were usually
technical in nature, but sometimes switched to a lively debate
on issues a particular individual felt strongly about.

11
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:   Statement in Support of Providence Inquiry – U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


k. (U) Over a period of time, I became more involved in these
discussions, especially when the conversation turned to
geopolitical events and information topics, such as networking
and encryption methods.   Based on these observations I would
describe the WLO conversation as almost academic in nature.

l. (U) In addition to the WLO conversations, I participated
in numerous other IRC channels across at least three different
networks.   The other IRC channels I participated in normally
dealt with technical topics including the Linux and Berkeley
Security Distribution (BSD) Operating Systems (OS), networking,
encryption algorithms and techniques, and other more political
topics such as politics and queer rights.

m. (U) I normally engaged in multiple IRC conversations
simultaneously, mostly publicly but often privately.   The X-Chat
client enabled me to manage these multiple conversations across
different channels and servers.   The screen for X-Chat was often
busy, but experience enabled me to see when something was
interesting.   I would then select the conversation and either
observe or participate.

n. (U) I really enjoyed the IRC conversations pertaining to
and involving the WLO.   However, at some point in late February
or early March, the WLO IRC channel was no longer accessible.
Instead, the regular participants of this channel switched to
using a "Jabber" server.   Jabber is another Internet
communication tool, similar, but more sophisticated than IRC.
The IRC and Jabber conversations allowed me to feel connected to
others even when alone.   They helped me pass the time and keep
motivated throughout the deployment.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry – U.S. v. Private First Class (PFC) Bradley E. Manning (U)

6. (U) Facts regarding the unauthorized storage and disclosure of the SIGACTs.

a. (U) As indicated above, I created copies of the CIDNE-I and CIDNE-A SIGACTs tables as part of the process of backing up information. At the time I did so, I did not intend to use this information for any purpose other than for back-up. However, I later decided to release this information publicly. At that time I believed, and still believe, that these tables are two of the most significant documents of our time.

b. (U) On 8 January 2010, I collected the CD-RW I stored in the conference room of the T-SCIF and placed it into the cargo pocket of my Army Combat Uniform (ACU). At the end of my shift, I took the CD-RW out of the T-SCIF and brought it to my Containerized Housing Unit (CHU). I copied the data onto my personal laptop. Later, at the beginning of my shift, I returned the CD-RW back to the conference room of the T-SCIF.

c. (U) At the time I saved the SIGACTs to my laptop, I planned to take them with me on mid-tour leave, and decide what to do with them. At some point prior to mid-tour leave, I transferred the information from my computer to a Secured Digital memory card for my digital camera. The SD card for the camera also worked on my computer, and allowed me to store the SIGACT tables in a secure manner for transport.

d. (U) I began mid-tour leave on 23 January 2010, flying from Atlanta, GA to Reagan National Airport in Virginia. I arrived at the home of my aunt, Debra M. Van Alstyne, in Potomac, MD and quickly got into contact with my then-boyfriend Tyler R. Watkins. Tyler, then a student at Brandeis University in Waltham, MA, and I made plans for me to visit in the Boston, MA area. I was excited to see Tyler, and planned on talking to Tyler about where our relationship was going, and about my time in Iraq.

e. (U) However, when I arrived in the Boston area, Tyler and I seemed to have become distant. He did not seem very excited about my return from Iraq. I tried talking to him about our relationship, but he refused to make any plans. I also tried raising the topic of releasing the CIDNE-I and CIDNE-A SIGACT tables to the public.

13
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry - U.S. v. Private First Class (PFC) Bradley E. Manning (U)

   f. (U) I asked Tyler hypothetical questions about what he would do if he had documents that he thought the public needed access to. Tyler didn't really have a specific answer for me. He tried to answer the question and be supportive, but seemed confused by the question and its context. I then tried to be more specific, but he asked too many questions. Rather than try to explain my dilemma, I decided to just drop the conversation.

   g. (U) After a few days in Waltham, I began feeling that I was overstaying my welcome, and I returned to Maryland. I spent the remainder of my time on leave in the Washington, DC area.

   h. (U) During this time, a blizzard bombarded the mid-Atlantic, and I spent a significant period of time essentially stuck at my aunt's house in Maryland. I began to think about what I knew, and the information I still had in my possession. For me, the SIGACTs represented the on-the-ground reality of both the conflicts in Iraq and Afghanistan. I felt we were risking so much for people that seemed unwilling to cooperate with us, leading to frustration and hatred on both sides.

   i. (U) I began to become depressed at the situation that we found ourselves increasingly mired in, year-after-year. The SIGACTs documented this in great detail, and provided context to what we were seeing on-the-ground. In attempting to conduct counter-terrorism (CT) and counter-insurgency (COIN) operations, we became obsessed with capturing and killing human targets on lists, on being suspicious of and avoiding cooperation with our host-nation partners, and ignoring the second and third order effects of accomplishing short-term goals and missions.

   j. (U) I believed that if the general public, especially the American public, had access to the information contained within the CIDNE-I and CIDNE-A tables, this could spark a domestic debate on the role of the military and our foreign policy in general, as well as it related to Iraq and Afghanistan. I also believed a detailed analysis of the data over a long period of time, by different sectors of society, might cause society to re-evaluate the need, or even the desire to engage in CT and COIN operations that ignored the complex dynamics of the people living in the affected environment each day.

14
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


k. (U) At my aunt's house, I debated about what I should do
with the SIGACTs. In particular, whether I should hold on to
them, or disclose them through a press agency. At this point, I
decided it made sense to try and disclose the SIGACT tables to
an American newspaper.

l. (U) I first called my local newspaper, the Washington Post
and spoke with a woman saying she was a reporter. I asked her
if the Washington Post would be interested in receiving
information that would have enormous value to the American
public. Although we spoke for about five minutes concerning the
general nature of what I possessed, I do not believe she took me
seriously. She informed me that the Washington Post would
possibly be interested, but that such decisions are made only
after seeing the information I was referring to, and after
consideration by the senior editors.

m. (U) I then decided to contact the largest and most popular
newspaper, the New York Times. I called the public editor
number on the New York Times website. The phone rang and was
answered by a machine. I went through the menu to the section
for news tips and was routed to an answering machine. I left a
message stating I had access to information about Iraq and
Afghanistan that I believed was very important. However,
despite leaving my Skype phone number and personal email
address, I never received a reply from the New York Times.

n. (U) I also briefly considered dropping into the office for
the political commentary blog Politico. However, the weather
conditions during my leave hampered my efforts to travel.

o. (U) After these failed efforts, I ultimately decided to
submit the materials to the WLO. I was not sure if WLO would
actually publish the SIGACT tables, or, even if they did
publish, I was concerned they might not be noticed by the
American media. However, based on what I read about WLO through
my research described above, this seemed to be the best medium
for publishing this information to the world within my reach.

p. (U) At my aunt's house, I joined in on an IRC conversation
and stated I had information that needed to be shared with the
world. I wrote that the information would help document the
true costs of the wars in Iraq and Afghanistan.

15
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


q. (U) One of the individuals in the IRC asked me to describe
the information. However, before I could describe the
information, another individual pointed me to the link for the
WLO website's online submission system.

r. (U) After ending my IRC connection, I considered my
options one more time. Ultimately, I felt that the right thing
to do was to release the SIGACTs. On 3 February 2010, I visited
the WLO website on my computer, and clicked on the "Submit
Documents" link. Next, I found the "submit your information
online link," and elected to submit the SIGACTs via the TOR
Onion Router (TOR) anonymizing network by a special link.

s. (U) TOR is a system intended to provide anonymity online.
The software routes Internet traffic through network of servers
and other TOR clients in order to conceal a user's location and
identity. I was familiar with TOR and had it previously
installed on my computer to anonymously monitor the social media
websites of militia groups operating within central Iraq.

t. (U) I followed the prompts and attached the compressed
data files of the CIDNE-I and CIDNE-A SIGACTs. I attached a
text file I drafted while preparing to provide the documents to
the Washington Post. It provided rough guidelines stating "it's
already been sanitized of any source identifying information.
You might need to sit on this information, perhaps 90-180 days,
to figure out how best to release such a large amount of data,
and to protect source. This is possibly one of the more
significant documents of our time, removing the fog of war, and
revealing the true nature of 21st century asymmetric warfare.
Have a good day." After sending this, I left the SD card in a
camera case at my aunt's house, in the event I needed it again
in the future.

u. (U) I returned from mid-tour leave on 11 February 2010.
Although the information had not yet been published by the WLO,
I felt a sense of relief by them having it. I felt had
accomplished something that allowed me to have a clear
conscience based upon what I had seen, read about and knew were
happening in both Iraq and Afghanistan every day.


16
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

7. (U) Facts regarding the unauthorized storage and disclosure
of "10REYKJAVIK13".

   a. (U) I first became aware of diplomatic cables during my
training period in AIT.  I later learned about the Department of
State (DOS) Net-Centric Diplomacy (NCD) portal from the 2-10BCT
S2, Captain (CPT) Steven Lim.  CPT Lim sent a section-wide email
to the other analysts and officers in late December 2009
containing the SIPRNet link to the portal, along with
instructions to look at the cables contained within and
incorporate them into our work product.  Shortly after this, I
also noticed that diplomatic cables were being referred to in
products from the Corps-level, U.S. Forces-Iraq (USF-I).

   b. (U) Based on CPT Lim's direction to become familiar with
its contents, I read virtually every published cable concerning
Iraq.  I also began scanning the database and reading other,
random, cables that piqued my curiosity.  It was around this
time, in early-to-mid-January 2010 that I began searching the
database for information on Iceland.  I became interested in
Iceland due to IRC conversations I viewed in the WLO channel
discussed an issue called "Icesave."  At this time, I was not
very familiar with the topic, but it seemed to be a big issue
for those participating in the conversation.  This is when I
decided to investigate, and conduct a few searches on Iceland to
find out more.

   c. (U) At the time, I did not find anything discussing the
"Icesave" issue, either directly or indirectly.  I then
conducted an open source search for "Icesave."  I then learned
that Iceland was involved in a dispute with the United Kingdom
(UK) and Netherlands concerning the financial collapse of one or
more of Iceland's banks.  According to open source reports, much
of the public controversy involved the UK's use of "anti-
terrorism legislation" against Iceland in order to freeze
Icelandic assets for payment of the guarantees for UK depositors
that lost money.

   d. (U) Shortly after returning from mid-tour leave, I
returned to the NCD to search for information on Iceland and
"Icesave" as the topic had not abated on the WLO IRC channel.
To my surprise, on 14 February 2010, I found the cable
10REYKJAVIK13 which referenced the "Icesave" issue directly.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


e. (U) The cable, published on 13 January 2010, was just over
two pages in length.  I read the cable, and quickly concluded
that Iceland was essentially being bullied, diplomatically, by
two larger European powers.  It appeared to me that Iceland was
out of viable solutions, and was now coming to the U.S. for
assistance.  Despite their quiet request for assistance, it did
not appear we were going to do anything.  From my perspective,
it appeared we were not getting involved due to the lack of long
term geopolitical benefit to do so.

f. (U) After digesting the contents of 10REYKJAVIK13, I
debated on whether this was something I should send to the WLO.
At this point, the WLO had not published nor acknowledged
receipt of the CIDNE-I and CIDNE-A SIGACT tables.  Despite not
knowing if the SIGACTs were a priority for the WLO, I decided
the cable was something that would be important, and I felt I
might be able to right a wrong by having them publish this
document.  I burned the information onto a CD-RW on 15 February
2010, took it to my CHU and saved it onto my personal laptop.

g. (U) I navigated to the WLO website via a TOR connection
like before, and uploaded the document via the secure form.
Amazingly, the WLO published 10REYKJAVIK13 within hours, proving
that the form worked and that they must have received the SIGACT
tables.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)

8. (U) Facts regarding the unauthorized storage and disclosure of the 12 July 2007 Air Weapons Team (AWT) video.

a. (U) During the mid-February 2010 timeframe, the 2-10BCT Targeting analyst, then-Specialist (SPC) Jihrleah W. Showman and others discussed video Ms. Showman found on the "T-Drive." The video depicted a several individuals being engaged by an Air Weapons Team (AWT). At first, I did not consider the video very special, as I had viewed countless other "war-porn" type videos depicting combat. However, the recorded audio comments by the AWT crew and the second engagement in the video, of an unarmed bongo truck, troubled me.

b. (U) Ms. Showman and a few other analysts and officers in the T-SCIF commented on the video, and debated whether the crew violated the Rules of Engagement (ROE) in the second engagement. I shied away from this debate, and instead conducted some research on the event. I wanted to learn what happened, and whether there was any background to the events of the day the event occurred, 12 July 2007.

c. (U) Using Google, I searched for the event by its date and general location. I found several news accounts involving two Reuters employees who were killed during the AWT's engagement. Another story explained that Reuters requested for a copy of the video under the Freedom of Information Act (FOIA). Reuters wanted to view the video in order to be able to understand what happened, and improve their safety practices in combat zones. A spokesperson for Reuters was quoted saying that the video might help avoid a reoccurrence of the tragedy, and believed there was a compelling need for the immediate release of the video.

d. (U) Despite the submission of a FOIA request, the news account explained that CENTCOM replied to Reuters, stating that they could not give a timeframe for considering the FOIA request, and the video might no longer exist. Another story I found, written a year later, said that even though Reuters was still pursuing their request, they still did not receive a formal response or written determination in accordance with the FOIA.

19
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)

e. (U) The fact neither CENTCOM nor Multi-National Forces-Iraq (MCF-I) would not voluntarily release the video troubled me further. It was clear to me that the event happened because the AWT mistakenly identified the Reuters employees with a potential threat, and that the people in the bongo truck were merely attempting to assist the wounded. The people in the van were not a threat, but "good Samaritans."

f. (U) The most alarming aspect of the video to me, however, was the seemingly delightful bloodlust they appeared to have. They dehumanized the individuals they were engaging, and seemed to not value human life by referring to them as "dead bastards" and congratulating each other on the ability to kill in large numbers.

g. (U) At one point in the video, there is an individual on the ground attempting to crawl to safety. The individual is seriously wounded. Instead of calling for medical attention to the location, one of the AWT crew members verbally asked for the wounded person to pick up a weapon so he would have a reason to engage. For me, this seems similar to a child torturing ants with a magnifying glass.

h. (U) While saddened by the AWT crew's lack of concern about human life, I was disturbed by their response to the discovery of injured children at the scene. In the video, you can see the bongo truck driving up to assist the wounded individual. In response, the AWT crew assumes the individuals are a threat. They repeatedly request for authorization to fire on the bongo truck, and once granted, they engage the vehicle at least six times.

i. (U) Shortly after the second engagement, a mechanized infantry unit arrives at the scene. Within minutes, the AWT crew learns that children were in the van and, despite the injuries, the crew exhibits no remorse. Instead, they downplayed the significance of their actions saying "well, it's their fault for bringing their kids into a battle." The AWT crew members sound like they lack sympathy for the children or their parents. Later, in a particularly disturbing manner, the AWT crew verbalizes enjoyment at the sight of one of the ground vehicles driving over the bodies.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


j. (U) As I continued my research I found an article
discussing a book "The Good Soldiers," written by Washington
Post writer David Finkel. In Mr. Finkel's book, he writes about
the AWT attack. As I read an online excerpt on "Google Books,"
I followed Mr. Finkel's account of the event, along with the
video. I quickly realized Mr. Finkel was quoting, I feel in
verbatim, the audio communications of the AWT crew. It's clear
to me that Mr. Finkel obtained access and a copy of the video
during his tenure as an embedded journalist.

k. (U) I was aghast at Mr. Finkel's portrayal of the
incident. Reading his account, one would believe the engagement
was somehow justified as "payback" for an earlier attack that
lead to the death of a Soldier. Mr. Finkel ends his account of
the engagement by discussing how a Soldier finds an individual
still alive from the attack. He writes that the Soldier finds
him, and sees him gesture with his two forefingers together, a
common method in the Middle-East to communicate that they are
friendly. However, instead of assisting him, the Soldier makes
an obscene gesture, extending his middle finger. The individual
apparently dies shortly thereafter. Reading this, I can only
think of how this person was simply trying to help others, and
then quickly finds he needs help as well. To make matters
worse, in the last moments of his life, he continues to express
his friendly intent, only to find himself receiving this well
known gesture of "unfriendliness." For me, it's all a big mess,
and I'm left wondering what these things mean, and how it all
fits together. It burdens me emotionally.

l. (U) I saved a copy of the video on my workstation. I
searched for, and found the ROE, ROW Annexes and a flowchart
from the 2007 time period, as well as an unclassified ROE smart
card from 2006. On 15 February 2010, I burned these documents
onto a CD-RW, the same time I burned 10REYKJAVIK13 onto a CD-RW.

m. (U) At the time, I placed the video and ROE information
onto my personal laptop in my CHU. I planned to keep this
information there until I redeployed in Summer 2010. I planned
on providing this to the Reuters office in London, UK to assist
them in preventing events such as this in the future.


21

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


n. (U) However, after the WLO published 10REYKJAVIK13, I
altered my plans.  I decided to provide the video and ROEs to
them, so that Reuters would have this information before I
redeployed from Iraq.  On about 21 February 2010, as described
above, I used the WLO submission form and uploaded the
documents.

o. (U) The WLO released the video on 5 April 2010.  After the
release, I was concerned about the impact of the video, and how
it would be perceived by the general public.  I hoped the public
would be as alarmed as me about the conduct of the AWT crew
members.  I wanted the American public to know that not everyone
in Iraq and Afghanistan were targets that needed to be
neutralized, but rather people who were struggling to live in
the "pressure-cooker" environment of what we call asymmetric
warfare.

p. (U) After the release, I was encouraged by the response in
the media and general public who observed the AWT video.  As I
hoped, others were just as troubled, if not more troubled, than
me by what they saw.  At this time, I began seeing reports
claiming that DoD and CENTCOM could not confirm the authenticity
of the video.  Additionally, one of my supervisors CPT Casey
Fulton (nee Martin) stated her belief that the video was not
authentic.  In response, I decided to ensure that the
authenticity of the video would not be questioned in the future.
On 25 April 2010 I e-mailed CPT Fulton a link to the video that
was on our "T-Drive" and to a copy of the video published by WLO
from the Open Source Center (OSC) so she could compare them
herself.

q. (U) Around this timeframe, I burned a second CD-RW
containing the AWT video.  In order to make it appear authentic,
I placed a classification sticker and wrote "Reuters FOIA Req"
on its face.  I placed the CD-RW in one of my personal CD cases
containing a set of "Starting out in Arabic."  I planned on
mailing the CD-RW to Reuters after I redeployed so they could
have a copy that was unquestionably authentic.

r. (U) Almost immediately after submitting the AWT video and
ROE documents, I notified the individuals in the WLO IRC to
expect an important submission.  I received a response from an
individual going by the handle of "office."

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


    s. (U) At first our conversations were general in nature, but
over time, as our conversations progressed, I assessed this
individual to be an important part of the WLO. Due to the
strict adherence of anonymity by the WLO, we never exchanged
identifying information; however, I believed the individual was
likely Mr. Julian Assange, Mr. Daniel Schmidt, or a proxy-
representative of Mr. Assange and Schmidt.

    t. (U) As the communications transferred from IRC to the
Jabber client, I gave "office," and later "pressassociation" the
name of "Nathaniel Frank" in my address book, after the author
of a book I read in 2009.

    u. (U) After a period of time, I developed what I felt was a
friendly relationship with Nathaniel. Our mutual interest in
information technology and politics made our conversations
enjoyable. We engaged in conversation often, sometimes as long
as an hour or more. I often looked forward to my discussions
with Nathaniel after work.

    v. (U) The anonymity that provided by TOR, the Jabber client,
and WLO's policy allowed me to feel I could just be myself, free
of the concerns of social labeling and perceptions that are
often place upon me in real life (IRL). IRL, I lacked close
friendship with the people I worked with in my section, the S2
sections in subordinate battalions, and 2BCT as a whole. For
instance, I lacked close ties with my roommate due to his
discomfort regarding my perceived sexual orientation.

    w. (U) Over the next few months, I stayed in frequent contact
with Nathaniel. We conversed on nearly a daily basis, and I
felt we were developing a friendship. The conversations covered
many topics, and I enjoyed the ability to talk about pretty much
anything, and not just the publications that the WLO was working
on.

    x. (U) In retrospect, I realize these dynamics were
artificial, and were valued more by myself than Nathaniel. For
me, these conversations represented an opportunity to escape
from the immense pressures and anxiety that I experienced and
built up throughout the deployment. It seemed that as I tried
harder to "fit in" at work, the more I seemed to alienate my
peers, and lose respect, trust and the support I needed.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


9. (U) Facts regarding the unauthorized storage and disclosure
of documents relating to detainments by the Iraqi Federal Police
(FP), the Detainee Assessment Briefs (DABs), and the USACIC
report.

   a. (U) On 27 February 2010, a report was received from a
subordinate battalion. The report described an event in which
the FP detained fifteen (15) individuals for printing "anti-
Iraqi literature." By 2 March 2010, I received instructions
from an S3 section officer in the 2-10BCT Tactical Operations
Center (TOC) to investigate the matter, and figure out who these
"bad guys" were, and how significant this event was for the FP.

   b. (U) Over the course of my research, I found that none of
the individuals had previous ties with anti-Iraqi actions or
suspected terrorist or militia groups. A few hours later, I
received several photos from the scene from the subordinate
battalion. They were accidently sent to an officer on a
different team in the S2 section, and she forwarded them to me.
These photos included pictures of the individuals, palettes of
unprinted paper, seized copies of the final printed document,
and a high-resolution photo of the printed material.

   c. (U) I printed a blown up copy of the high-resolution
photo, and laminated it for ease of storage and transfer. I
then walked to the TOC and delivered the laminated copy to our
category 2 interpreter. She reviewed the information and about
a half-hour later delivered a rough written transcript in
English to the S2 section.

   d. (U) I read the transcript, and followed up with her,
asking for her take on its contents. She said it was easy for
her to transcribe verbatim since I blew up the photograph and
laminated it. She said the general nature of the document was
benign. The documentation, as I assessed as well, was merely a
scholarly critique of the then-current Iraqi Prime Minister,
Nouri al-Maliki. It detailed corruption within the cabinet of
al-Maliki's government, and the financial impact of this
corruption on the Iraqi people.

   e. (U) After discovering this discrepancy between the FP's
report, and the interpreter's transcript, I forwarded this
discovery, in person to the TOC OIC and Battle NCOIC.

24
UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


f. (U) The TOC OIC and, the overhearing Battlecaptain,
informed me they didn't need or want to know this information
any more. They told me to "drop it" and to just assist them and
the FP in finding out where more of these print shops creating
"anti-Iraqi literature" might be. I couldn't believe what I
heard, and I returned to the T-SCIF and complained to the other
analysts and my section NCOIC about what happened. Some were
sympathetic, but no-one wanted to do anything about it.

g. (U) I am the type of person who likes to know how things
work, and as an analyst, this means I always want to figure out
the truth. Unlike other analysts in my section, or other
sections within 2-10BCT, I was not satisfied with just
scratching the surface, and producing "canned" or "cookie-
cutter" assessments. I wanted to know why something was the way
it was, and what we could do to correct or mitigate a situation.
I knew that if I continued to assist the Baghdad FP in
identifying the political opponents of Prime Minister al-Maliki,
those people would be arrested, and in the custody of this
special unit of the Baghdad FP, very likely tortured and not
seen again for a very long time, if ever.

h. (U) Instead of assisting the special unit of the Baghdad
FP, I decided to take the information and disclose it to the WLO
in the hope that, before the upcoming 7 March 2010 election,
they could generate immediate press on the issue, and prevent
this unit of the FP from continuing to crack down on political
opponents. On 4 March 2010, I burned the report, the photos,
the high resolution copy of the pamphlet, and the interpreter's
handwritten transcript onto a CD-RW. I took the CD-RW to my CHU
and copied the data onto my personal computer.

i. (U) Unlike the times before, instead of uploading the
information through the WLO websites' submission form, I made a
Secure File Transfer Protocol (SFTP) connection to a "cloud"
dropbox operated by the WLO. The dropbox contained a folder
that allowed me to upload directly into it. Saving files into
this directory allowed anyone with login access to the server to
view and download them.

UNCLASSIFIED

SUBJECT:   Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


j. (U) After uploading these files to the WLO on 5 March
2010, I notified Nathaniel over Jabber.  Although sympathetic,
he said that the WLO needed more information to confirm the
event in order for it to be published or to gain interest in the
international media.  I attempted to provide specifics, but to
my disappointment, the WLO website chose not to publish this
information.

k. (U) At the same time, I began sifting through information
from the U.S. Southern Command (SOUTHCOM) and Joint Task Force
(JTF) Guantanamo, Cuba (GTMO).  The thought occurred to me,
although unlikely, that I wouldn't be surprised if the
individuals detained by the FP might be turned over back into
U.S. custody and ending up in the custody of JTF-GTMO.

l. (U) As I digested through the information on JTF-GTMO, I
quickly found the detainee assessment briefs (DABs).  I
previously came across these documents before, in 2009, but did
not think much of them.  However, this time I was more curious
and during this search I found them again.  The DABs were
written in standard DoD memorandum format, and addressed the
Commander, U.S. SOUTHCOM.  Each memorandum gave basic background
information about a specific detainee held at some point by JTF-
GTMO.

m. (U) I have always been interested on the issue of the
moral efficacy of our actions surrounding JTF-GTMO.  On the one
hand, I always understood the need to detain and interrogate
individuals who might wish to harm the U.S. and our allies.  I
felt that was what we were trying to do at JTF-GTMO.  However,
the more I became educated on the topic, it seemed that we found
ourselves holding an increasing number of individuals
indefinitely that we believed or knew were innocent, low-level
"foot soldiers" that didn't have useful intelligence and would
be released if they were still held in theater.

n. (U) I also recalled that in early 2009, the then-newly-
elected President Barack Obama stated he would close JTF-GTMO
and that the facility compromised our standing in the world and
diminished our "moral authority."  After familiarizing myself
with the DABs, I agreed.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


o. (U) Reading through the DABs, I noted that they were not
analytical products.  Instead, they contained summaries of tear-
lined versions of Interim Intelligence Reports (IIRs) that were
old or unclassified.  None of the DABs contained names of
sources or quotes from Tactical Interrogation Reports (TIRs).
Since the DABs were being sent to the U.S. SOUTHCOM commander, I
assessed that they were intended to provide very general
background information on each detainee, and not a detailed
assessment.

p. (U) In addition to the manner the DABs were written, I
recognized that they were at least several years old, and
discussed detainees that were already released from JTF-GTMO.
Based on this, I determined that the DABs were not very
important from either an intelligence or national security
standpoint.

q. (U) On 7 March 2010, during my Jabber conversations with
Nathaniel, I asked him if he thought the DABs were of any use to
anyone.  Nathaniel indicated that although he didn't believe
they were of political significance he did believe that they
could be used to merge into the general historical account of
what occurred at JTF-GTMO.  He also thought that the DABs might
be helpful to the legal counsel of those currently and
previously held at JTF-GTMO.

r. (U) After this discussion, I decided to download the DABs.
I used an application called "WGet" to download the DABs.  I
downloaded WGet off the NIPRNet laptop in the T-SCIF like other
programs.  I saved that onto a CD-RW and placed the executable
in "My Documents" directory of my user profile on the DCGS-A
SIPRNet workstation.

s. (U) On 7 March 2010, I took the list of links for the DABs
and WGet downloaded them sequentially.  I burned the DABs onto a
CD-RW and took it to my CHU and copied them to my personal
computer.  On 8 March 2010, I combined the DABs with the USACIC
report on the WLO into a compressed "zip" file.  Zip files
contain multiple files which are compressed to reduce their
size.  After creating the zip file, I uploaded the file onto
their "cloud" dropbox via SFTP.  Once these were uploaded, I
notified Nathaniel that the information was in the "x"
directory, which had been assigned for my use.

27
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

t. (U) Earlier that day, I downloaded the USACIC report on
WLO.  As discussed above, I previously reviewed the report on
numerous occasions and, although I had saved the document onto
workstation before, I could not locate it.  After I found the
document again, I downloaded it to my workstation and saved it
onto the same CD-RW as the DABs, described above.

u. (U) Although I my access included a great deal of
information, I decided I had nothing else to send to the WLO
after sending them the DABs and the USACIC report.  Up to this
point I sent them the following:

(1) The CIDNE-I and CIDNE-A SIGACT tables.

(2) The "10REYKJAVIK13" DOS cable.

(3) The 12 July 2007 AWT video and the 2006 and 2007 ROE
documents.

(4) The SIGACT report and supporting documents concerning
the 15 individuals detained by the Baghdad FP.

(5) The U.S. SOUTHCOM and JTF-GTMO DABs.

(6) The USACIC report on the WLO and website.

v. (U) Over the next few weeks, I did not send any additional
information to the WLO.  I continued to converse with Nathaniel
over the Jabber client, and in the WLO IRC channel.  Although I
stopped sending documents to WLO, no one associated with the WLO
pressured me into giving more information.  The decisions that I
made to send documents and information to the WLO and website
were my own decisions, and I take full responsibility for my
actions.

Case 1:19-dm-00003-CMH   Document 5-8   Filed 03/04/19   Page 30 of 35 PageID# 289

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

10.  (U) Facts regarding the unauthorized storage and disclosure
of other government documents.

a.  (U) On 22 March 2010, I downloaded two documents.  I found
these documents over the course of my normal duties as an
analyst.  Based on my training and the guidance of my superiors,
I looked at as much information as possible.  Doing so provided
me with the ability to make connections others might miss.

b.  (U) On several occasions during the month of March, I
accessed information from a government entity.  I read several
documents from a section within this government entity.  The
content of two of these documents upset me greatly.  I had
difficulty believing what this section was discussing.

c.  (U) On 22 March 2010, I downloaded the two documents that
I found troubling.  I compressed them into a zip file named
"blah.zip" and burned them onto a CD-RW.  I took the CD-RW to my
CHU and saved the file to my personal computer.  I uploaded the
information to the WLO website using the designated drop-box.

29
UNCLASSIFIED

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

11. (U) Facts regarding the unauthorized storage and disclosure
of the NCD DOS cables.

a. (U) In late March I received a warning over Jabber from
Nathaniel that the WLO website would be publishing the AWT
video.  He indicated that the WLO would be very busy and the
frequency and intensity of our Jabber conversations decreased
significantly.

b. (U) During this time, I had nothing but work to distract
me.  I read more of the diplomatic cables published on the DOS
NCD server.  With my insatiable curiosity and interest in
geopolitics, I became fascinated with them.  I read not only
cables on Iraq, but also about countries and events I found
interesting.  The more I read, the more I was fascinated by the
way we dealt with other nations and organizations.  I also began
to think that they documented backdoor deals and seemingly
criminal activity that didn't seem characteristic of the de
facto leader of the free world.

c. (U) Up to this point during the deployment, I had issues I
struggled with and difficulty at work.  Of the documents
released, the cables are the only one I was not absolutely
certain couldn't harm the U.S.  I conducted research on the
cables published on NCD, as well as how DOS cables work in
general.  In particular, I wanted to know how each cable was
published on SIPRNet via the NCD.

d. (U) As part of my open-source research, I found a document
published by DOS on its official website.  The document provided
guidance on caption markings for individual cables and handling
instructions for their distribution.  I quickly learned that
caption markings clearly detail the sensitivity level of a DOS
cable.  For example, "NODIS" (No Distribution) was used for
messages of the highest sensitivity, and were only distributed
to the authorized recipients.  The "SIPDIS" (SIPRNet
Distribution) caption was applied only to reporting and other
informational messages that were deemed appropriate for release
to a wide number of individuals.

UNCLASSIFIED

SUBJECT: Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)

e. (U) According to the DOS guidance for a cable to have the
SIPDIS caption it could not include any other captions that were
intended to limit distribution. The SIPDIS caption was only for
information that could be shared with anyone with access to
SIPRNet. I was aware that thousands of military personal, DoD,
DOS, and other civilian agencies had easy access to the cables.
The fact that the SIPDIS caption was only for wide distribution
made sense to me given that the vast majority of the NCD cables
were not classified.

f. (U) The more I read the cables, the more I came to the
conclusion that this type of information should become public.
I once read and used a quote on open diplomacy written after the
First World War, and how the world would be a better place if
states would avoid making secret pacts and deals with and
against each other. I thought these cables were a prime example
of the need for a more open diplomacy. Given all the DOS
information I read, the fact that most of the cables were
unclassified, and that all of the cables had the SIPDIS caption,
I believed that the public release of these cables would not
damage the U.S. However, I did believe the cables might be
embarrassing, since they represented very honest opinions and
statements behind the backs of other nations and organizations.
In many ways, these cables are a catalog of cliques and gossip.
I believed exposing this information might make some within the
DOS and others unhappy.

g. (U) On 28 March 2010, I began downloading a copy of the
SIPDIS cables using the program WGet described above. I used
instances of the WGet application to download the NCD cables in
the background, as I worked on my daily tasks. The NCD cables
were downloaded from 28 March 2010 to 9 April 2010. After
downloading the cables, I saved them onto a CD-RW. These cables
went from the earliest dates in NCD to 28 February 2010. I took
the CD-RW to my CHU on 10 April 2010. I sorted the cables on my
personal computer, compressed them using the BZip2 compression
algorithm described above, and uploaded them to the WLO via the
designated dropbox described above.

UNCLASSIFIED.

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v. Private First Class (PFC) Bradley E. Manning (U)


h. (U) On 3 May 2010, I used WGet to download an update of the cables for the months of March 2010 and April 2010, and saved the information onto a zip file and burned it to CD-RW.  I then took the CD-RW to my CHU and saved them to my computer.

i. (U) I later found that the file was corrupted during the transfer.  Although I intended to resave another copy of these cables, I was removed from the T-SCIF on 8 May 2010, after an altercation.

UNCLASSIFIED

12. (U) Facts regarding the unauthorized storage and disclosure of the Gharani (Farah province), Afghanistan 15-6 investigation and videos.

a. (U) In late March 2010, I discovered a U.S. CENTCOM directory on a 2009 airstrike in Afghanistan. I was searching CENTCOM for information I could use as an analyst. As described above, this was something that myself and other analysts and officers did on a frequent basis.

b. (U) As I reviewed the documents, I recalled the incident and what happened. The airstrike occurred in the Gharani village in the Farah Province of Northwestern Afghanistan. It received worldwide press coverage during the time as it was reported that up to 100 to 150 Afghan civilians, mostly women and children, were accidently killed during the airstrike.

c. (U) After going through the report and its annexes, I began to view the incident as being similar to the 12 July 2007 AWT engagements in Iraq. However, this event was noticeably different in that it involved a significantly higher number of individuals, larger aircraft, and much heavier munitions. Also, the conclusions of the report are even more disturbing than those of the 12 July 2007 incident.

d. (U) I did not see anything in the 15-6 report or its annexes that gave away sensitive information. Rather, the investigation and its conclusions help explain how this incident occurred and what those involved should have done, and how to avoid an event like this from occurring again.

e. (U) After reviewing the report and its annexes, I downloaded the 15-6 investigation, PowerPoint presentations, and several other supporting documents to my DCGS-A workstation. I also downloaded three zip files containing the videos of the incident. I burned this information onto a CD-RW and transferred it to the personal computer in my CHU. Either later that day or the next day, I uploaded the information to the WLO website, this time using a new version of the WLO website submission form. Unlike other times using the submission form above, I did not activate the TOR anonymizer.

UNCLASSIFIED

SUBJECT:  Statement in Support of Providence Inquiry -- U.S. v.
Private First Class (PFC) Bradley E. Manning (U)


13.  (U) This concludes my statement and facts for this
providence inquiry.  The point of contact (POC) for this
memorandum is the undersigned at HHC, USAG, Joint Base Myer-
Henderson Hall, Fort Myer, Virginia 22211.

