UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| In re: Grand Jury Subpoena, | ) | |
| | ) | **1-19-dm-00003** |
| CHELSEA MANNING, | ) | |
| | ) | |
| Movant. | ) | |
| | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RELEASE WITNESS

Preliminary Statement

Chelsea Manning is recognized world-wide as a champion of the Free Press and open government. In 2013, Ms. Manning, then an all-source intelligence analyst for the U.S. military, was convicted at a United States Army court martial for disclosing classified information to the public. Her reasons for making the 2010 disclosures of classified information involved her inability to reconcile herself to the knowledge that the United States was engaging in, and concealing, the true nature of modern asymmetric warfare. She took the decision to make those disclosures entirely on her own, with the full knowledge that she was likely to suffer dearly as a result. She was sentenced to thirty-five years imprisonment and a dishonorable discharge.  She was confined under onerous conditions, including but not limited to prolonged solitary confinement, leading U.N. Special Rapporteur on Torture Juan Mendez to classify isolation exceeding 15 days as "cruel and inhumane treatment." In 2017 her sentence was commuted by then-President Barack Obama. She was released from prison in May, 2017.

In early 2019, Ms. Manning was summoned to appear and give testimony before a grand jury sitting in the Eastern District of Virginia. On principle, she refused to answer questions put to her before the grand jury. As a result of her refusal, she was found in contempt by this Court, and was ordered civilly confined until the term of the grand jury expired or such time as she agreed to answer questions, thus "purging" her contempt.

She has been incarcerated since March 8, 2019. The direct and collateral consequences of her confinement have been devastating, severe, and persistent. Nevertheless, her belief that her participation in the Grand Jury investigation will at worst, function to undermine the independence of the free press, and at a minimum, make her complicit in efforts to do so, grow stronger with each loss she suffers. The only lawful purpose for her confinement is to coerce her to give testimony. Because her confinement is not serving and will never serve any coercive purpose, it has become punitive, and the Court must terminate the order of confinement.

Argument

The relevant question in the instant proceeding is not whether Ms. Manning had "just cause" for her refusal to testify. Rather, the inquiry must be into whether her current confinement is likely ever to lead Ms. Manning to testify before the Grand Jury. What little law there is in the Fourth Circuit is unambiguous: If the witness can show by a preponderance of the evidence that there is no reasonable possibility that she will testify, then continued confinement is unconstitutional, and contrary to the mandate of 28 U.S.C. §1826.

The civil contempt sanction is one that may be imposed without the protections afforded criminal defendants. This is because the confinement is conditioned upon the

contemnor's own conduct. Shillitani v. U.S., 86 S.Ct. 1531 (1966). Thus, under both the common law governing the court's traditional contempt powers, and its codification in 28 U.S.C. §1826, civil confinement is intended *only* to be coercive. "If a judge orders continued confinement without regard to its coercive effect upon the contemnor, or as a warning to others who might be tempted to violate their testimonial obligations, he has converted the civil remedy into a criminal penalty." Simkin v. U.S., 715 F.2d 34 (2d Cir. 1983) at 38. In the event that there is no possibility of purging contempt, either because the grand jury has ended, or because the witness is uncoercible, then the confinement serves no further lawful purpose, and the witness must be released. 28 U.S.C. §1826, Shillitani v. United States, 384 U.S. 364 (1966); Armstrong v. Guccione, 470 F.3d 89, 111 (2d Cir. 2006).

     The recalcitrant witness statute sets 18 months as the maximum term of confinement, but that is not to say that all confinement up through 18 months is definitionally coercive. Simkin, overruling the logic of United States v. Dien, 598 F,2d 743 (2d Cir. 1979)). Furthermore, although a long civil confinement does not in itself constitute a due process violation, a witness is not required to demonstrate unusual circumstances in order to show that confinement has lost its coercive impact. Sanchez v. United States, 725 F.2d 29 (2d Cir. 1984). Returning directly to the legislative history of the recalcitrant witness statute, we see in fact that "[a] court is free to conclude at any time that further incarceration of a recalcitrant witness will not cause the witness to relent and testify, and, upon such grounds, to release the witness from confinement." Grand Jury Reform: Hearings on H.R. 94 Before the Subcomm. On Immigration, Citizenship, and

International Law of the House Comm on the Judiciary, 95th Cong., 1st Sess. 713 n. 1 (1977) (statement of Asst. Atty. Gen. Civiletti).

The burden rests with the contemnor to convince the judge of her intransigence, and the district judge retains "virtually unreviewable discretion." Nevertheless, all relevant rulings have made clear that such deference can be extended "only if it appears that the judge has assessed the likelihood of a coercive effect upon the particular contemnor. There must be an individualized decision, rather than application of a policy…" Simkin at 37. *See also* In re Cocilovo, 618 F.Supp. 1378 (S.D.N.Y. 1985); In re Papadakis, 613 F.Supp. 109 (S.D.N.Y. 1985); U.S.v. Buck, U.S. v. Shakur, 1987 WL 15520 (S.D.N.Y. 1987); United States v. Whitehorn, 808 F.2d 836 (4th Cir. 1986); In re Cueto, 443 F. Supp. 857 (S.D.N.Y. 1978). The judge's virtually unreviewable discretion therefore "detracts in no way from our duty to follow the clear pronouncements of a higher court…[which] compels a finding" that a truly intransigent witness, "ready, willing, and able to persist in [his] defiance," be set free. In re Dorie Clay, 1985 WL 1977 (S.D.N.Y. 1985).

Several factors play into the individualized determination of a witness's intransigence. These include the length of confinement, the witness's connection with the activity under investigation and continued need for the witness's unique evidence, the articulated moral basis for the refusal, the witness's perception of community support, and the witness's conduct and demeanor. These are factors that have been used as the basis for judges' individualized assessments, although the weight, or even the presence of each factor in any given inquiry appears to be entirely at the discretion of the judge. See, generally, In re Cueto, 443 F.Supp. 857 (S.D.N.Y.)(two women working for Episcopal

Church released after ten months, based on "humane factors" as well as their unwavering belief, supported by the church, that they were suffering religious persecution); In re Dohrn, 560 F.Supp. 179 (S.D.N.Y. 1983) (Witness released despite Judge's antipathy, based on the intransigence of her beliefs and the diminished need for her cooperation); Clay, supra, at 4, (Contemnor released based on her intransigence, despite the need for her unique and relevant testimony: "To infer that a [grand jury resister] is likely to remain silent … does not require a great leap of logic. That she is wrong is beside the point." at 2.); Buck, supra, (contemnors' motions granted *prior to confinement* based on the strength of their convictions); Cocilovo, (contemnor released after ten months with no indication that he would yield); In re Thomas, 614 F.Supp. 983 (S.D.N.Y. 1985) (contemnor released based on her articulated principles, strengthened by her awareness of "the collective disapproval that would follow a decision to testify." at 984.").

There are cases that say a mere assertion is insufficient, but these do not countervail so much as confirm the underlying theory that the contemnor must in all actuality be able to show that they are uncoerceable. Papadakis, *supra*, (Finding that the contemnor's desire to "obtain the fruits of his friends' criminal activity," however ignoble, precluded the possibility of his ever testifying); In re Grand Jury Proceedings, 2001 WL 527401 (E.D.N.Y. 2001) (release denied; sole evidence was contemnor's "bald assertion" that he would not cooperate); S.E.C. v. Princeton Economic International, Ltd., 152 F.Supp.2d 456 (S.D.N.Y. 2001) (release denied because contemnor's desperate and disingenuous paper-shuffling convinced the Judge only that he was in fact susceptible to the coercive effects of incarceration).

Furthermore, unlike a criminal case in which a defendant might be persuaded that they have run out of viable legal options, "judicial process is never truly 'exhausted' for a civil contemnor because [...] the Court has a continuing obligation to assess the efficacy of confinement. [...] There will thus never come a time for [a contemnor] where his only remaining option is to cooperate." In re Grand Jury Proceedings, 994 F. Supp. 2d 510, 519 (S.D.N.Y. 2014).

The overwhelming majority of relevant law stems from the Second Circuit. However, the *Simkin/Sanchez* rule has been endorsed and adopted by courts in the The 1st, 3d, 4th, 6th, 7th, 9th, and 11th Circuits. *See* In re Grand Jury Proceeding, 13 F.3d 459 (1st Cir. 1994); In re Impounded, 178 F.3d 150 (3d Cir. 1999); United States v. Whitehorn, et al, 808 F.2d 836 (4th Cir. 1985); United States v. Adams, 2012 WL 2953075 (N.D.W.V. 2012); United States v. Hallahan, 768 F.2d 754 (6th Cir. 1985); United States v. Jones, 880 F.2d 987, 989 (7th Cir. 1989); Matter of Crededio, 759 F.2d 589, 592 (7th Cir. 1985); United States v. Clough, 946 F.2d 899 (9th Cir. 1991); In re Grand Jury Proceedings, 877 F.2d 849 (11th Cir. 1989).

However counter-intuitive, the state of the law with respect to civil confinement is clear. The sole lawful purpose of confinement is to exert a coercive effect upon a recalcitrant witness. In the absence of a reasonable expectation of coercing testimony, confinement has exceeded its lawful scope, and must be terminated.

This is the impasse at which we have arrived.

Chelsea Manning is known globally for being a person who acts on principle, even at great risk and harm to herself. This is core to her identity, and she has quite

publicly persisted in her various stances in the face of opprobrium, severe punishment, and profound disruptions to her daily life, including her instant incarceration.

Ms. Manning has well-founded reasons to believe the subpoena issued to her is an abuse of process, and may have been propounded on the basis of unlawful electronic surveillance. She has litigated these issues, and believes the decisions of the District and Circuit Courts denying her motions to quash, and denying that she has just cause for her refusal to testify, are incorrect. But above and beyond these legal issues, she is convinced that to cooperate with this grand jury would be a betrayal of her beliefs about the grand jury process, and this grand jury process in particular. She is prepared to suffer the consequences for her beliefs, and it should surprise nobody to find that she has the courage of her convictions.

Upon filing her initial motion to quash, Ms. Manning issued a public statement affirming that she would not cooperate with this or any other grand jury. Upon being found in contempt, Ms. Manning reiterated that statement. She made these statements prior to her confinement with the full knowledge that her liberty is precious, and that being reincarcerated would likely cause and compound physical health issues related to her recent surgery and mental health struggles stemming from her previous incarceration. She took a very public decision, making herself accountable to her friends and political community, with the full knowledge that her career as a writer and public speaker would be radically disrupted. In spite of the imminent harm she faced, she made her position clear: under no circumstances will she cooperate. After her appeal was denied by the Fourth Circuit, she stated "While I miss home, they can continue to hold me in jail, with all the harmful consequences that brings. I will not give up." Press Release, April 22,

2019. She made that statement after having already spent nearly two months in jail, and suffering severe physical and emotional, as well as economic and professional harms.

As is made clear in Chelsea's declaration, she is suffering severe physical, emotional, and career consequences. But the severity of these negative impacts is matched only by the strength of her commitment to her principles, and no amount of suffering will change her mind. see <u>Declaration of Chelsea Manning</u> annexed hereto. Given that the central inquiry here must be the strength of her conviction and the likelihood that her testimony will be coerced, every case decided under the <u>Shillitani</u>/ <u>Simkin</u> precedent militates in favor of her release on this factor.

Ms. Manning has been well-supported by people here and around the world for her decision. She is regarded by some as an international hero, a person of principle who was willing to sacrifice everything in the public interest. The fact of her previous incarceration was abhorrent to huge numbers of people who were outraged by the government's willingness to punish the disclosure, rather than the commission of war crimes. She has become a figurehead of the movement for transgender equity. Amnesty International, the ACLU, the Freedom of the Press Foundation, and many other organizations publicly stated their support for her and called for her release. She has been written about sympathetically by scholars and the press. Her actions are viewed as noble by widely-respected philosophers like Noam Chomsky, historians, historical figures such as Daniel Ellsberg, and her many friends. Her reincarceration on the basis of this subpoena is seen as retaliatory, and is felt as a deep wound by the millions of people across the globe who fought for her release. Her incarceration also strengthens the prevailing view that she is being unjustly targeted by the United States government, and

it is understood as a sacrifice in the name of civil liberties, government transparency, and the integrity of the free press. Her incarceration is understood by historical and legal experts as part of a contribution to a long history of principled resistance to political and press repression. See Cueto, supra, where the support of those people whose approval most mattered to contemnors was deemed a significant factor for their release; Clay, supra, in which the support of the contemnor's community played a part in her release; and a contemnor whose "status as a hero" militated against his further confinement. Matter of Ford 615, F.Supp. 259 (S.D.N.Y. 1985). Like those contemnors released on the basis of their rigid unwillingness to cooperate, Ms. Manning is supported in her beliefs by the people about whose opinion she cares. To agree to cooperate would be to betray her own principles, and also her reputation.

At this point, given the sacrifices she has already made, her strong principles, her strong and growing support community, and the disgrace attendant to her capitulation, it is inconceivable that Chelsea Manning will ever change her mind about her refusal to cooperate with the grand jury.

Despite having lost her relatively newfound liberty and nascent stability, Ms. Manning has been steadfast in her silence. Even in the face of sympathetic reminders that she may end her confinement by agreeing to testify she has been adamant in her resolve.

As set forth in her declaration, Ms. Manning has endured great psychological and physical harm as a result of her confinement. Not only has she remained unwavering, her commitment is reinforced by her suffering. That is, inasmuch as Ms. Manning believes that her suffering is in the service of her convictions, her continued anguish is a painful confirmation of her righteousness. Moreover, every fresh insult associated with her

imprisonment serves only to vindicate her beliefs about the failures of the legal system to comport with the government's claims to justice.

Since the law requires an individualized assessment of a contemner's susceptibility to coercion, denials of motions for release have been made on the basis of the contemner's failure to convince the court that confinement is no longer coercive. For example, some contemnors appear to submit no more than a bare claim, unsupported by evidence, that they will not cooperate. In re Grand Jury Proceedings, 2001 WL 527401 (E.D.N.Y. 2001). In another case, release was denied due to the fact that his "decision not to testify [appeared] not to be a matter of absolute principle, but a reflection of [his] view that it is not yet in his personal interest to testify." United States v. Salerno, 632 F.Supp. 529 ( S.D.N.Y. 1986). Release has been denied where a contemnor's desperation resulted in profligate and ever-stranger requests for relief, leading the Court to conclude that confinement was in fact having precisely the desired effect. S.E.C. v. Princeton Economic International, Ltd, 152 F.Supp.2d 456 (S.D.N.Y. 2001).

On the other hand, where a moral basis for the refusal was clearly articulated, the Court determined that release was no less than mandatory under the law, notwithstanding the judge's frustration, which he expressed at great length, at what he considered a perverse outcome. In re Grand Jury Proceedings, 994 F.Supp 2d 510 (S.D.N.Y. 2014), see also In re Duran, No. 12-GJ-149, 2014 WL 7140454 (W.D. Wash. Dec. 12, 2014).

Ms. Manning's articulated moral reasons for her refusal to testify, supported by the many letters and affidavits of her friends, family, supporters, and those who know her in a professional capacity, stand in stark contrast to the self-serving, or unsupported statements of a contemnor who merely seeks the most expedient route home. As should

be clear from her declaration and those of her supporters, she is a deeply principled woman, who has already suffered, and expects to continue to suffer in various ways, as a result of standing by her principles. Whatever one may make of her beliefs, it is evident that they are well-developed, robust, and sincerely held. She will cleave to them as her most trustworthy touchstone.

## Conclusion

As Ms. Manning's resolve not to testify has been unwavering, and as her moral conviction, for which she is deservedly renowned, has become only more developed since her confinement, her incarceration is no longer serving its coercive purpose. For that reason, the motion should be granted in its entirety.


Respectfully Submitted,
By Counsel


Dated: May 5, 2019

/s/ Moira Meltzer-Cohen
MOIRA MELTZER-COHEN
*(pro hac vice)*
277 Broadway, Suite 1501
New York, NY 10007
347-248-6771
mo_at_law@protonmail.com

/s/ Sandra Freeman
SANDRA C. FREEMAN (VSB# 78499)
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004
sandra.c.freeman@protonmail.com

/s/ *Chris Leibig*
CHRISTOPHER LEIBIG (VSB#40594)
114 N. Alfred Street
Alexandria, Virginia 22314
703-683-4310
chris@chrisleibiglaw.com

/s/ Vincent J. Ward
VINCENT J. WARD
*(pro hac vice pending)*
Freedman Boyd Hollander Goldberg Urias & Ward, P.A
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
505-842-9960
vjw@fbdlaw.com